relies on the facts in the record and the construction of the insurance policy at issue. Plaintiffs will agree that the construction of a contract of insurance presents a question of law for the court. Aetna Life & Cas. Co. v. Bulaong, 588 A.2d 138, 142 (Conn. 1991).

### B. Standard for Construing Insurance Policies Under Connecticut Law.

Under Connecticut law, the terms of an insurance contract are construed according to the general rules of contract construction. Schultz v. Hartford Fire Ins. Co., 569 A.2d 1131, 1134 (Conn. 1990). The policy language controls the extent of coverage. Enfield Pizza Palace, Inc. v. Ins. Co. of Greater New York, 755 A.2d 931, 934 (Conn. App. 2000). Courts give the words used in a policy their natural and ordinary meaning. Shilberg Integrated Metals Corp. v. Continental Cas. Co., 819 A.2d 773, 789 (Conn. 2003); Kelly v. Figueiredo, 610 A.2d 1296, 1298 (Conn. 1992). Courts do not indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties. Schultz, supra, 569 A.2d at 1135.

> The determinative question is the intent of the parties as to what coverage the insured expected to receive and what the insurer was to provide, as disclosed by the provisions of the policy. If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning.

Western World Ins. Co. v. Peters, 989 F. Supp. 188, 190-91 (D. Conn. 1997) (citations and internal quotation marks omitted).

Determining whether an ambiguity exists is a threshold question of law for the court. Hansen v. Ohio Cas. Ins. Co., 687 A.2d 1262, 1265 (Conn. 1996). The trial court will not create an ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings. Schultz, 569 A.2d at 1135.

## II. NONE OF THE CLAIMS FOR WHICH COVERAGE IS SOUGHT WAS MADE DURING THE POLICY PERIOD

Insuring Agreements A and B in Section I of the Policy provide coverage for Loss incurred by Directors and Officers of CBC as a result of a Claim first made during the Policy Period against the Directors and Officers for a Wrongful Act that took place during or prior to the Policy Period. Complaint, Ex. A, Sections I(A) and I(B). Section IV(A) of the Policy defines "Claim" as:

> 1) a written demand for civil damages or other civil relief commenced by the Insureds' receipt of such a demand;
>
> 2) a civil proceeding commenced by the service of a complaint or similar pleading; or
>
> 3) a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document.
>
> against Directors or Officers or, with respect to Insuring Agreement (C), the Company, for a Wrongful Act, including any appeal therefrom.

Id., Section IV(A).

The Policy Period expired at 12:01 a.m. on July 1, 2002. Id. at Declarations. In their Complaint, Plaintiffs seek coverage for loss incurred by them as a result of the following:

- The Megaler Action, a lawsuit brought by a former depositor of CBC in October 2002;

- A regulatory proceeding brought by the FDIC in November 2002 and a regulatory proceeding brought by the CDOB in November 2002. (Plaintiffs lump these two proceedings together as the "FDIC Action.")

- A "Threatened Shareholder Action" made in a letter dated January 3, 2003.

Complaint at ¶ 2.

None of these actions was brought before July 1, 2002, when the Policy Period expired. In fact, in their Complaint, Plaintiffs do not identify any Claim, as defined by the Policy, made during the Policy Period against any Directors or Officers for a Wrongful Act.

It is clear that no such Claim was made: the FDIC Dismissal Order issued during the Policy Period did not make any demand upon, seek relief from or commence any proceeding against any Director or Officer; it merely orders CBC to dismiss Lenz and Weand.[8]  Similarly, the CDOB's application for a court order naming the FDIC as receiver was not a Claim against any Director or Officer.  The application noted deficiencies, including management weaknesses, but made no demand upon and sought no relief from any Insured.  Finally, neither the application nor the resulting court order constituted a "notice of charges" or "formal investigative order" against the Directors or Officers – as noted above, those documents were not issued until November 2002.[9]  Based on the clear and unambiguous terms of the Policy, therefore, Plaintiffs can only prevail in this coverage action if Hartford received adequate notice

