FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D. C.

| | |
|---|---|
| In the Matter of:<br><br>RANDOLPH W. LENZ, J. DONALD WEAND, JR., MARCIAL CUEVAS, JACK W. DUNLAP, STEVEN B. LEVINE, TIMOTHY S. REED, BRIAN A. MARKS, and MARSHALL C. ASCHE, individually and as former institution-affiliated parties of<br><br>CONNECTICUT BANK OF COMMERCE STAMFORD, CONNECTICUT<br><br>(INSURED STATE NONMEMBER BANK) (IN RECEIVERSHIP) | FDIC-02-174e<br>FDIC-02-158e<br>FDIC-02-160c&b<br>FDIC-02-161c&b<br>FDIC-02-175k<br>FDIC-02-176k<br>FDIC-02-177k<br>FDIC-02-178k<br>FDIC-02-179k<br>FDIC-02-180k<br>FDIC-02-181k<br>FDIC-02-182k |

NOTICE OF INTENTION TO PROHIBIT FROM FURTHER
PARTICIPATION; NOTICE OF CHARGES FOR ORDERS OF RESTITUTION
AND OTHER APPROPRIATE RELIEF;
NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES,
FINDINGS OF FACT AND CONCLUSIONS OF LAW;
ORDER TO PAY; AND NOTICE OF HEARING

The Federal Deposit Insurance Corporation ("FDIC") has determined that Randolph W. Lenz ("Respondent Lenz") and J. Donald Weand, Jr. ("Respondent Weand"), individually and as former institution-affiliated parties of Connecticut Bank of Commerce, Stamford, Connecticut ("CBC" or "Bank"), have each directly or indirectly participated or engaged in violations of an order to cease and desist, violation of a condition imposed in writing by the FDIC in connection with the grant of a CBC application, unsafe or unsound banking practices which involved a reckless disregard for the law, violations of laws, rules, and regulations, and/or acts, omissions, or practices which constituted breaches of their fiduciary duty as officers or directors of CBC;

NOV-25-2002 13:35 FROM:G-LOG LEGAL        2039254894         TO:212+819+7583        P.005/060

that CBC has suffered financial loss or other damage, that the interests of its depositors have been prejudiced or could be prejudiced and/or that Respondent Lenz and Respondent Weand have each received financial gain or other benefit by reason of such violations, practices and/or breaches of fiduciary duty; and that such violations, practices and/or breaches of fiduciary duty demonstrate Respondent Lenz's and Respondent Weand's personal dishonesty and/or their willful or continuing disregard for the safety or soundness of CBC. Therefore, the FDIC institutes this proceeding for the purpose of determining whether an appropriate order should be issued against Respondent Lenz and Respondent Weand under the provisions of section 8(e) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. § 1818(e), prohibiting said Respondents from further participation in the conduct of the affairs of CBC and any other insured depository institution or organization listed in section 8(e)(7)(A) of the Act, 12 U.S.C. § 1818(e)(7)(A), without prior written approval of the FDIC and any other appropriate Federal financial institutions regulatory agency, as that term is defined in section 8(e)(7)(A) of the Act, 12 U.S.C. § 1818(e)(7)(A).

The FDIC, further being of the opinion that Respondent Lenz and Respondent Weand, individually and as former institution-affiliated parties of CBC, have each engaged in an unsafe or unsound practice in conducting the business of CBC, or have each violated a law, rule, or regulation, or a condition imposed in writing by the FDIC in connection with the grant of a CBC application, institutes this proceeding for the purpose of determining whether an appropriate order should be issued against Respondent Lenz and Respondent Weand under the provisions of section 8(b) of the Act, 12 U.S.C. § 1818(b), to take affirmative action to correct the conditions resulting from such practices and/or violations.

