NOV-25-2002 13:39 FROM:G-LOG LEGAL            2039254894              TO:212+819+7583            P.019/060

55. The proceeds advanced as a result of the 3/22 Meeting ("3/22 Loan Proceeds") were not used for the purposes stated in the Status Reports.

56. The 3/22 Loan Proceeds were initially deposited into accounts of the 3/22 Straw Borrowers.

57. Within a day or two of these initial deposits, the 3/22 Loan Proceeds were wired by the 3/22 Straw Borrowers either to a deposit account in the name of Respondent Lenz or to one in the name of CBCIP, at SunTrust Bank ("SunTrust"). Both accounts were controlled by Respondent Lenz.

58. On or about March 28, 2000 through March 30, 2000, the 3/22 Loan Proceeds were wired from the two SunTrust deposit accounts controlled by Respondent Lenz to two deposit accounts at CBC owned and/or controlled by Respondent Lenz. Thereafter, the 3/22 Loan Proceeds were transferred internally at CBC and used to fund the purchase of $20,000,000 of CBC common and preferred stock issued to Lenz and his related interest, CBCIP, and to purportedly satisfy the FDIC's Required Capital Injection.

59. During the joint FDIC/State of Connecticut Department of Banking examination dated March 5, 2001, Respondent Lenz told FDIC and State examiners that the 3/22 Loan Proceeds were not the source of funds for the FDIC's Required Capital Injection, and that Respondent Lenz used his own assets for that purpose.

60. These statements were false. The source of the funds for the FDIC's Required Capital Injection was not Respondent Lenz's personal assets, but, instead, the 3/22 Loan Proceeds. Respondent Weand was aware that Respondent Lenz's statements to examiners were false, and failed to correct them.

NOV-25-2002 13:39 FROM:G-LOG LEGAL          2039254894          TO:212+819+7583          P.020/060

61. Under applicable Generally Accepted Accounting Principles and the FFIEC's Instructions for Preparation of Consolidated Reports of Condition and Income ("Call Report Instructions"), CBC was required to deduct from its capital account any capital contributions that were funded by CBC loans. Consequently, the FDIC's Required Capital Injection, a written condition of the FDIC's approval of the MTB Transaction, was not satisfied prior to the MTB Transaction, nor on any date thereafter.

62. State non-member banks are required to file Reports of Condition and Income ("Call Reports") with the FDIC no later than thirty days after the last calendar day of each calendar quarter. These reports contain data on the bank's financial condition and results of operations. This information is extensively used by the FDIC in its off-site monitoring of banks to supplement on-site, full scope examinations.

63. As a result of the failure to comply with the FDIC's Required Capital Injection, CBC's Call Reports filed with the FDIC for the quarters ending March 31, 2000, June 30, 2000, September 30, 2000, December 31, 2000, March 31, 2001, June 30, 2001, September 30, 2001, December 31, 2001, and March 31, 2002 were materially inaccurate.

64. Upon information and belief, certain CBC records were falsified under the direction of Respondent Lenz and/or Respondent Weand, or with their consent and knowledge.

65. At the time that the 3/22 Loans were presented to the Credit Committee for approval, Respondent Lenz did not disclose that the proceeds of these loans were going to be transferred to him for his use. Respondent Lenz voted for some of the 3/22 Loans knowing that the proceeds would be transferred to him or for his benefit. Thereafter, Respondent Lenz continued to conceal such information from CBC's Board of Directors and from FDIC and State bank examiners.

NOV-25-2002 13:39 FROM:G-LOG LEGAL          2039254894           TO:212+819+7583         P.021/060

66. At the time that he presented the 3/22 Loans to the Credit Committee, Respondent Weand knew or should have known the 3/22 Loan Proceeds were not going to be used for the purposes represented to the directors, and he did not disclose such information. Thereafter, Respondent Weand continued to conceal such information from CBC's Board of Directors and from FDIC and State bank examiners.

### The 6/21 Straw Loan Scheme

67. In or around June 2000, CBC had loans or other credit facilities outstanding to National Pallet Leasing Systems, LLC ("NPLS") in excess of $5,000,000 ("NPLS Loans").

