## VERIFICATION

I, HOWARD F. PITKIN, Administrator of Depository Institutions of the Department of Banking of the State of Connecticut, make oath and say that the material contained in the foregoing application is true to the best of my knowledge and belief.

Howard F. Pitkin
Administrator

STATE OF CONNECTICUT     )
                         )   ss. Hartford    June 26, 2002
COUNTY OF HARTFORD       )

Before me personally appeared HOWARD F. PITKIN, Administrator of Depository Institutions of the Department of Banking of the State of Connecticut, who made oath to the truth of the matters herein contained.

William J. Prensky
Commissioner of the Superior Court

4

P 0082

OCT 31 2002 11:32                              2033803711         PAGE 13

Ret. JULY 23, 2002

| | | |
|---|---|---|
| JOHN P. BURKE, COMMISSIONER OF BANKING | : | SUPERIOR COURT |
| | : | |
| V. | : | JUDICIAL DISTRICT OF HARTFORD |
| | : | AT HARTFORD |
| | : | |
| CONNECTICUT BANK OF COMMERCE | : | JUNE 26, 2002 |

## AFFIDAVIT

STATE OF CONNECTICUT )
                      ) ss. Hartford
COUNTY OF HARTFORD    )

I, HOWARD F. PITKIN, being duly sworn, hereby depose and say:

1. I am over eighteen years of age and believe in the obligations of an oath.

2. I make this Affidavit based upon my own knowledge, information and belief.

3. I make this Affidavit of my own free will.

4. I am employed by the State of Connecticut Department of Banking ("CDOB") as Administrator of Depository Institutions ("Administrator"). I have been employed with the CDOB since October 28, 1977, and have served as Administrator since September 8, 2000.

5. As Administrator, I administer the programs and operations of the Bank Examination Division, which include, among other things, licensing state-chartered

- 1 -

P 0083

bank and trust companies, monitoring their condition, and examining their assets, records, books, and accounts.

6. On July 9, 1991, and thereafter on December 21, 1993, the Federal Deposit Insurance Corporation ("FDIC") with the concurrence of the State Commissioner of Banking, John P. Burke, issued Cease and Desist Orders ("Orders") against Connecticut Bank of Commerce ("CBC" or the "Bank"), a Connecticut chartered bank and trust company existing and doing business under Chapter 664 of the Connecticut General Statutes, with a principal place of business at 612 Bedford Street, Stamford, Connecticut. The Orders were issued against CBC for having engaged in unsafe or unsound banking practices and for apparent violations of law and/or regulations.

7. On October 26, 1998, the CDOB and the FDIC commenced an examination of CBC. With regard to the Orders, the examination findings disclosed that CBC had addressed all provisions of the Orders; although, it still had not met the classified asset reduction target levels established by the plan required by the July 9, 1991 Order.

8. As a result of the 1998 joint examination, CBC continued to be designated as a "troubled institution" as defined under 12 CFR § 303.14 (1998). Under this definition, a "troubled institution" is one that is subject to a written agreement which requires action to improve or maintain the safety and soundness of the institution

-2-

P 0084

and which is issued by the FDIC and the appropriate state banking authority (the CDOB).

9. On March 23, 1999, CBC entered into a Memorandum of Understanding ("MOU") with CDOB and FDIC and, among other things, agreed to maintain Tier 1 capital at or in excess of seven and one-half percent. A copy of the MOU is attached as Exhibit A.

10. "Tier 1 capital" or "core capital" is defined in 12 CFR § 325.2 to mean:

> [T]he sum of common stockholders' equity, noncumulative perpetual preferred stock (including any related surplus), and minority interests in consolidated subsidiaries, minus all intangible assets (other than mortgage servicing assets, nonmortgage servicing assets and purchased credit card relationships eligible for inclusion in core capital pursuant to 12 CFR § 325.5(f)), minus credit-enhancing interest –only and qualifying supervisory goodwill eligible for inclusion in core capital pursuant to 12 CFR Part 567, minus deferred tax assets in excess of the limit set forth in 12 CFR § 325.5(g), minus identified losses (to the extent that Tier 1 capital would have been reduced if the appropriate accounting entries to reflect the identified losses had been recorded on the insured depository institution's books), and

P 0085

minus investments in financial subsidiaries subject to 12 CFR Part 362, Subpart E, and minus the amount of the total adjusted carrying value of nonfinancial equity investments that is subject to a deduction from Tier 1 capital as set forth in section II.B.(6) of appendix A to this part.

