SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------X

EDWARD BAZINET,                          :

            Plaintiff,              :

    -against-                              :

GALINA KLUGE Individually and as Executrix of    :
THE ESTATE OF MICHAEL KLUGE and
SAMUEL J. REISER As Escrow Agent,        :

          Defendants.           :

--------------------------------------------------------------X

SAMUEL J. REISER,                        :

        Third-Party Plaintiff,   :

    -against-                              :

RANDOLPH W. LENZ, J. DONALD WEAND, JR.,  :
MARSHALL C. ASCHE, TIMOTHY S. REED,
MARCIAL CUEVAS, JACK W. DUNLAP, STEVEN B.  :
LEVINE and BRIAN A. MARKS,

       Third-Party Defendants.   :

--------------------------------------------------------------X

Honorable Edward H. Lehner
IAS Part 19

Index No. 110143/01

**THIRD-PARTY COMPLAINT**

Third-Party
Index No.        /04

Third-Party Plaintiff, Samuel J. Reiser ("Reiser"), by his undersigned attorneys, Schneider Goldstein Bloomfield LLP, as and for his Third-Party Complaint herein, alleges upon information and belief:

### The Within Lawsuit

1.  Prior to this third-party action, Plaintiff Edward Bazinet filed a claim against Reiser (the "Claim"), and co-defendant Galina Kluge, individually and as Executrix of the Estate of Michael Kluge (collectively "Kluge"), filed cross-claims against Reiser (as amended,

S:\docs\H&R\Kluge\third-party comp.12-22-03.wpd

the "Cross-Claims") to recover damages caused by Reiser's alleged negligence in connection with his deposit and maintenance of certain escrows at CBC Bank ("CBC" or the "Bank"), which thereafter failed. A copy of the Second Amended Complaint, and Kluge's Second Amended Cross-Claims in this action are annexed hereto as Exhibits "A" and "B" respectively and are made a part hereof.

2. In his Answer, Reiser denied the material allegations of the Cross-Claims. A copy of his Answer is annexed hereto as Exhibit "C" and made a part hereof.

3. The Claim against Reiser is stayed pending occurrence of certain events.


**The Parties**

4. At all times relevant herein, Third-Party Plaintiff Reiser was and still is a resident of the State of New York.

5. At all times relevant herein, CBC was a corporation existing under the laws of the State of Connecticut, and maintained one or more branches in the State of New York.

6. At all times relevant herein, Third-Party Defendant Randolph W. Lenz ("Lenz") was the Chairman of the Board of Directors of CBC, served on CBC's Credit Committee of the Board ("Credit Committee"), and owned in excess of 80% of CBC's common stock.

7. At all times relevant herein, Lenz was an "institution-affiliated party" of CBC as that term is defined in 12 U.S.C. § 1813(u), and for purposes of 12 U.S.C. §§ 1818(b), 1818(c), 1818(e) and 1818(i).

8. At all times relevant herein, Third-Party Defendant J. Donald Weand, Jr.

("Weand") served as CBC's President, and, up to August 2001, served as CBC's Chief Lending Officer. On or about May 10, 2000, Weand was approved by CBC's Board of Directors as Chief Executive Officer. At various times relevant herein, Weand served as an "ex-officio" member of the Credit Committee.

9. At all times relevant herein, Lenz was an "executive officer" and an "insider" of CBC, as those terms are used in 12 CFR §§ 215.2 (e)(1) and (h), respectively.

10. At all times relevant herein, some of the 3/22 Straw Borrowers and some of the 6/23 Extension Borrowers (as these terms are hereinafter defined) were "related interests" of Lenz, as that term is used in 12 CFR § 215.2 (n).

11. Lenz received the "tangible economic benefit," as that term is used in 12 CFR § 215.3(f), of the 3/22 Loans and the 6/21 Loans, the Additional Related Loans, and the 6/23 Extensions (as these terms are hereinafter defined).

12. At all times relevant herein, Lenz exercised substantial control and influence over CBC's directors, officers, and employees.

13. At all times relevant herein, Lenz exercised substantial control and influence over CBC's operations, particularly the credit decisions made by the Bank.

14. At all times relevant herein, Lenz also controlled and was a principal owner of Equity Merchant Banking Corporation ("EMBC"), a merchant banking firm located in Fort Lauderdale, Florida. A substantial portion of CBC's largest commercial loans and credit facilities during the period from January, 2000 through June 26, 2002 were referrals from EMBC and/or Lenz, and the borrowers were related to, affiliated with, or associated with Lenz.