---

[8]  The FDIC Dismissal Order is not a Claim made against CBC, in large part because, under Insuring Agreement C, the Policy provides coverage for direct liability of CBC only for "Securities Claims" and "Employment Practices Claims." Complaint, Ex. A, Section I(C) and Endorsement No. 7.  Section IV(M) of the Policy defines a Securities Claim as a Claim by a Securities holder that alleges a violation of the federal or state securities laws or arises from the purchase or sale of, or offer to purchase or sell, Securities issued by CBC.  Id., Section IV(M). Pursuant to Endorsement No. 7 to the Policy, an Employment Practices Claim is one that is brought by or on behalf of a past, present or prospective employee of CBC.  Id., Endorsement No. 7.  Accordingly, neither the FDIC Dismissal Order, its takeover of CBC nor any of the other matters described in the Complaint constitute Claims against CBC.

[9]  Even if the CDOB *ex parte* application to the Superior Court could be deemed a Claim made against Directors or Officers during the Policy Period, coverage for that Claim would be precluded because notice of the *ex parte* application was not provided to Hartford within "sixty days after the termination of the Policy Period" as required by Section I of the Policy.

during the Policy Period of the specific Wrongful Acts alleged in the Claims for which Plaintiffs seek coverage.

III.  **THE CORRESPONDENCE TO HARTFORD PRIOR TO THE EXPIRATION OF THE POLICY PERIOD DID NOT PROVIDE NOTICE OF THE SPECIFIC WRONGFUL ACTS THAT GAVE RISE TO THE CLAIMS FOR WHICH COVERAGE IS NOW SOUGHT**

   A.  **The Notice Provisions in a Claims-Made Policy Define The Scope of Coverage**

Coverage under a "claims-made" policy, as opposed to an "occurrence" policy, is only triggered when a claim is made or deemed to have been made during the policy period. Appleman, 7A Insurance Law and Practice §4504.01 at 312 (Berdal ed., 1979). When an "occurrence" policy expires, the insurer still has what is known as "tail" exposure – i.e. potential exposure for claims or suits that may be asserted at some later point as the result of an unreported occurrence having taken place during the policy period. When a "claims-made" policy expires, however, it is easy for an insurer to know whether it will have any continuing liability. If a claim has been made during the policy period, the insurer has ongoing exposure in connection with that claim. If no claim has been made, the insurer has no "tail" exposure and it can close its books. See ITC Investments, Inc. et al. v. Employers Reinsurance Corporation, 2000 Conn. Super LEXIS 3544, *16-18. See also LaForge v. American Casualty Company of Reading, PA 37 F.3d 580, 584 (10th Cir. 1994); F.D.I.C. v. Mijalis, 15 F.3d 1314, 1330 (5th Cir. 1994) (quoting Burns v. Int'l Ins. Co., 709 F. Supp. 187, 191 (N.D. Cal. 1989), affirmed, 929 F.2d 1422 (9th Cir. 1991)).

From an insurer's perspective, "claims-made" policies offer greater certainty. They allow an insurer to establish reserves without having to consider factors such as the possibility of inflation after the end of the policy period or changes in legal standards applicable to its insureds.

ITC Investments, supra, 2000 Conn. Super LEXIS at *17-18. In exchange for this certainty, an insurer charges a lower premium for "claims-made" coverage and the policy will cover acts, errors and omissions occurring before its inception – coverage that would be unavailable under an "occurrence" policy. Id.