The FDIC, further being of the opinion that Respondent Lenz and Respondent Weand, individually and as former institution-affiliated parties of CBC, have each knowingly violated a law, a regulation, a final order issued by the FDIC pursuant to section 8(b) of the Act, 12 U.S.C. § 1818(b), or a condition imposed in writing by the FDIC in connection with the grant of a CBC application; knowingly engaged in unsafe or unsound practices in conducting the affairs of CBC, and/or knowingly breached a fiduciary duty; and knowingly or recklessly caused a substantial loss to CBC and/or the FDIC as receiver for CBC, or received a substantial pecuniary gain or other benefit by reason of such violations, practices or breaches; hereby assesses civil money penalties against Respondent Lenz and Respondent Weand in the amounts set forth in the accompanying Order to Pay.

The FDIC, further being of the opinion that former CBC directors (hereinafter referred to collectively as "Respondent Directors") Marcial Cuevas ("Respondent Cuevas"), Jack W. Dunlap ("Respondent Dunlap"), Steven B. Levine ("Respondent Levine"), Timothy S. Reed ("Respondent Reed"), Brian A. Marks ("Respondent Marks"), and Marshall C. Asche ("Respondent Asche"), individually and as former institution-affiliated parties of CBC, have violated a law, regulation, or final order issued pursuant to subsection 8(b) of the Act, recklessly engaged in an unsafe or unsound practice in conducting the affairs of CBC, and/or breached a fiduciary duty to CBC; which violation, practice, or breach is part of a pattern of misconduct, caused or is likely to cause more than a minimal loss to CBC, or has resulted in pecuniary gain or other benefit to such individuals; hereby assesses civil money penalties against the Respondent Directors in the amounts set forth in the accompanying Order to Pay.

The FDIC hereby issues:

Case 3:03-cv-00416-PCD   Document 22-5   Filed 01/31/2005   Page 4 of 15

NOV-25-2002 13:36 FROM:G-LOG LEGAL        2039254894        TO:212+819+7583        P.007/060

(A)   A NOTICE OF INTENTION TO PROHIBIT FROM FURTHER PARTICIPATION against Respondent Lenz and Respondent Weand pursuant to section 8(e) of the Act, 12 U.S.C. § 1818(e), and the FDIC's Rules of Practice and Procedure, 12 C.F.R. Part 308 ("FDIC Rules");

(B)   A NOTICE OF CHARGES FOR ORDERS OF RESTITUTION AND OTHER AFFIRMATIVE RELIEF against Respondent Lenz and Respondent Weand, pursuant to section 8(b) of the Act, 12 U.S.C. § 1818(b) and the FDIC Rules;

(C)   A NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES; FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING ("NOTICE OF ASSESSMENT") against all Respondents, pursuant to section 8(i) of the Act, 12 U.S.C. § 1818(i), and the FDIC Rules; and alleges as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FDIC'S JURISDICTION

1.   At all times pertinent to this proceeding until its failure on June 26, 2002, CBC was a corporation existing and doing business under the laws of the State of Connecticut, having its principal place of business at Stamford, Connecticut. CBC had been, at all times pertinent to this proceeding, an insured State nonmember bank, subject to the Act, 12 U.S.C. §§ 1811-1831y, the Rules and Regulations of the FDIC, 12 C.F.R., Chapter III, Regulation O of the Board of Governors of the Federal Reserve System, 12 C.F.R., Part 215 ("Reg O") (made applicable to CBC by section 337.3 of the Rules and Regulations of the FDIC, 12 C.F.R. § 337.3), and the laws of the State of Connecticut.

4

NOV-25-2002 13:36 FROM:G-LOG LEGAL         2039254894          TO:212+819+7583         P.008/060

2. At all times pertinent to the charges herein, Respondent Lenz was the Chairman of CBC's Board of Directors, served on CBC's Credit Committee of the Board ("Credit Committee"), and owned in excess of 80% of CBC's common stock.

3. Respondent Lenz was an "institution-affiliated party" of CBC as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of §§ 8(b), 8(c), 8(e), and 8(i) of the Act, 12 U.S.C. §§ 1818(b), 1818(c), 1818(e) and 1818(i).

4. At all times pertinent to the charges herein, Respondent Weand served as CBC's President, and, up to August 2001, served as CBC's Chief Lending Officer. On or about May 10, 2000, Respondent Weand was approved by CBC's Board of Directors as Chief Executive Officer. At various times pertinent to the charges herein, Respondent Weand served as an "ex-officio" member of the Credit Committee.