68. At the time, NPLS was owned, indirectly, by F. Ross Walpole ("Walpole"), a social acquaintance and close business associate of Respondent Lenz; by Respondent Lenz's two adult children, Corbett Lenz and Stacie Daley; and by another individual who held a minority interest.

69. In or around June 2000, the NPLS Loans were seriously delinquent, and NPLS did not have the financial capacity to repay its loans or other credit facilities to CBC.

70. The delinquent status of the NPLS Loans and the financial condition of NPLS at the time made it difficult to dispose of the NPLS Loans at book value.

71. Upon information and belief, in or around June 2000, Respondent Lenz and Respondent Weand initiated and implemented another straw or nominee loan scheme in order to facilitate the sale or other disposition of the NPLS Loans.

72. In furtherance of that scheme, in or around June 2000, Peachtree Group, LLC ("Peachtree") was formed. Peachtree's Limited Liability Company Agreement lists the initial owners of Peachtree as Walpole and his wife, Carol Walpole. At the time of its formation, Peachtree had only $10 in capital.

NOV-25-2002 13:40 FROM:G-LOG LEGAL          2039254894           TO:212+819+7583          P.022/060

73. Upon information and belief, the Walpoles were acting as agents for Respondent Lenz with respect to the ownership and/or control of Peachtree.

74. On or about June 21, 2000, the Credit Committee took action that included but was not limited to the approval of seven loans totaling approximately $11,000,000, of which $6,500,000 was new money advanced ("6/21/ Loans"). All of the borrowers were entities controlled by Respondent Lenz, Respondent Lenz's adult children, or Respondent Lenz's business associates ("6/21 Straw Borrowers"). The names of the borrowers and the dates and amounts of the loans or loan modifications are set forth in the following chart:

| BORROWER NAME | LOAN DATE | LOAN AMOUNT |
| --- | --- | --- |
| Almonte Investment Partners, LLC | 6/15/2000 | $1,500,000 |
| Carjon International Corp. | 6/29/2000 | $ 500,000 |
| Carjon International Corp. | 6/29/2000 | $2,000,000 |
| CLSD Properties, LLC | 6/29/2000 | $4,000,000 |
| CLSD Properties, LLC | 6/28/2000 | $1,000,000 |
| NetTech Solutions, LLC | 6/22/2000 | $ 750,000 |
| Texas Encore Corporation | 6/29/2000 | $1,500,000 |

75. At the time of their approval by the Credit Committee, most of the 6/21 Loans exhibited more than the normal risk of repayment and/or other unsafe or unsound characteristics. At the first examination of CBC after the 6/21 Loans were approved, the joint FDIC/State of Connecticut Department of Banking examination of March 5, 2001, all of the 6/21 Loans were either adversely classified or Listed for Special Mention.

76. Upon information and belief, the 6/21 Meeting was conducted through a telephone conference call, with Respondents Weand, Dunlap, Cuevas, and Levine taking part in the call.

NOV-25-2002 13:40 FROM:G-LOG LEGAL        2039254894        TO:212+819+7583        P.023/060

77. The Status Reports for the 6/21 Loans that were presented to the Credit Committee represented the purpose of the 6/21 Loans to be working capital or commercial mortgages for the 6/21 Straw Borrowers.

78. Respondent Weand orally presented, personally recommended, and voted to approve each of the 6/21 Loans at the 6/21 Meeting.

79. The Respondent Directors who participated in the 6/21 Meeting breached their fiduciary duties by voting to approve the 6/21 Loans under circumstances that should have caused the Respondent Directors to question the propriety of the loans. These circumstances include, but are not limited to:

    a) the Respondent Directors were or should have been aware of prior regulatory criticism regarding the Bank's lending function;

    b) the Status Reports presented to the Respondent Directors lacked information necessary to make an informed credit decision, such as the financial condition of the borrower and an analysis of the borrower's ability to repay; and

    c) many of the loans were in contravention of the Bank's loan policy.