11. On August 16, 1999, CBC filed an application pursuant to Connecticut General Statutes §§ 36a-412(b) and 36a-210(g) to acquire a significant part of the assets and business of MTB Bank, a New York-chartered bank.

12. On December 27, 1999, the CDOB and the FDIC commenced a joint examination of CBC. Examination findings disclosed the institution to be in only fair overall condition. While capital levels were found to be satisfactory and there were improvements in asset quality, the following concerns persisted: increases in asset concentration; weaknesses identified in the loan administration area; earnings performance continued to be erratic; remaining concerns with regard to staffing levels and the internal audit plan; and satisfactory reduction of adversely classified assets remained outstanding. Consequently, CBC continued to be designated as a "troubled institution".

13. On February 23, 2000, the Commissioner of Banking approved the application of CBC to acquire a significant part of the assets and business of MTB Bank.

14. On February 25, 2000, the FDIC approved the application of CBC to acquire in a purchase and assumption transaction the New York banking business and the two

- 4 -

New York City banking offices of MTB Bank, New York, subject to certain conditions, including that Tier One Capital of CBC be increased by not less than $20 million.

15. On March 31, 2000, CBC's purchase and assumption of deposits and liabilities of MTB Bank became effective.

16. On September 11, 2000, the CDOB and FDIC commenced a post merger visitation to assess CBC's progress with respect to the acquisition of MTB Bank. The following deficiencies were noted: the administration of the Bank's internal audit program was not adequate; a detailed internal audit scope and testing procedures to be performed by outside contractors had not been completed; the accuracy of assigned internal classifications was marginally adequate, internal ratings did not always reflect the severity of deficiencies noted in the credit exposure reports. Accurate ratings are necessary to ensure that an adequate allowance for loan and lease losses is maintained since reserve allocations are based on those risk ratings.

17. On March 5, 2001, the CDOB and FDIC commenced a joint examination of CBC. Examination findings disclosed that the overall condition of the institution had deteriorated to an unsatisfactory level. Findings included insufficient board oversight; lack of management adherence to board-approved policies, particularly in the areas of loan underwriting and credit administration; non-compliance with governing laws and regulations; weak risk management practices; and the lack of

timely response to previous examination recommendations. The Bank's loan activity had increased with supervisory attention drawn to a group of loans extended to a number of insiders and/or their related interests. A significant number of these loans, which total $45,671,000, had severe weaknesses and were either adversely classified or listed for Special Mention. Adversely classified items represented 90% of Tier 1 capital and reserves at this examination indicated an elevated overall risk profile. In view of the increased risk in the Bank's assets noted during the March 5, 2001 examination, capital levels were considered marginal to support the Bank's overall risk profile.

18. As a result of the March 5, 2001 joint examination, numerous apparent violations of federal laws and regulations were cited relating to: the Banking Affiliates Act of 1982; the filing procedures for proposed board members; Regulation O, Loans to Executive Officers, Directors, And Principal Shareholders (12 CFR Part 215); the Bank Secrecy Act; Regulation U, Extensions of Credit Secured Margin Stock (12 CFR Part 221); and 12 CFR Part 323 regarding Appraisals. Several contraventions of Statements of Policy were also cited at this examination with regard to Interagency Guidelines for Establishing Standards for Safety and Soundness; Interagency Guidelines for Real Estate Lending Policies; and the Joint Agency Policy Statement on Interest Rate Risk.

P 0088

19. The March 5, 2001 joint examination also found that the Bank had still not satisfactorily addressed all of the provisions of the MOU. Consequently, CBC continued to be designated a "troubled institution."