15. Beginning on or about November 21, 2001 through all times relevant herein, Third-Party Defendant Marshall C. Asche ("Asche") was a member of the board of directors of CBC and served on the Credit Committee of CBC.

16. Prior to joining CBC's board of directors, Asche was employed by BDO Seidman, L.L.P., and served as the client service partner in charge of CBC's external audits from 1993 until he retired in June 2000. From July 1, 2000 through September 30, 2001, Asche was employed as Chief Financial Officer of Northern Healthcare Inc., an entity affiliated with Lenz. In that capacity, Asche was responsible for the financial oversight of three related hospitals, including Fort Lauderdale Hospital Management, a 3/22 Borrower (as hereinafter defined).

17. At all times relevant herein, Third-Party Defendant Marcial Cuevas ("Cuevas") was a member of the board of directors of CBC and served on the Credit Committee of CBC.

18. At all times relevant herein, Third-Party Defendant Jack W. Dunlap ("Dunlap") was a member of the board of directors of CBC and served on the Credit Committee of CBC.

19. At all times relevant herein, Third-Party Defendant Steven B. Levine ("Levine") was a member of the board of directors of CBC and served on the Credit Committee of CBC.

20. Beginning on or about February 14, 2001 and through all times relevant herein, Third-Party Defendant Timothy S. Reed ("Reed") was a member of the board of directors of CBC and served on the Credit Committee of CBC.

21. Through on or about November 28, 2001, Third-Party Defendant Brian A.

Marks ("Marks") was a member of the board of directors of CBC and served on the Credit Committee of CBC.

22. At all times relevant herein, Asche, Cuevas, Dunlap, Levine, Marks and Reed were each an "institution-affiliated party" of CBC as that term is defined in 12 U.S.C. §1813 (u), for purposes of 12 U.S.C. §1818 (i).

23. The cause of action alleged herein arose from the transaction of business by the Third-Party Defendants within the state as well as their commission of tortious acts without the state that caused injury to property within the state.

## Substantive Allegations

24. The allegations set forth below demonstrate a pattern and practice of breach by Lenz of his fiduciary duties and other tortious conduct for his personal benefit, in which Lenz was aided and abetted in this course of action by the active participation of Weand. Such conduct includes, but is not limited to, the following general categories:

    a. a straw or nominee loan scheme in order to avoid using personal funds to satisfy a regulatory requirement to increase the Bank's capital in connection with an acquisition transaction;

    b. a second straw or nominee loan scheme which was designed to remove non-performing loans associated with Lenz's adult children and business partner from the Bank's books;

    c. a number of additional related loans, the proceeds of which were used to make payments on or to pay off many of the prior

straw or nominee loans, or to provide funds to Lenz or Lenz's affiliated entities; and

d.  a last minute attempt to obtain CBC's Board of Directors' approval of new loans and extensions to the maturity of loans to individuals and entities closely associated with Lenz, in order to circumvent anticipated regulatory action that might prohibit or restrict the Bank's ability to extend credit.

25. The misconduct described in general in the immediately preceding paragraph, and set forth in more detail hereafter, caused CBC to make fraudulent loans that had an aggregate unpaid balance of at least $34 million when CBC was closed, exposed CBC and its depositors to losses of at least $34 million, and directly contributed to CBC's failure on June 26, 2002.

## The MTB Transaction

26. Following months of discussions with the FDIC, CBC submitted an application to the FDIC on or about August 4, 1999, for permission to purchase substantially all of the banking assets and to assume the deposits and certain liabilities of MTB Bank ("MTB Transaction").

27. MTB Bank was a substantially larger institution than CBC at the time of the MTB Transaction. Consequently, as a condition of its approval of CBC's application, the FDIC required CBC to increase its Tier 1 Capital by not less than $20,000,000 ("FDIC's Required Capital Injection"), so that CBC would have an adequate capital structure to support its much higher level of assets after the transaction.

28. Lenz and Weand made representations to the FDIC that the FDIC's Required Capital Injection would be satisfied by Lenz using his personal assets to fund his purchase of $10,000,000 of CBC common stock and $10,000,000 of CBC preferred stock. In reliance upon those representations, the FDIC approved the application.

29. On or around March 31, 2000, the FDIC's Required Capital Injection was purportedly satisfied, as Lenz purchased $10,000,000 of CBC common stock and CBC Investment Partners ("CBCIP"), a related interest of Lenz, purchased $10,000,000 of CBC preferred stock.