Under "claims-made" policies, as long as the insured renews its policy from year to year, coverage will be in place if and when a claim is made. But if an insured's coverage lapses or is canceled, the insured will lose coverage for claims that were not asserted before coverage expired. Many "claims-made" policies contain a feature designed to alleviate this situation and to allow an insured to enjoy continuity of coverage when it obtains replacement coverage. Under this feature, known variously as a "notice of circumstances" or "notice of potential claim" provision – an insured can give its insurer written notice during the policy period of a specific Wrongful Act of which the insured becomes aware during the policy period, if the insured believes that Wrongful Act may later give rise to a claim. If the insured does so, then a claim asserted against the insured after the expiration of coverage will be treated as having been made during the policy period, but only if that claim arises out of the specific Wrongful Act of which notice was given. Thus, the giving of written notice of "potential Claims" becomes a second "trigger" of coverage under a "claims-made" policy – as long as the notice is given during the policy period and with the required particularity. Because the notice provisions in "claims-made" policies define the scope of coverage, the express requirements are strictly construed and satisfactory notice becomes a condition precedent to coverage. ITC Investments, supra, 2000 Conn. Super LEXIS at *37-38; see also Home Ins. Co. v. Adco Oil Co., 154 F.3d 739, 742 (7th Cir. 1998).

### B.    The Notice Provided To Hartford By CBC

Under Section VIII(A) of the Policy, an Insured may give notice during the Policy Period of a potential Claim:

> [i]f during the Policy Period the Insureds become aware of a specific Wrongful Act that may reasonably be expected to give rise to a Claim against any Director or Officer . . . and if such Wrongful Act is reported to the Insurer during the Policy Period in writing with particulars as to the reasons for anticipating such a Claim, the nature and dates of the alleged Wrongful Act, the alleged damages sustained, the names of potential claimants, any Director or Officer involved in the alleged Wrongful Act and the manner in which the Insureds first became aware of the specific Wrongful Act, then any Claim subsequently arising from such duly reported Wrongful Act shall be deemed under this Policy to be a Claim made during the Policy Period in which the Wrongful Act is first duly reported to the insurer.

Complaint, Ex. A, Section VIII(A).

Based on this plain language, coverage for the Megaler Action, the "FDIC Action" (including the CDOB regulatory proceeding) and the Threatened Shareholder Action could only be triggered if the Insureds gave Hartford notice of a specific Wrongful Act with the requisite particulars prior to July 1, 2001 at 12:01 a.m., and if that specific Wrongful Act subsequently gave rise to the Claims in question.

The only notice received by Hartford during the Policy Period was the letter from CBC's Darren Schulman enclosing the FDIC Dismissal Order. Palermini Aff., Ex. 6. (Swett & Crawford's correspondence was sent and received after 12:01 a.m. on July 1, 2002. Palermini Aff., Ex. 7) Any coverage for subsequent Claims must, therefore, arise from any specific Wrongful Acts described in detail, together with the other particulars required by the Policy, in the Schulman letter and the Dismissal Order. The Schulman letter states:

> I write to provide you with notice in connection with the above-referenced policy.

- 16 -

> It has come to the attention of the Connecticut Bank of Commerce (the "Insured") that its directors and officers, including but not limited to its Chairman Randolph W. Lenz and its President and CEO J. Donald Weand, Jr., may be subject to claims for wrongful acts. The Insured learned about this matter on Tuesday, June 25, 2002, when it[s] directors and senior management met with representatives of the Federal Deposit Insurance Corporation ("FDIC") and the State of Connecticut Banking Department. Attached to this letter is the Prompt Corrective Action Directive Ordering Dismissal issued by the FDIC on June 25, 2002, which describes the information that the Insured has obtained at this point in time.

Palermini Aff., Ex. 6.

The Dismissal Order was the only document attached to the Schulman letter. Palermini Aff., ¶ 8. The Dismissal Order does not describe Wrongful Acts of any persons other than Lenz and Weand, who were found to have caused or permitted CBC to engage in lax, preferential and hazardous lending activities. Palermini Aff., Ex. 6, Dismissal Order at ¶¶ 1(a) and 2(b). The Dismissal Order refers to an "apparently fraudulent scheme or unlawful and unsound lending whereby [Lenz and Weand] caused or permitted the Bank to purchase another financial institution, MTB Bank . . . with $20 million of the Bank's own existing funds" instead of through the infusion of $20 million in new capital as required by the FDIC. Id. at ¶¶ 1(e) and 2(b). According to the Dismissal Order, the scheme was accomplished

> through more than $20 million in loans that [Lenz] caused or permitted the Bank to make to nominee borrowers and others, including related interests of Respondent Lenz. That same money was later transferred to Respondent Lenz or his related interests, who transferred it to the Bank in the form of capital purportedly to satisfy the condition to purchase MTB. The result was that the Bank's capital was inflated by $20 million more than it actually was. Respondent Lenz subsequently concealed the scheme from FDIC examiners.