5. Respondent Weand was an "institution-affiliated party" of CBC as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of §§ 8(b), 8(c), 8(e), and 8(i) of the Act, 12 U.S.C. §§ 1818(b), 1818(c), 1818(e) and 1818(i).

6. At all times pertinent to the charges herein, Respondent Cuevas was a member of CBC's Board of Directors and served on the Credit Committee.

7. Respondent Cuevas was an "institution-affiliated party" of CBC as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of 8(i) of the Act, 12 U.S.C. § 1818(i).

8. At all times pertinent to the charges herein, Respondent Dunlap was a member of CBC's Board of Directors and served on the Credit Committee.

NOV-25-2002 13:36 FROM:G-LOG LEGAL            2039254894            TO:212+819+7583            P.009/060

9. Respondent Dunlap was an "institution-affiliated party" of CBC as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of § 8(i) of the Act, 12 U.S.C. § 1818(i).

10. At all times pertinent to the charges herein, Respondent Levine was a member of CBC's Board of Directors and served on the Credit Committee.

11. Respondent Levine was an "institution-affiliated party" of CBC as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of § 8(i) of the Act, 12 U.S.C. § 1818(i).

12. At all times pertinent to the charges herein up to November 28, 2001, Respondent Marks was a member of CBC's Board of Directors and served on the Credit Committee.

13. Respondent Marks was an "institution-affiliated party" of CBC as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of § 8(i) of the Act, 12 U.S.C. § 1818(i).

14. At all times pertinent to the charges herein beginning February 14, 2001, Respondent Reed was a member of CBC's Board of Directors and served on the Credit Committee.

15. Respondent Reed was an "institution-affiliated party" of CBC as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of § 8(i) of the Act, 12 U.S.C. § 1818(i).

16. At all times pertinent to the charges herein beginning November 21, 2001, Respondent Asche was a member of CBC's Board of Directors and served on the Credit Committee.

NOV-25-2002 13:37 FROM:G-LOG LEGAL        2039254894         TO:212+819+7583         P.010/060

17.   Respondent Asche was an "institution-affiliated party" of CBC as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of § 8(i) of the Act, 12 U.S.C. § 1818(i).

18.   Prior to joining CBC's Board of Directors, Respondent Asche was employed by BDO Seidman, L.L.P., and served as the client service partner in charge of CBC's external audits from 1993 until he retired in June 2000. From July 1, 2000 through September 30, 2001, Respondent Asche was employed as Chief Financial Officer of Northern Healthcare Inc., an entity affiliated with Respondent Lenz. In that capacity, he was responsible for the financial oversight of three related hospitals, including Fort Lauderdale Hospital Management, a 3/22 Borrower (as hereinafter defined).

19.   The FDIC has jurisdiction over CBC, Respondent Lenz, Respondent Weand, Respondent Cuevas, Respondent Dunlap, Respondent Levine, Respondent Marks, Respondent Reed, Respondent Asche, and the subject matter of this proceeding.

### Background

20.   In or around August, 1992, Respondent Lenz acquired more than 80% of the common stock of Amity Bank, which became CBC upon a change of name in January 1993. From the time Lenz acquired control and continuing until CBC's failure on June 26, 2002, CBC was a troubled institution, with a Uniform Financial Institution Rating System composite rating of either "3", "4" or "5." Throughout the period of time during which the transactions and incidents described hereafter occurred, CBC operated under either a Memorandum of Understanding or a Cease and Desist Order.

NOV-25-2002 13:37 FROM:G-LOG LEGAL          2039254894          TO:212+819+7583          P.011/060

21. On or about March 23, 1999, CBC entered into a Memorandum of Understanding ("MOU") with the FDIC. Among its other provisions, the MOU was created to improve the following areas of CBC's operations:

   a) prudent limitations on extensions of credit to a single obligor;

   b) management's adherence to bank policies;

   c) reduction in levels of adversely classified assets; and

   d) Board of Directors' oversight of transactions with affiliates.