80. Instead of being used for the stated purposes, within a few days, $5,500,000 of the loan proceeds from the 6/21 Loans were transferred by the 6/21 Straw Borrowers to Peachtree.

81. On or about June 30, 2000, Peachtree entered into a Purchase and Sale Agreement with CBC by which Peachtree paid approximately $5,000,000 to CBC, representing 100% of the principal and interest outstanding on the NPLS Loans at the time, for a 100% participation in the majority of the NPLS Loans ("NPLS Sale"). Under the agreement, CBC agreed to service the NPLS Loans for Peachtree.

NOV-25-2002 13:40 FROM:G-LOG LEGAL         2039254894              TO:212+819+7583           P.024/060

82. The NPLS Sale was never presented to CBC's Board of Directors for prior approval, although Board members learned of it some time later.

83. At the time of the 6/21 meeting, Respondent Weand was aware of the fraudulent nature of the 6/21 Loans.

84. At the 6/21 Meeting, Respondent Weand did not disclose to the members of the Credit Committee that the proceeds of the 6/21 Loans were not going to be used for the stated purposes, but instead would be transferred to Peachtree to fund its purchase of the problem NPLS Loans.

85. By selling the NPLS Loans prior to June 30, 2000, CBC would have substantially reduced its ratio of past due loans to total loans and would have avoided having to increase its Allowance for Loan and Lease Losses. Instead, by virtue of the 6/21 Loans scheme, CBC's condition appeared in the Bank's June 30, 2000 Call Reports to be materially better than it actually was. In addition, by virtue of the 6/21 Loans scheme, CBC appeared to be meeting certain provisions of the MOU, when in fact it was not.

86. On or about December 18, 2001, the Walpoles executed an Assignment and Conveyance of Undivided Membership Interests in Peachtree Group, LLC, transferring their interests in Peachtree to Respondent Lenz. Upon information and belief, no valid consideration passed from Respondent Lenz to the Walpoles in exchange for the Walpoles' purported interests in Peachtree, as would have occurred in a legitimate, arm's length transaction.

### Additional Related Loans

87. In and after March 2000, additional loans or loan modifications were made by CBC to one or more of the 3/22 Straw Borrowers or other individuals or entities ("Additional Related Loans"). Proceeds of some loans were transferred to CBCIP and used to make interest

and/or principal payments on the 3/22 Loans or 6/21 Loans. Proceeds of other loans were used to provide operating funds for Respondent Lenz and his various related entities. In some instances, proceeds of these loans were used to pay off the entire outstanding balance of a 3/22 Loan or 6/21 Loan. The Additional Related Loans include, but are not limited to, the following:

| BORROWER NAME | LOAN DATE | LOAN AMOUNT |
| --- | --- | --- |
| Aerialscope, Inc. | 06/29/00 | $2,850,000 |
| Almonte Fire Trucks LTD | 04/24/00 | $1,500,000 |
| Almonte Investment Partners, LP | 06/15/00 | $1,500,000 |
| FWD Corporation | 04/17/00 | $2,000,000 |
| NetTech Solutions, LLC | 11/28/00 | $4,750,000 |
| F. Ross Walpole | 10/11/00 | $1,000,000 |
| F. Ross Walpole | 10/24/00 | $ 215,000 |
| F. Ross Walpole | 11/15/00 | $ 650,000 |
| F. Ross Walpole | 11/27/00 | $ 400,000 |
| F. Ross Walpole | 12/22/00 | $2,600,000 |
| F. Ross Walpole | 01/16/01 | $ 425,000 |
| F. Ross Walpole | 01/24/01 | $ 200,000 |
| F. Ross Walpole | 02/02/01 | $ 267,000 |

88. Respondent Weand orally presented many of the Additional Related Loans to CBC's Credit Committee and recommended their approval.

89. Upon information and belief, Respondent Lenz referred the Additional Related Loans to CBC and caused CBC to make the loans, knowing that the proceeds would not be used for their stated purposes.