20. As a result of the condition of CBC as noted in the March 5, 2001, joint examination, formal regulatory corrective action pursuant to § 8(b) of the Federal Deposit Insurance Act in the form of an Order to Cease and Desist dated November 28, 2001, was initiated to resolve the problems identified and to return the Bank to a satisfactory condition.

21. CBC reported equity capital of $29,556,000 as of March 31, 2002.

22. On April 1, 2002, the CDOB and FDIC commenced a joint examination of CBC. Findings from such examination indicated that the Bank was out of compliance with several provisions of the November 28, 2001, Order to Cease and Desist, including the provision related to minimum acceptable capital levels. Results of the examination indicated that the Bank had total equity capital of $27,732,000 (adjusted) as of March 31, 2002.

23. The Allowance for Loan and Lease Losses means those general valuation allowances that have been established through charges against earnings to absorb losses on loans and lease financing receivables. After absorbing the losses noted at this examination, as well as providing for the elevated risk in the loan portfolio, the allowance for loan and lease losses was underfunded by $34,500,000. The Bank has insufficient earnings to fund the deficiency in the allowance for loan and

- 7 -

P 0089

lease losses necessitating a transfer of $34,500,000 from equity capital or from the capital accounts of the Bank. This transfer will result in a negative Tier 1 capital of ($7,461,000).

24. On Sunday, June 23, 2002, the Board of Directors of CBC approved two loans totaling $11.5 million, which are exceptions to the Bank's credit policy. One loan for $6.5 million was disbursed without financial statements, which are critical to making a prudent credit decision. This is an unsafe and unsound loan practice and results in a dissipation of the Bank's assets.

25. As a result of this transfer and as the resulting capital position the Bank is insolvent. There is a reasonable likelihood that an unsafe and unsound condition exists which is likely to have an adverse effect upon depositors or creditors of Connecticut Bank of Commerce.

I have read the preceding statement and to the best of my knowledge and belief, it is true.

_____
Howard F. Pitkin

Subscribed and sworn to before me at Hartford, Connecticut, this 26th day of June 2002.

_____
William J. Prensky
Commissioner of the Superior Court

- 9 -

Exhibit D

RECYCLED

P 0092

[¶11,869] **In the Matter of Connecticut Bank of Commerce, Stamford, Connecticut,** Docket No. 01-178b (11-30-01).

A cease and desist order was issued, based on findings by the FDIC that it had reason to believe that respondent had engaged in unsafe and unsound practices.

[.1] Management—Qualifications Specified

[.2] Board of Directors—Outside Directors Added to Board

[.3] Risk Management—Plan Required

[.4] Loan Policy—Preparation or Revision of Policy Required

[.5] Assets—Charge-off or Collection

[.6] Loans—Special Mention

[.7] Loan Loss Reserve—Establishment of or Increase Required

[.8] Credit Administration Deficiencies—Correction Required

[.9] Loans—Extensions of Credit—To Borrowers with Existing Adversely Classified Credits

[.10] Technical Exceptions—Correction of Technical Exceptions Required

[.11] Loans—Internal Grading System Required

[.12] Loans—Risk Position—Monitoring Required

[.13] Loans—Comply with Written Policy

[.14] Budget and Earnings Forecast—Preparation Required

[.15] Strategic Plan—Preparation of Required

[.16] Conflicts of Interest—Written Policy Required

[.17] Capital—Maintain Tier I Capital

[.18] Violations of Law—Correction of Violations Required

[.19] Board of Directors—Meetings—Recording of Actions Required

[.20] Bank Operations—Internal Controls, Correction of Weaknesses Required

[.21] Interest Rate Risk Policy—Compliance Required

[.22] Reports of Condition and Income—Amendment Required

[.23] Dividends—Dividends Restricted

[.24] Information Technology Plan—Minimum Requirements

[.25] Bank Secrecy Act—Compliance

[.26] Audit—Program Required

[.27] Brokered Deposits—Brokered Deposits Restricted

[.28] Business—New Business Restricted

[.29] Security Controls—Security Against Tampering Required
{{3-31-02 p.C-5290.1}}