30. On or around March 31, 2000, the MTB Transaction was consummated.

### The 3/22 Straw Loan Scheme

31. Contrary to his representations that he would use personal funds to satisfy the FDIC's Required Capital Injection, prior to March 31, 2000, Lenz initiated and implemented a straw or nominee loan scheme. Lenz used this scheme as a means of purporting to satisfy the FDIC's Required Capital Injection without the use of his personal funds. Consequently, the representations described above were false.

32. Lenz caused CBCIP to be formed in order to facilitate this straw or nominee loan scheme. At all times relevant herein, Lenz controlled and was the managing member of CBCIP. On the surface, CBCIP was made to appear to be a legitimate investment partnership. In fact, it was a vehicle used to facilitate the straw or nominee loan scheme.

33. Lenz could not have obtained one or more loans totaling $20,000,000 from CBC in or around that time due to the restrictions and prohibitions on loans to "insiders" contained in Reg O.

34. On or about March 22, 2000, just days prior to the consummation of the MTB Transaction, CBC's Board of Directors and the Credit Committee held a joint meeting ("3/22 Meeting"). At that time, the memberships of the Board and the Credit Committee were identical. At the 3/22 Meeting, the Credit Committee approved a number of large, commercial loans or other credit facilities totaling approximately $20,000,000. All of these loans were in an amount of $1,000,000 or greater.

35. The 3/22 Meeting was held at EMBC's offices with Lenz presiding. Lenz, Weand, Cuevas and Dunlap attended the meeting in person. Marks and Levine attended the meeting via telephone conference.

36. Written loan presentations ("Status Reports") for some of the loans or credit facilities presented at the 3/22 Meeting were prepared by or under the direction of Weand, and were given to the members of the Credit Committee only a few hours prior to the 3/22 Meeting.

37. Most of the Status Reports generally lacked adequate financial analysis and contained inaccurate or incomplete information about the borrowers.

38. Most of the Status Reports represented that the purpose of the proposed credit was working capital or investments of the borrowers.

39. Members of the Credit Committee were not given Status Reports or other written loan presentations in advance or at the 3/22 Meeting to review for many of the loans and credit facilities presented at the 3/22 Meeting, in contravention of CBC's loan policy and safe and sound banking practice.

40. In presenting loans during the 3/22 Meeting, Weand referred to the Status Reports, to the extent they were available, drawing the Directors' attention to sections

purportedly containing underwriting information about the loans or credit facilities.

41. Weand orally presented and personally recommended the approval of all the loans and credit facilities presented at the 3/22 Meeting. Five additional loans or credit facilities were not voted upon at the 3/22 Meeting. Weand caused loans to be made and funded without Board or Credit Committee approval, exceeding his lending authority. All of the loans and credit facilities presented at the 3/22 Meeting plus the five loans and credit facilities that Weand caused to be made without Board or Credit Committee approval are hereinafter collectively referred to as the "3/22 Loans," and the borrowers are hereinafter collectively referred to as the "3/22 Straw Borrowers."

42. For some of the 3/22 Loans, Lenz recruited a number of social acquaintances or business associates to obtain, enter into or increase loans or other credit facilities from CBC in their own names, or in the names of their business entities, and to then turn some or all of the proceeds over to CBCIP. The names of these borrowers and the dates and amounts of the loans are:

| Borrower Name | Loan Date | Loan Amount |
| --- | --- | --- |
| Fort Lauderdale Hospital Management | 3/23/2000 | $3,000,000 |
| Fort Lauderdale Hospital Management | 3/24/2000 | $1,500,000 |
| Lawrence Kessler | 3/28/2000 | $1,000,000 |
| James Loomis | 3/24/2000 | $1,000,000 |
| Patrick Moran | 3/24/2000 | $1,100,000 |

| | | |
|---|---|---|
| Anthony Piano | 3/24/2000 | $1,500,000 |
| Texas Encore, LLC | 3/24/2000 | $1,000,000 |
| Triumph Financial, LLC | 3/24/2000 | $1,300,000 |
| Western Oil Processors, LTD | 3/27/2000 | $1,700,000 |