Id. at ¶ 1(e).

Based on the foregoing, it is clear that Dismissal Order did not satisfy the requisite notice under Section VIII(A) of the Policy. The only acts reported to Hartford with particularity was the following conduct of Lenz and Weand:

- Lenz referred to CBC a hazardous line of credit beginning on November 8, 2000 to finance gaming operations in Latin America; Id. at ¶ 1(d)

- Lenz added another hazardous line of credit on December 1, 2001 for a sale-leaseback arrangement where CBC purchased slot machines in Panama; Id.

- Lenz engaged in an apparently fraudulent scheme "beginning the first quarter of 2000" involving CBC's purchase of MTB Bank in New York, artificially inflating CBC's capital by $20 million, and that Lenz hid the scheme from FDIC examiners; Id. at ¶ 1(e)

- Weand was responsible for and was the originating officer for some aspects of the MTB scheme. Id. at ¶ 2(b).

No other Wrongful Acts are specified. Moreover, no correspondence to Hartford during the Policy Period ever described the "reasons for anticipating such a Claim [against the Plaintiffs], the nature and dates of the alleged Wrongful Act [by Plaintiffs from which such anticipated Claim may arise, or the] alleged damages sustained."

C.    **The Megaler Action Alleges Different Wrongful Acts By Different Directors**

The claimant in the Megaler Action is a depositor in CBC. Complaint, Ex. G, ¶ 18. The Wrongful Acts alleged by Megaler consist of misrepresentations made by a CBC officer, Eduardo Martin, and negligence by CBC's directors in supervising and preventing Martin from making such misrepresentations. Id. at ¶¶ 22-24, 53. Megaler also alleges that CBC's directors breached their duty to plaintiff as a depositor to disclose the bank's financial condition. Id. at ¶ 41. Megaler seeks damages of $2,693,103.18, which it deposited in its CBC account following Martin's alleged misrepresentations. Id. at ¶24.

- 18 -

The FDIC Dismissal Order, which was the only information provided to Hartford during the Policy Period, did not set forth either the name of the potential claimant (Megaler), the nature and dates of the alleged misrepresentations to Megaler, the alleged damages of $2.7 million in deposits, or the names of any of the defendants named by Megaler, other than Lenz. Palermini Aff., Ex. 6, Dismissal Order. Accordingly, because the information set forth in the Dismissal Order does not encompass the particulars as to the Megaler claim, that action is outside the scope of coverage.[10] See, e.g., Am. Home Assurance Co. v. Abrams, 69 F. Supp. 2d 339, 347-50 (D. Conn. 1999) (holding that a letter that expressed concern that claims might arise but did not explain the circumstances that might lead to a claim or give an explanation as to why claims were likely to arise was insufficient notice of a potential claim); FDIC v. Mijalis, 15 F.3d 1314, 1335-36 (5th Cir. 1994) ("non-specific communications merely disclosing that events have occurred do not satisfy the requirement of notice of potential claims"); FDIC v. Caplan, 838 F. Supp. 1125, 1130 (W.D. La. 1993) (holding the insured had provided insufficient notice of a potential claim where it had merely identified the source of potential claims, but provided no information regarding the types of practices alleged to constitute wrongful acts, the insureds involved in the alleged wrongdoing, or the time period of the alleged wrongful acts); and Sapp v. Greif, No. 97-3200, 1998 U.S. App. LEXIS 6668, at *14-15 (10th Cir. Apr. 3, 1998) (unpublished case) (holding that notice of a potential claim was insufficient where the insurer had received from the FDIC a letter providing a general description of "wrongful acts" but failed to mention misapplication of funds which was the basis for the claim that ultimately arose, and

---

[10] Hartford reserves and does not waive its right to assert that, if the Court deems the matters for which Plaintiffs seek coverage to be a Claim made during the Policy Period, coverage may be precluded based on the other terms, conditions and exclusions of the Policy.

did not mention by name either the individual insured against whom the claim was brought or the party who brought the claim).