22. On or about November 30, 2001, the FDIC issued a Cease and Desist Order ("C&D"), pursuant to section 8(b) of the Act, 12 U.S.C.§1818(b), against CBC. Among its other provisions, the C&D was designed to improve the following areas of CBC's operations:

   a) the Bank's risk management practices;

   b) management's supervision of the Bank's lending function;

   c) hazardous lending practices, including, but not limited to, failing to follow loan policy guidelines and the need to amend CBC's loan policy to conform to Appendix A to Part 364 of the FDIC's Rules and Regulations; and,

   d) management's inadequate disclosure, due diligence, and oversight of insider-related transactions and potential conflicts of interest.

23. At all times pertinent to the charges herein, Respondent Lenz was an "executive officer" and an "insider" of CBC, as those terms are used in 12 CFR §§ 215.2 (e)(1) and (h), respectively.

24. At all times pertinent to the charges herein, some of the 3/22 Straw Borrowers and some of the 6/23 Extension borrowers (as hereinafter defined) were "related interests" of Respondent Lenz, as that term is used in 12 CFR § 215.2 (n).

25.  Respondent Lenz received the "tangible economic benefit," as that term is used in 12 CFR § 215.3(f), of the 3/22 Loans and the 6/21 Loans, the Additional Related Loans, and the 6/23 Extensions (as hereinafter defined).

26.  At all times pertinent to the charges herein, Respondent Lenz exercised substantial control and influence over CBC's directors, officers, and employees.

27.  At all times pertinent to the charges herein, Respondent Lenz exercised substantial control and influence over CBC's operations, particularly the credit decisions made by the Bank.

28.  Respondent Lenz also controlled and was a principal owner of Equity Merchant Banking Corporation ("EMBC"), a merchant banking firm located in Fort Lauderdale, Florida. A substantial portion of CBC's largest commercial loans and credit facilities during the period from January, 2000 through June 26, 2002, were referrals from EMBC and/or Respondent Lenz, and the borrowers were related to, affiliated with, or associated with Respondent Lenz.

29.  The allegations that follow demonstrate a pattern and practice of abuse by Respondent Lenz of his fiduciary duties to CBC for his personal benefit. Respondent Lenz was aided and abetted in this course of action by the active participation of Respondent Weand. The Respondent Directors failed to exercise independent judgment and care in the performance of their duties and instead consistently and without question approved every credit referred by Respondent Lenz and recommended by Respondent Weand, notwithstanding numerous indicia that the loans were at best unsafe or unsound. Respondent Lenz's abusive activities include, but are not limited to, the following general categories:

a)  a straw or nominee loan scheme in order to avoid using personal funds to satisfy a regulatory requirement to increase the Bank's capital in connection with an acquisition transaction;

b)  a second straw or nominee loan scheme which was designed to remove non-performing loans associated with Respondent Lenz's adult children and business partner from the Bank's books;

c)  a number of additional related loans, the proceeds of which were used to make payments on or to pay off many of the prior straw or nominee loans, or to provide funds to Respondent Lenz or Lenz-affiliated entities; and

d)  a last minute attempt to obtain CBC's Board of Directors' approval of new loans and extensions to the maturity of loans to individuals and entities closely associated with Respondent Lenz, in order to circumvent anticipated regulatory action that might prohibit or restrict the Bank's ability to extend credit.

30. The misconduct described in general in paragraph 29 above, and set forth in more detail hereafter, caused CBC to make fraudulent loans that had an aggregate unpaid balance of at least $34 million when CBC was closed, exposed CBC and the FDIC as receiver for CBC to losses of at least $34 million, and directly contributed to CBC's failure on June 26, 2002.

### The MTB Transaction

31. Following months of discussions with the FDIC, CBC submitted an application to the FDIC on or about August 4, 1999, for permission to purchase substantially all of the banking assets and to assume the deposits and certain liabilities of MTB Bank, New York, NY ("MTB Transaction").