90. Respondent Weand recommended the Additional Related Loans for approval, knowing that many of the loans, like the 3/22 Loans and 6/21 Loans, were poorly underwritten, violated the Bank's loan policy, or exhibited other unsafe or unsound characteristics.

91. The Respondent Directors who approved the Additional Related Loans breached their fiduciary duties by voting to approve many of the Additional Related Loans under

NOV-25-2002 13:41 FROM:G-LOG LEGAL          2039254894           TO:212+819+7583         P.026/060

circumstances that should have caused those Respondent Directors to question the propriety of the loans. These circumstances include, but are not limited to:

a) the Respondent Directors were or should have been aware of prior regulatory criticism regarding the Bank's lending function;

b) some of the loans were presented verbally only, with no Status Reports or other written presentation;

c) the Status Reports presented to the Respondent Directors lacked information necessary to make an informed credit decision, such as the financial condition of the borrower and an analysis of the borrower's ability to repay; and

d) many of the loans were in contravention of the Bank's loan policy.

92. Among the Additional Related Loans are the loans aggregating approximately $5,700,000 to F. Ross Walpole ("Walpole Loans"), a social acquaintance and business partner of Respondent Lenz and a principal of at least three of the 3/22 and 6/21 borrowers. The stated purposes of the Walpole Loans were "investment in closely held companies" and "Federal tax lien."

93. The proceeds of the Walpole Loans were not used for the stated purposes, but rather used to: a) pay off two loans to Carjon International Corp., a company owned by Walpole and a 3/22 and 6/21 borrower; b) provide funds to CBCIP so that CBCIP could send money periodically to some of the 3/22 and 6/21 borrowers to enable them to keep their loans current; and c) provide funds to Respondent Lenz and his various related entities.

94. At the time Respondent Weand recommended the Walpole Loans for approval, Respondent Weand was aware of the true purpose of the Walpole Loans.

95. Respondent Weand did not disclose the true purpose of the Walpole Loans to the Board or Credit Committee.

96. Another of the Additional Related Loans is the $2,000,000 loan to FWD Corporation ("FWD Loan"). The stated purpose of that loan was working capital.

97. The proceeds of the FWD Loan were not used for the stated purpose, but rather transferred to the account of Respondent Lenz and used to pay Respondent Lenz's federal tax obligation in the amount of $2,000,000.

98. Upon information and belief, at the time Respondent Weand recommended the FWD Loan for approval, Respondent Weand was aware of the true purpose of the FWD Loan.

99. Respondent Weand did not disclose the true purpose of the FWD Loan to the Board or Credit Committee.

### The 6/23 Sunday Night Board Meeting

100. On or about April 1, 2002, a joint FDIC/State of Connecticut Department of Banking examination of CBC began ("2002 Examination").

101. In or around June 2002, the FDIC and the State of Connecticut Department of Banking (hereinafter referred to collectively as the "Regulators") informed CBC that the Regulators planned to have meetings with CBC management and its Board of Directors, on June 24, 2002 and June 25, 2002, respectively.

102. On June 23, 2002, a Sunday evening, an interim meeting of CBC's Board of Directors was conducted by telephone ("Sunday Night Meeting"). Respondents Lenz, Weand, Cuevas, Dunlap, Levine, Reed, and Asche participated in the Sunday Night Meeting.

103. Prior to the Sunday Night Meeting, Respondent Lenz and Respondent Weand were aware that results of the 2002 Examination were likely to show a severe deterioration in

NOV-25-2002 13:41 FROM:G-LOG LEGAL          2039254894          TO:212+819+7583          P.028/060

CBC's condition from the prior examination and, consequently, that there was a possibility of additional regulatory actions being taken by the Regulators against either the Bank or themselves personally.

104. The members of the Board of Directors were given no more than two days' notice of the Sunday Night Meeting. One of the main reasons given to the members of the Board of Directors at the Sunday Night Meeting was the fear that, at the meetings scheduled for the two following days, the Regulators might prohibit or restrict CBC's ability to extend credit.