In the Matter of
CONNECTICUT BANK OF COMMERCE
STAMFORD, CONNECTICUT
(Insured State Nonmember Bank)
ORDER TO CEASE AND DESIST

FDIC-01-178b

Connecticut Bank of Commerce, Stamford, Connecticut ("Insured Institution"), having been advised of its right to a Notice of Charges and of Hearing detailing the unsafe or unsound banking practices and violations of law and/or regulations alleged to have been committed by the Insured Institution and of its right to a hearing on the alleged charges under section 8(b)(1) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. §1818(b)(1), and having waived those rights, entered into a STIPULATION AND CONSENT TO THE ISSUANCE OF AN ORDER TO CEASE AND DESIST ("CONSENT AGREEMENT") with counsel for the Federal Deposit Insurance Corporation ("FDIC"), dated November 28, 2001, whereby solely for the purpose of this proceeding and without admitting or denying the alleged charges of unsafe or unsound banking practices and violations of law and/or regulations, the Insured Institution consented to the issuance of an ORDER TO CEASE AND DESIST ("ORDER") by the FDIC.

The FDIC considered the matter and determined that it had reason to believe that the Insured Institution has engaged in unsafe or unsound banking practices and has committed violations of law and/or regulations. The FDIC, therefore, accepts the CONSENT AGREEMENT and issues the following:

## ORDER TO CEASE AND DESIST

IT IS HEREBY ORDERED that the Insured Institution, its directors, officers, employees, agents, and other institution-affiliated parties (as that term is defined in Section 3(u) of the Act, 12 U.S.C. §1813(u)), and its successors and assigns cease and desist from the following unsafe or unsound banking practices and violations:

(a) Operating with a board of directors ("Board") that fails to provide adequate supervision and direction to the operating management of the Insured Institution;

(b) Operating with inadequate risk management practices;

(c) Inadequately implementing prior regulatory recommendations, including the Memorandum of Understanding dated March 23, 1999;

(d) Operating with inadequate supervision of the lending function;

(e) Operating with an excessive volume of poor quality assets;

(f) Engaging in hazardous lending practices, including but not limited to:

    (i) Failing to follow loan policy guidelines and standards;

    (ii) Extending credit to borrowers who lack sufficient repayment ability;

    (iii) Failing to provide an adequate loan review and grading system;

    (iv) Extending credit without adequate diversification of risk;

    (v) Failing to adequately analyze credit risk;

    (vi) Failing to obtain or perfect adequate collateral and monitor collateral margins of secured borrowers;

    (vii) Extending credit in a manner for which management lacks expertise; and

    (viii) Extending credit with deficient loan documentation.

(g) Operating with an inadequate allowance for loan and lease losses;

(h) Operating with marginal earnings;

(i) Operating with an unsupported budgeting process;

(j) Operating with an outdated written strategic plan;

(k) Operating with inadequate disclosure, due diligence, and oversight of insider-related transactions and potential conflicts of interest;

(l) Operating with marginal capital in relation to the type and quality of assets held by the Insured Institution;
{{1-31-02 p.C-5291}}

(m) Engaging in violations of applicable federal laws and/or regulations;

(n) Operating with inadequate Board and Board Credit Committee minutes;

(o) Operating with inadequate internal routines and controls;

(p) Operating with Information Technology deficiencies;

(q) Operating with an inadequate Bank Secrecy Act Program; and

(r) Operating with internal audit weaknesses.

IT IS FURTHER ORDERED that the Insured Institution, its institution-affiliated parties, and its successors and assigns, take affirmative action as follows:

[.1]1. (a) During the life of this ORDER, the Insured Institution shall have management qualified to restore the Insured Institution to a sound condition. Such management shall include a chief executive officer and an experienced senior lending officer responsible for supervising the Insured Institution's overall lending function.