43. For other 3/22 Loans, Lenz caused companies that he, his family members, or his business associates owned or controlled, directly or indirectly, to obtain or enter into loans or other credit facilities from CBC and to then turn the proceeds directly over to Lenz. The names of these borrowers and the dates and amounts of the loans are:

| Borrower Name | Loan Date | Loan Amount |
|---|---|---|
| Almonte Fire Trucks, LTD | 3/24/2000 | $1,500,000 |
| AnPac Securities Group, Inc. | 3/24/2000 | $1,350,000 |
| Aerialscope, Inc. | 3/28/2000 | $1,450,000 |
| Carjon International Corp. | 3/24/2000 | $1,400,000 |
| National Pallet Leasing Systems, LLC | 3/23/2000 | $1,000,000 |
| NetTech Solutions, LLC | 3/24/2000 | $1,500,000 |
| FWD Corporation | 4/07/2000 | $1,000,000 |

44. The number and aggregate dollar amount of loans and credit facilities presented for approval at the 3/22 Meeting were far in excess of CBC's typical monthly loan activity.

45. Most, if not all, of the principal and interest payments subsequently made to CBC on the 3/22 Loans did not come from the borrowers' own resources. Instead, payments came directly or indirectly from Lenz, CBCIP, or the proceeds of additional loans made by CBC.

46. The Defendant-Directors who are participated in the 3/22 Meeting breached their fiduciary duties by voting to approve some or all of the 3/22 Loans under circumstances that should have caused them to question the propriety of such loans. These circumstances include, but are not limited to:

   a. the volume and aggregate dollar amount of the loans was significantly greater than normal for CBC;

   b. They were or should have been aware of prior regulatory criticism regarding CBC's lending function;

   c. Many of the loans were presented verbally only, with no Status Reports or other written presentation;

   d. the Status Reports presented to them lacked information necessary to make an informed credit decision, such as the financial condition of the borrower and an analysis of the borrower's ability to repay; and

   e. many of the loans were in contravention of CBC's loan policy.

47. The 3/22 Loans would not have been approved as presented by a bank that operated with customary and prudent credit underwriting procedures and risk standards.

48. Most, if not all, of the 3/22 Loans had a maturity date substantially longer than normal for a working capital or an investment loan.

49. At the time of their approval by the Credit Committee, most of the 3/22 Loans exhibited more than the normal risk of repayment. At the first examination of CBC after the 3/22 Loans were approved, the joint FDIC/State of Connecticut Department of Banking examination of March 5, 2001, the majority of the 3/22 Loans were either adversely classified or Listed for Special Mention.

50. The proceeds advanced as a result of the 3/22 Meeting ("3/22 Loan Proceeds") were not used for the purposes stated in the Status Reports.

51. The 3/22 Loan Proceeds were initially deposited into accounts of the 3/22 Straw Borrowers.

52. Within a day or two of these initial deposits, the 3/22 Loan Proceeds were wired by the 3/22 Straw Borrowers either to a deposit account in the name of Lenz or to one in the name of CBCIP, at SunTrust Bank ("SunTrust"). Both accounts were controlled by Lenz.

53. On or about March 28, 2000 through March 30, 2000, the 3/22 Loan Proceeds were wired from the two SunTrust deposit accounts controlled by Lenz to two deposit accounts at CBC owned and/or controlled by Lenz. Thereafter, the 3/22 Loan Proceeds were transferred internally at CBC and used to fund the purchase of $20,000,000 in the aggregate of CBC common and preferred stock issued to Lenz and his related interest,

CBCIP, and to purportedly satisfy the FDIC's Required Capital Injection.

54. During the joint FDIC/State of Connecticut Department of Banking examination dated March 5, 2001, Lenz told FDIC and State examiners that the 3/22 Loan Proceeds were not the source of funds for the FDIC's Required Capital Injection, and that Lenz used his own assets for that purpose.

55. These statements were false. The source of the funds for the FDIC's Required Capital Injection was not Lenz's personal assets, but, instead, the 3/22 Loan Proceeds. Weand was aware that Lenz's statements to examiners were false, and failed to correct them.

56. Most, if not all, of the principal and interest payments subsequently made to CBC on the 3/22 Loans did not come from the borrowers' own resources. Instead, payments came, directly or indirectly, from Lenz, CBCIP, or the proceeds of additional loans made by CBC.

57. Under applicable Generally Accepted Accounting Principles and the FFIEC's Instructions for Preparation of Consolidated Reports of Condition and Income ("Call Report Instructions"), CBC was required to deduct from its capital account any capital contributions that were funded by CBC loans. Consequently, the FDIC's Required Capital Injection, a written condition of the FDIC's approval of the MTB Transaction, was not satisfied prior to the MTB Transaction, nor on any date thereafter.