### D. The FDIC Action Alleges Different Wrongful Acts by Different Directors

The FDIC Action, which by Plaintiffs' definition consists of regulatory proceedings by the CDOB and the FDIC on November 22, 2002, elaborates upon the Dismissal Order's allegations regarding Lenz's and Weand's conduct of the $20 million MTB scheme. Palermini Aff., Ex. 2 and Ex. 3. As noted above, however, the FDIC Dismissal Order does not name any director or officer other than Lenz and Weand. With regard to Wrongful Acts by the Plaintiffs, the FDIC Proceeding goes further than the Dismissal Order and alleges that CBC's directors wrongfully approved "a number of large, commercial loans" totaling $20,000,000 on March 22, 2000, seven loans on June 21, 2000, thirteen "additional related loans" between April 2000 and February 2001, and eight extensions and two new loans on June 23, 2002. Palermini Aff., Ex. 2, ¶¶ 39, 74, 87, 105 and 107. The CDOB Proceeding identifies only 16 loans in March 2000 as the basis for Marks's liability. Palermini Aff., Ex. 3, ¶ 10. <u>None</u> of these specific loans is described in the Dismissal Order that was provided to Hartford as notice of potential Wrongful Acts.

In summary, both regulatory proceedings – what Plaintiffs term the "FDIC Action" – arise out of the Plaintiffs' approval of loans. However, neither the FDIC Dismissal Order nor the June 26, 2002 letter from CBC to Hartford identified the Plaintiffs' approval of specific loans as Wrongful Acts, even though such specificity is required by Section VIII(A) of the Policy. Instead, the materials submitted to Hartford described only wrongful conduct of Lenz and Weand and advised Hartford that the Dismissal Order contained all of "the information that the Insured has obtained at this point in time." Thus, the correspondence to Hartford describing the specific

Wrongful Acts of Lenz and Weand did not provide the requisite notice of potential claims for Wrongful Acts by Cuevas, Dunlap, Levine, Reed and Asche.

IV.  **IN ANY EVENT, THE POLICY EXCLUDES CLAIMS MADE BY THE FDIC AND CDOB**

Even if the FDIC Action (as Plaintiffs define it) could be deemed a Claim made during the Policy Period, it would be entirely excluded from coverage pursuant to Endorsement No. 4 to the Policy, which excludes Loss from

> any Claim made against the Directors and Officers . . . brought by or on behalf of the Resolution Trust Corporation, Office of Thrift Supervision, Federal Deposit Insurance Corporation, the Comptroller of the Currency, or similar federal or state supervisory or regulatory authority.
>
> In the event, however, of a judgment or other final adjudication establishing no liability on the part of any Insureds for any Claim(s) which would otherwise be excluded by the terms of this Endorsement, the Insurer hereby agrees that the Claims Expenses with regard to any such Claim(s) shall not be excluded [subject to a specified limit].

Complaint, Ex. A, Policy Endorsement No. 4.

The FDIC and CDOB Proceedings constitute Claims made against Directors and Officers brought by the FDIC and a "similar state supervisory or regulatory authority" in November 2002. Because of Endorsement No. 4, there is no coverage under the Policy for any liability the Insureds may have incurred by reason of those matters.  See, e.g., Slaughter v. Am. Cas. Co., 37 F.3d 385, 386-87 (8th Cir. 1994) (applying a similar regulatory exclusion to preclude coverage of an action brought against an insured bank by the Resolution Trust Corporation).  There is no evidence in the record of any "judgment or other final adjudication establishing no liability on the part of any Insureds."  Accordingly, Hartford respectfully requests that this Court grant summary judgment in Hartford's favor with respect to the FDIC and CDOB Proceedings on the

basis that any Loss from those proceedings is excluded from coverage under the terms of Endorsement No. 4.