NOV-25-2002 13:38 FROM:G-LOG LEGAL         2039254894           TO:212+819+7583         P.014/060

32.   MTB Bank was a substantially larger institution than CBC at the time of the MTB Transaction. As of December 31, 1999, MTB Bank had assets of approximately $278,000,000, while CBC had assets of only approximately $99,000,000. Consequently, as a condition of its approval of CBC's application, the FDIC required CBC to increase its Tier 1 Capital by not less than $20,000,000 ("FDIC's Required Capital Injection"), so that CBC would have an adequate capital structure to support its much higher level of assets after the transaction.

33.   Respondent Lenz, Respondent Weand and other representatives of CBC made representations to the FDIC that the FDIC's Required Capital Injection would be satisfied by Respondent Lenz using his personal assets to fund his purchase of $10,000,000 of CBC common stock and $10,000,000 of CBC preferred stock. In reliance upon those representations, the FDIC approved CBC's application.

34.   On or around March 31, 2000, the FDIC's Required Capital Injection was purportedly satisfied, as Respondent Lenz purchased $10,000,000 of CBC common stock and CBC Investment Partners ("CBCIP"), a related interest of Respondent Lenz, purchased $10,000,000 of CBC preferred stock.

35.   On or around March 31, 2000, the MTB Transaction was consummated.

### The 3/22 Straw Loan Scheme

36.   Contrary to his representations to the FDIC that he would use personal funds to satisfy the FDIC's Required Capital Injection, prior to March 31, 2000, Respondent Lenz initiated and implemented a straw or nominee loan scheme. Respondent Lenz used this scheme as a means of purporting to satisfy the FDIC's Required Capital Injection without the use of his personal funds. Consequently, the representations to the FDIC described in paragraph 33 were false.

37. Upon information and belief, Respondent Lenz caused CBCIP to be formed in order to facilitate this straw or nominee loan scheme. At all times pertinent to this proceeding, Respondent Lenz controlled and was the managing member of CBCIP. On the surface, CBCIP was made to appear to be a legitimate investment partnership. In fact, it was a vehicle used to facilitate the straw or nominee loan scheme.

38. Respondent Lenz could not have obtained one or more loans totaling $20,000,000 from CBC in or around that time due to the restrictions and prohibitions on loans to "insiders" contained in Reg O.

39. On or about March 22, 2000, just days prior to the consummation of the MTB Transaction, CBC's Board of Directors and the Credit Committee held a joint meeting ("3/22 Meeting"). At that time, the memberships of the Board and the Credit Committee were identical. At the 3/22 Meeting, the Credit Committee approved a number of large, commercial loans or other credit facilities totaling approximately $20,000,000. All of these loans were in an amount of $1,000,000 or greater.

40. The 3/22 Meeting was held at EMBC's offices in Fort Lauderdale, Florida, with Respondent Lenz presiding. Respondents Lenz, Weand, Cuevas and Dunlap attended the meeting in person. Respondents Marks and Levine attended via telephone conference from offices in Connecticut.

41. Written loan presentations ("Status Reports") for some of the loans or credit facilities presented at the 3/22 Meeting were prepared by or under the direction of Respondent Weand, and were given to the members of the Credit Committee within a few hours prior to the 3/22 Meeting.

NOV-25-2002 13:38 FROM:G-LOG LEGAL           2039254894              TO:212+819+7583            P.016/060

42.  Most of the Status Reports generally lacked adequate financial analysis and contained inaccurate or incomplete information about the borrowers.

43.  Most of the Status Reports represented that the purpose of the proposed credit was working capital or investments of the borrowers.

44.  Members of the Credit Committee were not given Status Reports or other written loan presentations in advance or at the 3/22 Meeting to review for many of the loans and credit facilities presented at the 3/22 Meeting, in contravention of CBC's loan policy and safe and sound banking practice.

45.  In presenting loans during the 3/22 Meeting, Respondent Weand referred to the Status Reports, to the extent they were available, drawing the Respondent Directors' attention to sections purportedly containing underwriting information about the loans or credit facilities.