105. A number of one-year extensions of maturity on loans to close business associates of Respondent Lenz and entities owned or controlled by these individuals, Respondent Lenz, or Respondent Lenz's family were presented to, and approved by the Board of Directors ("6/23 Extensions"). All of the 6/23 Extensions were approved based solely upon oral presentations. No Status Reports or other written loan presentations were prepared and given to the members of the Board of Directors to review in support of these proposed extensions. The names of the borrowers and the original dates and amounts of the loans are:

| BORROWER NAME | LOAN DATE | LOAN AMOUNT |
|---|---|---|
| Almonte Investment Partners, LP | 06/15/2000 | $1,500,000 |
| Richard Kresch | 03/20/2000 | $1,100,000 |
| NetTech Solutions, LLC | 11/28/2000 | $4,750,000 |
| NetTech Solutions, LLC | 11/28/2000 | $ 600,000 |
| Northern Healthcare Associates | 10/10/1996 | $ 500,000 |
| Texas Encore Materials | 11/14/2001 | $ 100,000 |
| F. Ross Walpole | 05/07/2001 | $4,200,000 |
| F. Ross Walpole | 05/07/2001 | $1,540,000 |

106. The 6/23 Extensions violated the C&D and exhibited numerous unsafe or unsound characteristics including, but not limited to the fact that the CBC Board of Directors did not affirmatively determine that:

a) the extension of credit was in full compliance with CBC's loan policy;

NOV-25-2002 13:42 FROM:G-LOG LEGAL            2039254894             TO:212+819+7583          P.029/060

b) that the extension was necessary to protect the Bank's interest or was adequately secured;

c) that based upon a credit analysis, the borrower was deemed creditworthy; and

d) that all necessary loan documentation was on file, including, but not limited to, current financial and cash flow information.

107. In addition, two large, structured finance proposals totaling approximately $11,500,000 ("6/23 New Loans") were presented to and approved by CBC's Board of Directors at the meeting, despite the fact that the members of the Board either did not have any written loan presentations to review, or, if they had written loan presentations, they were inadequate and they only had them in their possession for a few hours.

108. The 6/23 New Loans violated the C&D and exhibited numerous unsafe or unsound characteristics including, but not limited to:

a) violation of CBC's loan policy guidelines and standards;

b) lack of adequate financial statements of borrowers;

c) lack of adequate analysis regarding borrowers' ability to repay and credit risk; and

d) deficient loan documentation.

109. The Respondent Directors described in Paragraph 102 above breached their fiduciary duties by voting to approve some or all of the 6/23 Extensions and 6/23 New Loans under circumstances that should have caused the Respondent Directors to question the propriety of the loans and extensions. These circumstances include, but are not limited to:

a) the Respondent Directors were or should have been aware of prior regulatory criticism regarding the Bank's lending function;

b) many of the loans and extensions were presented verbally only, with no Status Reports or other written presentation;

c) the written loan proposals presented to the Respondent Directors lacked information necessary to make an informed credit decision, such as the financial condition of the borrower and an analysis of the borrower's ability to repay; and

d) many of the loans were in contravention of the Bank's loan policy.

110. The following day, June 24, 2002, $11,500,000 of loan proceeds from the 6/23 New Loans were wired out of CBC to a law firm which was temporarily holding the funds in escrow.

111. On June 26, 2002, CBC was closed by the Banking Commissioner of the State of Connecticut. After CBC failed, the FDIC, as receiver for CBC, was able to secure the return of the 6/23 New Loans funds.

### Allegations Particular to Respondent Lenz

112. Unsafe or unsound practices, breaches of fiduciary duties, or violations of law committed by Respondent Lenz in carrying out his responsibilities as the Chairman of CBC's Board of Directors with respect to the transactions, incidents, and/or series of events described above, include, but are not limited to, the following:

a) Initiating and implementing straw or nominee loan schemes.

b) Receiving, directly or indirectly, in excess of $20,000,000 in straw or nominee loan proceeds.

c) Causing the misapplication of approximately $40,000,000 in straw or nominee loan proceeds.