(b) Present management shall be assessed on its ability to:

(i) Comply with the requirements of this ORDER;

(ii) Restore and thereafter maintain the Insured Institution in a safe and sound condition, including management effectiveness, asset quality, capital adequacy, liquidity adequacy, and earnings adequacy, and sensitivity to market risk; and

(iii) Comply with all applicable State and Federal laws, regulations, and FDIC and FFIEC policy statements.

(c) During the life of this ORDER, the Insured Institution shall notify the Regional Director of the FDIC's Boston Regional Office ("Regional Director") and the Banking Commissioner of the State of Connecticut Department of Banking ("Commissioner") in writing of any resignations and/or terminations of any members of its Board and/or any of its senior executive officer(s), including senior vice presidents, within 15 days of the event.

(d) The Insured Institution shall comply with section 32 of the Act, 12 U.S.C. §1831i.

(e) (i) To ensure both compliance with this ORDER and qualified management for the Insured Institution, the Board, within 60 days from the effective date of this ORDER shall develop a written policy ("Management Policy") which, at a minimum, shall require an analysis of the Insured Institution's management and staffing requirements ("Analysis"), shall require clear and concise job descriptions, shall require periodic evaluations of each employee's job performance, and shall include the procedures requiring the periodic review and update of the Management Policy and Analysis. The Analysis shall, at a minimum, include: (1) both the number and type of positions needed to properly manage the Insured Institution, particularly the lending functions, giving appropriate consideration to the Insured Institution's loan types, loan volume, customer base, and the number of problem credits, (2) a clear and concise description of the needed experience for each job including a clear and concise description of the general duties and responsibilities for lending officers and their support staff, (3) an evaluation of present management including whether the current lending officials of the Insured Institution possess the necessary lending and collection experience and qualifications required to adequately perform present and anticipated duties, (4) a plan to recruit, hire or replace personnel with requisite ability and experience, and (5) a periodic evaluation of each individual's job performance.

(ii) Within 90 days of the effective date of this ORDER, the Board shall prepare a written plan of implementation ("Plan") addressing the Analysis and the Management Policy. The Plan shall specify the actions to be taken by the Board and the time frames for each action.

(iii) The Management Policy, Analysis, and Plan, and any subsequent modifications thereto, shall be submitted to the Regional Director and the Commissioner for review and comment. Within 30 days from receipt of any comment, and after consideration of such comment, the Board shall approve the Management Policy, Analysis, and Plan, which approval shall be recorded in the minutes of the meeting of the Board. Thereafter, the Insured Institution, its directors, officers, and employees shall implement and follow the Management Policy, Analysis, and Plan and any subsequent modifications thereto. It shall remain the responsibility of the Board to fully implement the Plan within the specified time frames. In the event the Plan, or
{{1-31-02 p.C-5292}}

any portion thereof, is not implemented in accordance with the Plan's specified time frames, the Board shall immediately advise the Regional Director and Commissioner, in writing, of specific reasons for deviating from the Plan.

(f) Within 30 days from the effective date of this ORDER, the Board shall establish a committee of the Board with the responsibility to ensure that the Insured Institution complies with the provisions of this ORDER. The members of such committee shall be independent with respect to the Insured Institution as defined in paragraph 2 of this ORDER. The committee shall report in writing monthly to the entire Board, and a copy of the report and any discussion relating to the report or the ORDER shall be included in

P 0097

the minutes of the Board. Nothing contained herein shall diminish the responsibility of the entire Board to ensure compliance with the provisions of this ORDER.

[.2]2. (a) At each meeting of the shareholders at which directors of the Insured Institution are to be elected, the members of the Board who are also shareholders shall nominate and support the election of candidates to the Board who are independent with respect to the Insured Institution, in such number as is necessary to maintain a majority of the Board to be and to remain independent with respect to the Insured Institution.