58. State non-member banks are required to file Reports of Condition and Income ("Call Reports") with the FDIC no later than thirty days after the last calendar day of each calendar quarter. These reports contain data on the bank's financial condition and results of operations. This information is extensively used by the FDIC in its off-site monitoring of

banks to supplement on-site, full scope examinations.

59. As a result of the failure to comply with the FDIC's Required Capital Injection, CBC's Call Reports filed with the FDIC for the quarters ending March 31, 2000, June 30, 2000, September 30, 2000, December 31, 2000, March 31, 2001, June 30, 2001, September 30, 2001, December 31, 2001, and March 31, 2002 were materially inaccurate.

60. Certain CBC records were falsified under the direction of Lenz and/or Weand, or with their consent and knowledge.

61. At the time that the 3/22 Loans were presented to the Credit Committee for approval, Lenz did not disclose that the proceeds of these loans were going to be transferred to him for his use. Lenz voted for some of the 3/22 Loans knowing that the proceeds would be transferred to him or for his benefit. Thereafter, Lenz continued to conceal such information from CBC's Board of Directors and from FDIC and State bank examiners.

62. At the time that he presented the 3/22 Loans to the Credit Committee, Weand knew or should have known the 3/22 Loan Proceeds were not going to be used for the purposes represented to the directors, and he did not disclose such information. Thereafter, Weand continued to conceal such information from CBC's Board of Directors and from FDIC and State bank examiners.

### The 6/21 Straw Loan Scheme

63. In or around June 2000, CBC had loans or other credit facilities outstanding to National Pallet Leasing Systems, LLC ("NPLS") in excess of $5,000,000 ("NPLS Loans").

64. At the time, NPLS was owned, indirectly, by F. Ross Walpole ("Walpole"), a

social acquaintance and close business associate of Lenz; by Lenz's two adult children, Corbett Lenz and Stacie Daley; and by another individual who held a minority interest.

65. In or around June 2000, the NPLS Loans were seriously delinquent, and NPLS did not have the financial capacity to repay its loans or other credit facilities to CBC.

66. The delinquent status of the NPLS Loans and the financial condition of NPLS at the time made it difficult to dispose of the NPLS Loans at book value.

67. Upon information and belief, in or around June 2000, Lenz and Weand initiated and implemented another straw or nominee loan scheme in order to facilitate the sale or other disposition of the NPLS Loans.

68. In furtherance of that scheme, in or around June 2000, Peachtree Group, LLC ("Peachtree") was formed. Peachtree's Limited Liability Company Agreement lists the initial owners of Peachtree as Walpole and his wife, Carol Walpole. At the time of its formation, Peachtree had only $10 in capital.

69. The Walpoles were acting as agents for Lenz with respect to the ownership and/or control of Peachtree.

70. On or about June 21, 2000, the Credit Committee of CBC took action that included but was not limited to the approval of seven loans totaling approximately $11,000,000, of which $6,500,000 was new money advanced ("6/21/ Loans"). All of the borrowers were entities controlled by Lenz, Lenz's adult children, or Lenz's business associates ("6/21 Straw Borrowers"). The names of the borrowers and the dates and amounts of the loans or loan modifications are set forth in the following chart:

| Borrower Name | Loan Date | Loan Amount |
| --- | --- | --- |

| | | |
|---|---|---|
| Almonte Investment Partners, LLC | 6/15/2000 | $1,500,000 |
| Carjon International Corp. | 6/29/2000 | $ 500,000 |
| Carjon International Corp. | 6/29/2000 | $2,000,000 |
| CLSD Properties, LLC | 6/29/2000 | $4,000,000 |
| CLSD Properties, LLC | 6/28/2000 | $1,000,000 |
| NetTech Solutions, LLC | 6/22/2000 | $ 750,000 |
| Texas Encore Corporation | 6/29/2000 | $1,500,000 |

71. At the time of their approval by the Credit Committee, most of the 6/21 Loans exhibited more than the normal risk of repayment and/or other unsafe or unsound characteristics. At the first examination of CBC after the 6/21 Loans were approved, the joint FDIC/State of Connecticut Department of Banking examination of March 5, 2001, all of the 6/21 Loans were either adversely classified or Listed for Special Mention.