## V. THERE IS NO COVERAGE FOR ANY THREATENED OR FUTURE CLAIMS AGAINST THE PLAINTIFFS

In addition to seeking coverage for the matters that have actually been brought (the Megaler Action and the FDIC Action), Plaintiffs' Complaint seeks a declaration of coverage for unspecified "future claims that may be filed" arising from the dismissal of CBC's Chairman, President and CEO and the FDIC's appointment as Receiver for CBC and the reasons therefor. Complaint at ¶ 2.

There is no evidence in the record that any such "future claims," including the Threatened Shareholder Action, have been filed against the Plaintiffs. Accordingly, coverage for such claims cannot be triggered. Even in the absence of actual claims, however, Hartford submits that the Court may grant summary judgment in Hartford's favor on the basis that, as noted in more detail above, no Wrongful Acts by the Plaintiffs were ever reported to Hartford during the Policy Period. Similarly, during the Policy Period, Hartford did not receive any report of potential claimants against Plaintiffs, the alleged damages sustained or the reasons for anticipating any "future claims" against them.

By failing to provide notice to Hartford with the particularity required by Section VIII(A) of the Policy, the Plaintiffs failed to preserve coverage for any "future claims" brought against them. Accordingly, Hartford respectfully requests that the Court find that no future claims against the Plaintiffs are eligible to be deemed made during the Policy Period.

## CONCLUSION

Plaintiffs' Complaint asks for a declaration of insurance coverage under Hartford's claims-made Policy for the Megaler Action, the "FDIC Action," and "future claims" including a

"Threatened Shareholder Action." The Megaler and FDIC Actions were brought after the Policy Period expired, the Threatened Shareholder Action has not been brought, and the unspecified "future claims" are still in the future. Plaintiffs failed to provide Hartford with notice of specific Wrongful Acts with sufficient particularity to preserve coverage for any Claims that have been or may be made against them after the Policy Period expired.

For the foregoing reasons, Hartford respectfully requests that the Court grant summary judgment on the Complaint in its favor and against Plaintiffs, and Hartford further requests that the Court award Hartford all of its counsel's fees and expenses incurred in connection with this action.

Dated: December 3, 2004

Respectfully submitted,

W. Joe Wilson (ct22292)
jwilson@tylercooper.com
William H. Champlin III (ct04202)
champlin@tylercooper.com
TYLER COOPER & ALCORN, LLP
185 Aslyum Street
CityPlace/35th Floor
Hartford, CT 06103-3488
(860) 725-6200
Fax (860) 278-3802
*Attorneys for Defendant*
*Hartford Insurance Company of Illinois*

Of Counsel:   Alan J. Joaquin
              Alison M. Jarandeh
              DRINKER BIDDLE & REATH
              1500 K Street N.W.
              Suite 1100
              Washington, D.C. 20005
              (202) 842-8800
              Fax (202) 842-8465

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARSHALL ASCHE, STEVEN B. LEVINE, TIMOTHY S. REED, MARCIAL CUEVAS and JACK WILLIAM DUNLAP, <br><br> Plaintiffs, <br><br> v. <br><br> HARTFORD INSURANCE COMPANY OF ILLINOIS, <br><br> Defendant. | Case No. 303CV0416 PCD <br><br> **CERTIFICATE OF SERVICE** |

W. Joe Wilson, an attorney admitted to practice in the United States District Court for the District of Connecticut certifies, pursuant to 28 U.S.C. §1746, under penalty of perjury, that on December 3, 2004, I served the attached Memorandum of Law Supporting Motion for Summary Judgment upon all counsel of record in this action by depositing true copies of the same, each enclosed in a pre-paid envelope, in a depository maintained by the United States Postal Service in the City and State of Connecticut, addressed to the following at the address provided by each for that purpose, to wit:

Charles A. Stewart, III
Stewart Occhipinti LLP
1350 Broadway, Ste. 2200
New York, NY 10018

Richard P. Weinstein
Weinstein & Wisser P.C.
29 South Main Street, Suite 207
West Hartford, CT 06107

Dated: December 3, 2004

_____
W. Joe Wilson