46.  Respondent Weand orally presented and personally recommended the approval of all the loans and credit facilities presented at the 3/22 Meeting. Upon information and belief, five additional loans or credit facilities were not voted upon at the 3/22 Meeting. Respondent Weand caused them to be made and funded without Board or Credit Committee approval, exceeding his lending authority. All of the loans and credit facilities presented at the 3/22 Meeting plus the five loans and credit facilities that Respondent Weand caused to be made without Board or Credit Committee approval are hereinafter collectively referred to as the "3/22 Loans," and the borrowers are hereinafter collectively referred to as the "3/22 Straw Borrowers."

47.  For some of the 3/22 Loans, Respondent Lenz recruited a number of social acquaintances or business associates to obtain, enter into or increase loans or other credit facilities from CBC in their own names, or in the names of their business entities, and to then

turn some or all of the proceeds over to CBCIP. The names of these borrowers and the dates and amounts of the loans are:

| Borrower Name | Loan Date | Loan Amount |
|---|---|---|
| Fort Lauderdale Hospital Management | 3/23/2000 | $3,000,000 |
| Fort Lauderdale Hospital Management | 3/24/2000 | $1,500,000 |
| Lawrence Kessler | 3/28/2000 | $1,000,000 |
| James Loomis | 3/24/2000 | $1,000,000 |
| Patrick Moran | 3/24/2000 | $1,100,000 |
| Anthony Piano | 3/24/2000 | $1,500,000 |
| Texas Encore, LLC | 3/24/2000 | $1,000,000 |
| Triumph Financial, LLC | 3/24/2000 | $1,300,000 |
| Western Oil Processors, LTD | 3/27/2000 | $1,700,000 |

48.   For other 3/22 Loans, Respondent Lenz caused companies that he, his family members, or his business associates owned or controlled, directly or indirectly, to obtain or enter into loans or other credit facilities from CBC and to then turn the proceeds directly over to Respondent Lenz. The names of these borrowers and the dates and amounts of the loans are:

| Borrower Name | Loan Date | Loan Amount |
|---|---|---|
| Almonte Fire Trucks, LTD | 3/24/2000 | $1,500,000 |
| AnPac Securities Group, Inc. | 3/24/2000 | $1,350,000 |
| Aerialscope, Inc. | 3/28/2000 | $1,450,000 |
| Carjon International Corp. | 3/24/2000 | $1,400,000 |
| National Pallet Leasing Systems, LLC | 3/23/2000 | $1,000,000 |
| NetTech Solutions, LLC | 3/24/2000 | $1,500,000 |
| FWD Corporation | 4/07/2000 | $1,000,000 |

49.   The number and aggregate dollar amount of loans and credit facilities presented for approval at the 3/22 Meeting were far in excess of CBC's typical monthly loan activity.

50.   Most, if not all, of the principal and interest payments subsequently made to CBC on the 3/22 Loans did not come from the borrowers' own resources. Instead, payments came directly or indirectly from Respondent Lenz, CBCIP, or the proceeds of additional loans made by CBC.

51. The Respondent Directors who participated in the 3/22 Meeting breached their fiduciary duties by voting to approve some or all of the 3/22 Loans under circumstances that should have caused those Respondent Directors to question the propriety of the loans. These circumstances include, but are not limited to:

   a) the volume and aggregate dollar amount of the loans was significantly greater than normal for the Bank;

   b) the Directors were or should have been aware of prior regulatory criticism regarding the Bank's lending function;

   c) many of the loans were presented verbally only, with no Status Reports or other written presentation;

   d) the Status Reports presented to the Respondent Directors lacked information necessary to make an informed credit decision, such as the financial condition of the borrower and an analysis of the borrower's ability to repay; and

   e) many of the loans were in contravention of the Bank's loan policy.

52. The 3/22 Loans would not have been approved as presented by a bank that operated with customary and prudent credit underwriting procedures and risk standards.

53. Most, if not all, of the 3/22 Loans had a maturity date substantially longer than normal for a working capital or an investment loan.

54. At the time of their approval by the Credit Committee, most of the 3/22 Loans exhibited more than the normal risk of repayment. At the first examination of CBC after the 3/22 Loans were approved, the joint FDIC/State of Connecticut Department of Banking examination of March 5, 2001, the majority of the 3/22 Loans were either adversely classified or Listed for Special Mention.