d) Knowingly making material misrepresentations of fact, and/or failing to disclose material information to CBC's Board of Directors and Credit Committee regarding the 3/22 Loans, the 6/21 Loans, the Additional Related Loans, the 6/23 Extensions, and the 6/23 New Loans.

e) Knowingly making material misrepresentations of fact, and/or failing to disclose material information to the FDIC and/or the State of Connecticut Department of Banking.

f) Conducting the affairs of CBC for his own benefit rather than for the benefit of the Bank, in breach of his duty of loyalty to CBC.

g) Knowingly causing CBC to violate a written condition imposed by the FDIC with respect to its approval of CBC's application to enter into the MTB Transaction.

h) Knowingly causing or knowingly or recklessly allowing CBC to file Call Reports containing false or materially inaccurate information.

i) Participating in the Sunday Night Meeting, and voting for approval of the 6/23 Extensions and the 6/23 New Loans, knowing that the credits were poorly underwritten and risky, and that the Board of Directors did not have sufficient time or information to adequately evaluate the proposed credits.

j) Voting for approval of some or all of the 3/22 Loans, the Additional Related Loans, the 6/23 New Loans, and the 6/23 Extensions, despite the fact that he knew they were fraudulent, unsafe or unsound, in violation of the Bank's loan policy, and/or in violation of law or regulation.

k) Violating CBC's conflict of interest policy.

l)   Causing CBC to violate the C&D by voting for and participating in the discussion and approval of the 6/23 New Loans and 6/23 Extensions, knowing that such loans did not comply with the requirements of the Order.

m)   Causing or permitting the inclusion of false or materially inaccurate information in the Officer's Questionnaire provided to the FDIC as part of the 2001 and 2002 examinations.

n)   Violating, or causing or permitting CBC to violate Reg O with respect to some or all of the 3/22 Loans, the 6/21 Loans, the Additional Related Loans, and the 6/23 Extensions, in that those loans:

  i)   were not made on substantially the same terms and following credit underwriting procedures that were not less stringent than those prevailing at the time for comparable transactions by CBC with other persons not covered by Reg O;

  ii)   involved more than the normal risk of repayment or presented other unfavorable features;

  iii)   were not approved in advance by a majority of CBC's Board of Directors with the interested party abstaining from participating directly or indirectly in the voting;

  iv)   exceeded the "Individual Lending Limit" set forth in paragraphs 215.2(i) and 215.4(c) of Reg O;

  v)   exceeded the "Aggregate Lending Limit" set forth in paragraph 215.4(d) of Reg O, when aggregated with all of the other outstanding extensions of credit by CBC to "insiders;" or,

vi)_ . exceeded the additional limitations on loans to executive officers set forth in paragraph 215.5(a) of Reg O.

o) Causing or permitting CBC to operate with materially false records.

### Allegations Particular to Respondent Weand

113. Unsafe or unsound practices, breaches of fiduciary duties, or violations of law committed by Respondent Weand in carrying out his responsibilities as the CBC's President, Chief Executive Officer, and Chief Lending Officer with respect to the transactions, incidents, and/or series of events described above include, but are not limited to, the following:

a) Implementing and participating in straw or nominee loan schemes.

b) Causing the misapplication of approximately $40,000,000 in straw or nominee loan proceeds.

c) Knowingly making material misrepresentations of fact, and/or failing to disclose material information to CBC's Board of Directors and Credit Committee regarding the 3/22 Loans, the 6/21 Loans, the Additional Related Loans, the 6/23 Extensions, and the 6/23 New Loans.

d) Knowingly making material misrepresentations of fact, and/or failing to disclose material information to the FDIC and/or the State of Connecticut Department of Banking.

e) Knowingly causing CBC to violate a written condition imposed by the FDIC with respect to its approval of CBC's application to enter into the MTB Transaction.

f) Knowingly causing or knowingly or recklessly allowing CBC to file Call Reports containing false or materially inaccurate information.

g) Participating in the Sunday Night Meeting, and recommending or acquiescing in the approval of the 6/23 New Loans and the 6/23 Extensions, knowing that the credits