(b) For purposes of this ORDER, an individual who is "independent with respect to the Insured Institution" shall be any individual (1) who is not an employee, in any capacity, of the Insured Institution or any of its affiliated organizations or who does not own or control more than five (5.0) percent of the voting stock of the Insured Institution or its holding company, (2) who is not related by blood, marriage or common financial interest to any officers or directors of the Insured Institution or to any stockholders owning more than five (5.0) percent of the Insured Institution's outstanding shares or affiliates of the Insured Institution, and (3) who is not indebted to the Insured Institution, directly or indirectly (including the indebtedness of any entity in which the individual has a substantial financial interest), in an amount exceeding five (5.0) percent of the Insured Institution's total equity capital and allowance for loan and lease losses.

(c) As used in this ORDER, "common financial interest" means any financial transaction or arrangement whereby the individual and the officer, director, or shareholder of the Insured Institution share some degree of financial interest such that their ability to exercise independent judgment on behalf of the Insured Institution could be materially impaired. It includes but is not limited to: (1) any common ownership interest in a closely held corporation, partnership, trust, sole proprietorship, joint venture, or other business entity, or any affiliates thereof, in which one or both parties, or related interests thereof, have a 5% or more ownership interest; (2) any common ownership interest in a publicly held corporation in which one or both parties, or related interests thereof, have control; (3) any lending relationship between the parties or related interests thereof; (4) any employment relationship where one or both parties is an executive officer; and (5) any financial relationship between the individual and a business entity in which an Insider (as defined in Paragraph 13(b) of this ORDER) of the Insured Institution has either control or is an executive officer. The terms "related interest," "control," and "executive officer" shall have the meaning ascribed to them in section 215.2 of the Rules and Regulations of the Board of Governors of the Federal Reserve System (Regulation O), 12 C.F.R. §215.2.

[.3]3. Within 60 days from the effective date of this Order, management shall:

(a) Evaluate the risk assessment controls and practices used to determine the quality of risk management practices and determine why the numerous weaknesses identified in the March 5, 2001 Joint FDIC/State Report of Examination were not identified internally.

P 0098

(b) Develop an action plan to improve risk management practices and to ensure that risk assessment controls and practices remain adequate.

(c) Thereafter, maintain a system(s) that accurately and effectively identifies, measures, monitors, and controls risks.

[.4]4. Within 60 days from the effective date of the ORDER, the Board and management shall review and amend the Insured Institution's current lending practices to comply with the standards outlined in Appendix A of Part 364 of the FDIC Rules and Regulations.

5. (a) Within 60 days from the effective date of this order, the Insured Institution shall {{1-31-02 p.C-5293}}

revise its lending policy to adopt the recommendations set forth in the March 5, 2001 Joint FDIC/State Report of Examination. The revisions to the Credit Policy shall include, at a minimum, the following:

(i) Provisions that provide parameters for identifying and aggregating related loans;

(ii) Provisions that provide guidelines governing the newly developed structured finance area;

(iii) Provisions that require complete loan documentation, adequate analysis, realistic repayment terms, and current credit information adequate to support the outstanding indebtedness of the borrower;

(iv) Provisions that provide guidance for financing new or expanding businesses, including provisions requiring the receipt and analysis of pro forma financial statements and budget projections;

(v) Provisions that provide guidelines for board reporting on factoring; and

(vi) Provisions that provide guidelines for fraud detection.

(b) Such policies and their implementation shall be in the form and manner acceptable to the Regional Director and the Commissioner as determined at subsequent examinations and/or visitations.

[.5]6. (a) Within 10 days from the effective date of this ORDER, the Insured Institution shall eliminate from its books, by charge-off or collection, all assets classified "Loss" as reported in the March 5, 2001 Joint FDIC/State Report of Examination, that have not been previously collected or charged off. Reduction of these assets through proceeds of other loans made by the Insured Institution is not considered collection for the purpose of this paragraph.