72. Upon information and belief, the 6/21 Meeting was conducted through a telephone conference call, with Weand, Dunlap, Cuevas and Levine taking part in the call.

73. The Status Reports for the 6/21 Loans that were presented to the Credit Committee represented the purpose of the 6/21 Loans to be working capital or commercial mortgages for the 6/21 Straw Borrowers.

74. Weand orally presented, personally recommended, and voted to approve each of the 6/21 Loans at the 6/21 Meeting.

75. Many of the 6/21 loans were in contravention of the Bank's loan policy.

76. The Defendant-Directors who participated in the 6/21 Meeting breached their fiduciary duties by voting to approve the 6/21 Loans under circumstances that should have caused them to question the propriety of the loans. These circumstances include, but are not limited to:

    a.  they were or should have been aware of prior regulatory criticism regarding the Bank's lending function;

    b.  the Status Reports presented to them lacked information necessary to make an informed credit decision such as the financial condition of the borrower and an analysis of the borrower's ability to repay; and

    c.  many of the loans were in contravention of the Bank's loan policy.

77. Instead of being used for the stated purposes, within a few days, $5,500,000 of the loan proceeds from the 6/21 Loans were transferred by the 6/21 Straw Borrowers to Peachtree.

78. On or about June 30, 2000, Peachtree entered into a Purchase and Sale Agreement with CBC by which Peachtree paid approximately $5,000,000 to CBC, representing 100% of the principal and interest outstanding on the NPLS Loans at the time, for a 100% participation in the majority of the NPLS Loans ("NPLS Sale"). Under the agreement, CBC agreed to service the NPLS Loans for Peachtree.

79. Instead of being used for the stated purposes, within a few days, $5,500,000 of the loan proceeds from the 6/21 Loans were transferred by the 6/21 Straw Borrowers to

Peachtree.

80. The NPLS Sale was never presented to CBC's Board of Directors for prior approval, although Board members learned of it some time later.

81. At the time of the 6/21 meeting, Weand was aware of the fraudulent nature of the 6/21 Loans.

82. At the 6/21 Meeting, Weand did not disclose to the members of the Credit Committee that the proceeds of the 6/21 Loans were not going to be used for the stated purposes, but instead would be transferred to Peachtree to fund its purchase of the problem NPLS Loans.

83. By selling the NPLS Loans prior to June 30, 2000, CBC would have substantially reduced its ratio of past due loans to total loans and would have avoided having to increase its Allowance for Loan and Lease Losses. Instead, by virtue of the 6/21 Loans scheme, CBC's condition appeared in the Bank's June 30, 2000 Call Reports to be materially better than it actually was. In addition, by virtue of the 6/21 Loans scheme, CBC appeared to be meeting certain provisions of the MOU, when in fact it was not.

84. On or about December 18, 2001, the Walpoles executed an Assignment and Conveyance of Undivided Membership Interests in Peachtree Group, LLC, transferring their interests in Peachtree to Lenz. No valid consideration passed from Lenz to the Walpoles in exchange for the Walpoles' purported interests in Peachtree, as would have occurred in a legitimate, arm's length transaction.

## Additional Related Loans

85. In and after March 2000, additional loans or loan modifications were made by CBC to one or more of the 3/22 Straw Borrowers or other individuals or entities ("Additional Related Loans"). Proceeds of some loans were transferred to CBCIP and used to make interest and/or principal payments on the 3/22 Loans or 6/21 Loans. Proceeds of other loans were used to provide operating funds for Lenz and his various related entities. In some instances, proceeds of these loans were used to pay off the entire outstanding balance of a 3/22 Loan or 6/21 Loan. The Additional Related Loans include, but are not limited to, the following:

| Borrower Name | Loan Date | Loan Amount |
| --- | --- | --- |
| Aerialscope, Inc. | 06/29/00 | $2,850,000 |
| Almonte Fire Trucks LTD | 04/24/00 | $1,500,000 |
| Almonte Investment Partners, LP | 06/15/00 | $1,500,000 |
| FWD Corporation | 04/17/00 | $2,000,000 |
| NetTech Solutions, LLC | 11/28/00 | $4,750,000 |
| F. Ross Walpole | 10/11/00 | $1,000,000 |
| F. Ross Walpole | 10/24/00 | $ 215,000 |
| F. Ross Walpole | 11/15/00 | $ 650,000 |

| | | |
|---|---|---|
| F. Ross Walpole | 11/27/00 | $ 400,000 |
| F. Ross Walpole | 12/22/00 | $2,600,000 |
| F. Ross Walpole | 01/16/01 | $ 425,000 |
| F. Ross Walpole | 01/24/01 | $ 200,000 |
| F. Ross Walpole | 02/02/01 | $ 267,000 |

86. Weand orally presented many of the Additional Related Loans to CBC's Credit Committee and recommended their approval.