(b) Within 60 days from the effective date of this ORDER, the Insured Institution shall formulate and submit to the Regional Director and the Commissioner for review and approval a written plan of action to reduce the Insured Institution's risk position in each asset and contingent liability classified "Substandard" or "Doubtful" in the March 5, 2001 Joint FDIC/State Report of Examination and which aggregated $100,000 or more. The Insured Institution shall add to its written plan of action assets and contingent liabilities which are so classified in any subsequent examination. Such plan shall include, but not be limited to, the following:

    (i) Target dollar levels to which the Insured Institution will reduce the volume of adversely classified assets and contingent liabilities, within three months, six months, and twelve months from the effective date of this ORDER; and

    (ii) Provisions for the submissions of monthly written progress reports under this Paragraph 6 to the Insured Institution's Board for review and recordation in the Board minutes. Copies of such reports shall also be submitted to the Regional Director and the Commissioner on a quarterly basis. A form of such report is attached as Exhibit A.

(c) As used in Paragraph 6(b), the word "reduce" means (i) to collect, (ii) to charge off, or (iii) to sufficiently improve the quality of assets adversely classified to warrant removing any adverse classification, as determined by the FDIC and the Commissioner.

[.6]7. Within 90 days of the effective date of this ORDER, the Insured Institution shall significantly reduce the dollar volume of assets subject to Special Mention as listed in the March 5, 2001 Joint FDIC/State Report of Examination, or otherwise sufficiently improve such assets so as to warrant removal from the Special Mention category.

[.7]8. (a) Within 30 days from the effective date of this Order, the Insured Institution shall establish and shall thereafter maintain, through charges to current operating income, an adequate valuation reserve for loan and lease losses. In determining the adequacy of the valuation reserve for loan and lease losses, the Board of the Insured Institution shall a a minimum consider the following:

    (i) Prevailing instructions contained in the Federal Financial Institutions Examination Council booklet entitled "Instructions-Consolidated Reports of Condition and Income";

    (ii) Prevailing regulatory guidance regarding the Allowance for Loan and Lease Losses, including: (a) FIL-89-93 dated December 21, 1993, entitled Interagency Statement of Policy on the Allowance for Loan and Lease Losses; and (b) FIL-63-2001 dated July 25, 2001, entitled Interagency Policy Statement on Allowance for {{1-31-02 p.C-5294}}

    Loan lease Losses Methodologies and Documentation for Banks and Savings Associations;

(iii) The volume and mix of the existing loan portfolio, including the volume and severity of nonperforming loans and adversely classified credits, as well as an analysis of net charge-offs experienced on previously adversely classified loans;

(iv) The extent to which loan renewals and extensions are used to maintain loans on a current basis and the degree of risk associated with such loans;

(v) The trend in loan growth, including any rapid increase in loan volume within a relatively short time period;

(vi) Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;

(vii) General and local economic conditions affecting the collectibility of the Insured Institution's loans;

(viii) Previous loan loss experience by loan type, including the trend of net charge-offs as a percent of average loans over the past several years;

(ix) Off balance sheet credit risks;

(x) The overall risk associated with each concentration of credit together with the degree of risk associated with each related individual borrower; and

(xi) Any other factors appropriate in determining future valuation reserves.

(b) Prior to the submission of any Report of Condition or Report of Income, the Board of the Insured Institution shall review the adequacy of the Insured Institution's valuation reserve for loan and lease losses. The minutes of the Board meetings at which each review is undertaken shall indicate the results of the review, the amount of any increase to the reserve, and the basis for the amount of the valuation reserve. The criteria for the review shall be as set forth in Paragraph 8(a).

(c) Notwithstanding the provisions of Paragraph 8(a) and 8(b) above, the Insured Institution shall provide, within 30 days of the effective date of this ORDER, an additional $3.2 Million provision to the valuation reserve for loan and lease losses as of March 31, 2001. Thereafter the Insured Institution shall maintain, through charges to current operating income, an adequate valuation reserve for loan and lease losses.

(d) In the event that the Regional Director and/or the Commissioner determine, at subsequent examinations and/or visitations, that the Insured Institution's valuation reserve for loan and lease losses is inadequate, the Insured Institution shall amend its Consolidated Reports of Condition and Income in accordance with Paragraph 23.