87. Lenz referred the Additional Related Loans to CBC and caused CBC to make the loans, knowing that the proceeds would not be used for their stated purposes.

88. Weand recommended the Additional Related Loans for approval, knowing that many of the loans, like the 3/22 Loans and 6/21 Loans, were poorly underwritten, violated the Bank's loan policy, or exhibited other unsafe or unsound characteristics.

89. The Defendant-Directors who approved the Additional Related Loans breached their fiduciary duties by voting to approve many of the Additional Related Loans under circumstances that should have caused them to question the propriety of the loans. These circumstances include, but are not limited to:

    a. they were or should have been aware of prior regulatory criticism regarding the Bank's lending function;

    b. some of the loans were presented verbally only with no Status Reports or other written presentation;

c. the Status Reports presented to them lacked information necessary to make an informed credit decision, such as the financial condition of the borrower and an analysis of the borrower's ability to repay; and

d. many of the loans were in contravention of the Bank's loan policy.

90. Among the Additional Related Loans are the loans aggregating approximately $5,700,000 to F. Ross Walpole ("Walpole Loans"), a social acquaintance and business partner of Lenz and a principal of at least three of the 3/22 and 6/21 borrowers. The stated purposes of the Walpole Loans were "investment in closely held companies" and "Federal tax lien."

91. The proceeds of the Walpole Loans were not used for the stated purposes, but rather used to: a) pay off two loans to Carjon International Corp., a company owned by Walpole and a 3/22 and 6/21 borrower; b) provide funds to CBCIP so that CBCIP could send money periodically to some of the 3/22 and 6/21 borrowers to enable them to keep their loans current; and c) provide funds to Lenz and his various related entities.

92. At the time Weand recommended the Walpole Loans for approval, he was aware of the true purpose of the Walpole Loans.

93. Weand did not disclose the true purpose of the Walpole Loans to the Board or Credit Committee.

94. Another of the Additional Related Loans is a $2,000,000 loan to FWD Corporation ("FWD Loan"). The stated purpose of that loan was working capital.

95. The proceeds of the FWD Loan were not used for the stated purpose, but rather, transferred to the account of Lenz and used to pay Lenz's federal tax obligation in the

amount of $2,000,000.

96. At the time Weand recommended the FWD Loan for approval, Weand was aware of the true purpose of the FWD Loan.

97. Weand did not disclose the true purpose of the FWD Loan to the Board or the Credit Committee.

### The 6/23 Sunday Night Board Meeting

98. On or about April 1, 2002, a joint FDIC/State of Connecticut Department of Banking examination of CBC began ("2002 Examination").

99. In or around June 2002, the FDIC and the State of Connecticut Department of Banking (hereinafter referred to collectively as the "Regulators") informed CBC that the Regulators planned to have meetings with CBC management and its Board of Directors, on June 24, 2002 and June 25, 2002, respectively.

100. On June 23, 2002, a Sunday evening, an interim meeting of CBC's Board of Directors was conducted by telephone ("Sunday Night Meeting"). Lenz, Weand, Cuevas, Dunlap, Levine, Reed and Asche participated in the Sunday Night Meeting.

101. Prior to the Sunday Night Meeting, Lenz and Weand were aware that results of the 2002 Examination were likely to show a severe deterioration in CBC's condition from the prior examination and, consequently, that there was a possibility of regulatory actions being taken by the Regulators against either the Bank or themselves personally.

102. The members of the Board of Directors were given no more than two days' notice of the Sunday Night Meeting. One of the main reasons given to the members of the Board of Directors at the Sunday Night Meeting was the fear that, at the meetings scheduled

for the two following days the Regulators might prohibit or restrict CBC's ability to extend credit.

103. A number of one-year extensions of maturity on loans to close business associates of Lenz and entities owned or controlled by these individuals, Lenz, or Lenz's family were presented to, and approved by the Board of Directors ("6/23 Extensions"). All of the 6/23 Extensions were approved based solely upon oral presentations. No Status Reports or other written loan presentations were prepared and given to the members of the Board of Directors to review in support of these proposed extensions. The names of the borrowers and the original dates and amounts of the loans are:

| Borrower Name | Loan Date | Loan Amount |
|---|---|---|
| Almonte Investment Partners, LP | 06/15/2000 | $1,500,000 |
| Richard Kresch | 03/20/2000 | $1,100,000 |
| NetTech Solutions, LLC | 11/28/2000 | $4,750,000 |
| NetTech Solutions, LLC | 11/28/2000 | $ 600,000 |
| Northern Healthcare Associates | 10/10/1996 | $ 500,000 |
| Texas Encore Materials | 11/14/2001 | $ 100,000 |
| F. Ross Walpole | 05/07/2001 | $4,200,000 |
| F. Ross Walpole | 05/07/2001 | $1,540,000 |

S:\docs\H&R\Kluge\third-party comp.12-22-03.wpd          23

104. The 6/23 Extensions violated the C&D and exhibited numerous unsafe or unsound characteristics including, but not limited to the fact that the CBC Board of Directors did not affirmatively determine that:

    a. the extension of credit was in full compliance with CBC's loan policy;

    b. the extension was necessary to protect the Bank's interest or was adequately secured;

    c. based upon a credit analysis, the borrower was deemed creditworthy; and

    d. all necessary loan documentation was on file, including, but not limited to, current financial and cash flow information.

105. The Defendant-Directors who attended the Sunday Night Meeting breached their fiduciary duties by voting to approve some or all of the 6/23 Extensions under circumstances that should have caused them to question the propriety of the extensions. These circumstances include but are not limited to:

    a. they were or should have been aware of prior regulatory criticism regarding the Bank's lending function;

    b. many of the loans and extensions were presented verbally only with no Status Reports or other written presentation;

    c. the written loan proposals presented to them lacked information necessary to make an informed credit decision, such as the financial condition of the borrower and an analysis of the borrower's ability to

d. many of the loans were in contravention of the Bank's loan policy.

106. Lenz was unjustly enriched in the amount of at least $20 million as a result of the violations and unsafe or unsound practices set forth above, in that, among other things, he received the proceeds of the 3/22 Loans and used those proceeds, instead of personal assets, to make the FDIC Required Capital Injection, as more particularly alleged above.

107. By reason of the allegations set forth above, Lenz and Weand engaged in unsafe or unsound practices in conducting the business of CBC, and violated laws, rules, and regulations and a condition imposed in writing by the FDIC in connection with the grant of the application by CBC to acquire MTB Bank.

108. By reason of the foregoing, Lenz and Weand caused or were primarily responsible for causing CBC to make the 3/22 Loans, the 6/21 Loans, the Additional Related Loans, and the 6/23 Extensions, which had an aggregate unpaid balance of at least $34 million when CBC was closed, exposed CBC to losses of at least $34 million, and resulted in the closure of CBC.

109. All of the foregoing exposed the subject escrows that Reiser deposited in CBC to potential partial loss, as the deposits into such accounts of the amount covered by FDIC insurance and partial distributions made by the FDIC thus far have not, as of this date, made the accounts whole.

110. If Kluge was caused to sustain damages as set forth in the Cross-Claims, or if Plaintiff was caused to sustain damages as set forth in the Claim, then said damages were sustained by reason of the conduct of the Third-Party Defendants alleged above.

111. By reason of the foregoing, if Reiser is found liable to Kluge on the Cross-

Claims or to Plaintiff on the Claim, then the Third-Party Defendants are liable to Reiser in the full amount of any such recovery herein or for that proportion thereof caused by the relative culpability of the Third-Party Defendants.

WHEREFORE, Third-Party Plaintiff Samuel J. Reiser demands judgment against the Third-Party Defendants as follows:

(a)   if Reiser is found liable to Kluge on the Cross-Claims or to Plaintiff on the Claim, then judgment over against the Third-Party Defendants in the full amount of any such recovery herein or for that proportion thereof caused by the relative culpability of the Third-Party Defendants; and

(b)   granting such other and further relief as to the Court may seem just and proper, including the costs and disbursements of this third-party action.


Dated:      New York, New York
            January 23, 2004


                        SCHNEIDER GOLDSTEIN BLOOMFIELD LLP

                        By: _____
                                Donald F. Schneider
                        Attorneys for Third-Party Plaintiff
                        Address and P.O. Box:
                        152 West 57th Street
                        New York, New York 10019
                        (212) 265-2266