UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------------------------------X
MARSHALL ASCHE, STEVEN B. LEVINE,          )
TIMOTHY S. REED, MARCIAL CUEVAS and        )
JACK WILLIAM DUNLAP,                        )
                                            )
                    Plaintiffs,             )
                                            )
        -against-                           )
                                            )
HARTFORD INSURANCE COMPANY                  )
OF ILLINOIS,                                )
                                            )
                    Defendant.              )
                                            )
------------------------------------------------------------X
```

Case No. 303CV0416 PCD

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO HARTFORD'S MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF THEIR CROSS-MOTION TO COMPEL AND
FOR A CONTINUANCE PURSUANT TO RULES 37(a) AND 56(f)**

Dated: January 10, 2005

Respectfully submitted,

Marshall Asche, Steven B. Levine, Timothy
S. Reed, Marcial Cuevas and Jack William
Dunlap

By their attorneys
Charles A. Stewart, III (CT 17452)
cstewart@somlaw.com
STEWART OCCHIPINTI, LLP
1350 Broadway, Suite 2200
New York, New York  10018
(212) 239-5500

and

WEINSTEIN & WISSER, P.C.
Richard P. Weinstein (CT 06215)
29 South Main Street, Suite 207
West Hartford, CT 06107
(860) 561-2628

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii-iv

I.    PRELIMINARY STATEMENT.................................................... 2

II.   FACTS................................................................................ 5

    A.    The Policy................................................................. 5

    B.    The Outside Directors' Meeting with Banking Regulators............... 7

    C.    The FDIC'S Appointment as Receiver of CBC............................8

    D.    CBC'S Notification to Hartford......................................10

    E.    The Megaler Action.....................................................13

    F.    The Federal and State Regulatory Actions................................. 13

    G.    The Threatened Class Action.........................................15

    H.    The Bazinet Action..................................................... 16

III.  ARGUMENT..........................................................................17

    A.    Summary Judgment Standard............................................. 17

    B.    Interpretation Of Insurance Policies...................................... 18

    C.    All Claims Against the Outside Directors Stem From the
          FDIC'S and CDOB'S Initial Allegations of Wrongdoing.................20

    D.    The Regulatory Exclusion Did Not Permit Hartford to
          Disregard its Obligation to Advance Claims Expenses
          for the Regulatory Actions.............................................. 24

    E.    Hartford's Wrongful Denial of its Obligation to Advance
          Defense Costs Obligates it to Reimburse the CBC Outside
          Directors for Defense Costs in All Actions and Settlement
          Costs in the Regulatory Actions......................................... 29

    F.    Plaintiffs' Cross-Motion to Compel and for a Continuance
          Should be Granted........................................................31

IV.   CONCLUSION.......................................................................33

## TABLE OF AUTHORITIES

**Cases:**

*Aetna Casualty & Surety. Co. v. Murphy,* 206 Conn. 409, 538 A.2d 219
(1988)..............................................................................................31

*American. Home Assur. Co. v. Abrams,* 69 F. Supp. 2d 339 (D. Conn. 1999)................23

*American Ins. Co. v. Saulnier,* 242 F. Supp. 257 (D. Conn. 1965)........................ 25

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 91 L. Ed. 2d 202,
106 S. Ct. 2505 (1986)...................................................................17

*Associated Elec. & Gas Ins. Servs., Ltd. v. Rigas,* 2004 U.S. Dist. LEXIS 4498
(E.D. Pa. Mar. 17, 2004)...............................................................28

*Brady v. Colchester,* 863 F.2d 205 (2d Cir. 1988)...........................................17

*Buell Indus., v. Greater N.Y. Mut. Ins. Co.,* 259 Conn. 527, 791 A.2d 489
(2002) ......................................................................................25

*Carlton v. Mystic Transp., Inc.,* 202 F.3d 129 (2d Cir. 2000)............................... 17

*Celotex Corp. v. Catrett,* 477 U.S. 317, 91 L. Ed. 2d 265,
106 S. Ct. 2548 (1986)...................................................................17

*Consolidated American Ins. Co. v. Mike Soper Marine Services,* 951 F.2d 186,
(9th Cir. 1991)............................................................................ 30

*Costabile v. Metro. Prop. & Cas. Ins. Co.,* 193 F. Supp. 2d 465
(D. Conn. 2002)......................................................................... 18

*FDIC. v. Caplan,* 838 F. Supp. 1125 (W.D. La. 1993).....................................23

*FDIC. v. Mijalis,* 15 F.3d 1314 (5th Cir. 1994)..............................................23

*Firestine v. Poverman,* 388 F. Supp. 948 (D. Conn. 1975)................................. 18, 29

*Green Door Realty Corp. v. TIG Ins. Co.,* 329 F.3d 282 (2d Cir. 2003).............. .....32

*Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718 (2d Cir.1994)..................................17

*Home Ins. Co. v. Adco Oil Co.,* 154 F.3d 739 (7th Cir. 1998)............................... 23

*ITC Investments, Inc. v. Employers Reinsurance Corp.*, 2000 Conn. Super.
LEXIS 3544 (Conn. Super. Ct. 2000)...............................................24

*Janus Films, Inc. v. Miller*, 801 F.2d 578 (2d Cir. 1986)...................27

*Nance v. N.Y. Police Dep't*, Civ. No. 01-7345, 2002 U.S. App. LEXIS 4129,
(2d Cir. March 13, 2002).............................................................27

*Keithan v. Massachusetts Bonding & Ins. Co.*, 159 Conn. 128,
267 A.2d 660(1970)............................................................18,29

*Krevolin v. Dimmick*, 39 Conn. Supp. 44, 467 A.2d 948
(Conn. Super. Ct. 1983)............................................................18

*LaBonte v. Federal Mut. Ins. Co.*, 159 Conn. 252, 268 A.2d 663
(Conn. 1970)..........................................................................18

*Lexington Insurance Co. v. Devaney*, 1995 U.S. App. LEXIS 4976
(9th Cir. Mar. 9, 1995)........................................................29, 30

*Little v. MGIC Indem. Corp.*, 836 F.2d 789 (3d Cir. 1987)................19

*McCuen v. American Casualty Co.*, 946 F.2d 1401 (8th Cir. 1991).......24

*McGinniss v. Employers Reinsurance Corp.*, 648 F. Supp. 1263
(S.D.N.Y. 1986)......................................................................19

*Milford Hosp. v. Fed. Ins. Co.*, 2002 Conn. Super. LEXIS 3353
(Conn. Super Ct. Oct. 15, 2002)...................................................19

*Ohio Casualty Insurance Co. v. Dentek, Inc.*, 283 F. Supp. 2d 655,
(D. Conn., 2003)......................................................................18

*Okada v. MGIC Indem. Corp.*, 823 F.2d 276 (9th Cir. 1987).............19

*Paddington Partners v. Bouchard*, 34 F.3d 1132 (2d Cir. 1994)..........31

*Parsons v. UPS*, 2002 U.S. Dist. LEXIS 27345 (D. Conn. Jan. 2, 2002)..........31

*PepsiCo. v. Continental Casualty Co.*, 640 F. Supp. 656 (S.D.N.Y. 1986)..............19

Pollack, The Supreme Court of Connecticut 1967-68, 43 Conn. B.J. 117,
130 (1969)............................................................................29

*Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir. 1995)..............17

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------X
MARSHALL ASCHE, STEVEN B. LEVINE, )
TIMOTHY S. REED, MARCIAL CUEVAS and )
JACK WILLIAM DUNLAP, )
 )
    Plaintiffs, )
 )
 -against- ) Case No. 303CV0416 PCD
 )
HARTFORD INSURANCE COMPANY )
OF ILLINOIS, )
 )
    Defendant. )
 )
---------------------------------------------------------------X

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO HARTFORD'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-MOTION TO COMPEL AND FOR A CONTINUANCE PURSUANT TO RULES 37(a) AND 56(f)

Plaintiffs, Marshall Asche, Steven B. Levine, Timothy S. Reed, Marcial Cuevas and Jack William Dunlap (collectively, the "CBC Outside Directors" or "Plaintiffs"), respectfully submit this memorandum of law (a) in opposition to the motion of Defendant Hartford Insurance Company of Illinois ("Hartford" or "Defendant") which seeks summary judgment; and (b) in support of Plaintiffs' cross-motion to compel Hartford to respond to discovery and for a continuance, pursuant to Rules 37(a) and 56(f) of the Federal Rules of Civil Procedure.

## I.  PRELIMINARY STATEMENT

On June 26, 2002, five days prior to the expiration of the directors and officers ("D&O") insurance policy, Hartford was notified of a "Claim" and told that the CBC Outside Directors and others "may be subject to claims for wrongful acts." Thereafter, the CBC Outside Directors were named in various lawsuits based on facts comprising the initial Claim. When asked to provide insurance coverage for these lawsuits, Hartford, the insurance company whose D&O policy was in effect during the relevant period, continuously has declined to provide coverage.

Hartford's denial of coverage has been wrongful. Hartford ignores the fact that its coverage extends to "Interrelated Wrongful Acts," namely, those claims that arise from a common nexus of facts. In an effort to deny coverage, Hartford has resorted to making inaccurate statements to this Court about information it requested and received prior to the July 1, 2002 termination of its insurance policy – asserting that it did not receive the November 30, 2001 Cease and Desist Order by July 1, 2002, when documents from CBC's insurance broker demonstrate otherwise.

The touchstone of insurance policy interpretation in Connecticut and elsewhere is the reasonable expectations of the parties. Here, the CBC Outside Directors reasonably expected that Hartford's policy would afford coverage for claims against them arising from CBC's collapse and taken over by the Federal Deposit Insurance Corporation ("FDIC") in June 2002, prior to the expiration of Hartford's policy.

On June 26, 2002, the same day of the FDIC takeover (and five days prior to the expiration of Hartford's policy), CBC's Chief Operating Officer, acting upon instructions from a partner of CBC's outside counsel, Day, Berry & Howard, LLP, notified Hartford

of the formal administrative proceeding commenced by the Connecticut Department of Banking ("CDOB") and the FDIC and that CBC's officers and directors "may be subject to claims for wrongful acts." He invited Hartford to contact him if it had any questions or needed additional information. Hartford, which had participated in the process of determining whether or not to renew CBC's D&O policy and knew of prior problems that CBC had experienced with regulatory authorities, did not request additional information from CBC. Instead, in response to a July 1, 2002 Accord Statement from CBC's insurance broker (which included two articles from the internet describing CBC's takeover by the FDIC, and the reasons therefore), Hartford began fashioning its coverage defenses, including the principal ones relied upon here. The CBC Outside Directors reasonably expected that their insurance company would offer them protection for claims arising from CBC's collapse, not hide from coverage.

The CBC Outside Directors' belief that Hartford's insurance policy affords protection is patently reasonable. Unlike the D&O insurance policies at issue in cases upon which Hartford relies, Hartford's D&O policy contains a provision stating that all Claims having a common nexus "any fact, circumstance, situation, event, transaction, cause or series of casually connected facts, circumstances, situations, events, transactions or causes" are a single Claim "deemed to be first made on the date the first such Claim is made or deemed to be made pursuant to Section VIII.(A) of this Policy, regardless of whether such date is before or after the Policy Period." All of the allegations of corporate misgovernance lodged against the CBC Outside Directors arise from a common nexus of causally related facts and circumstances, which formed the basis for the FDIC's and CDOB's initial proceedings in June, 2002.

Hartford's coverage position – that the risks resulting from the collapse of CBC should be borne either by the policyholders or by any D&O policy which provided coverage for the policy period after the expiration of its insurance policy – is disingenuous. Putting aside that the FDIC is not going to purchase D&O insurance, no insurance company would sell insurance to a bank that has been taken over by government authorities that would afford coverage for claims like those asserted against the CBC Outside Directors. Indeed, the facts reflect that Hartford had various concerns about CBC's financial activities prior to learning that the FDIC and CDOB had dismissed CBC's Chairman and CEO.

The FDIC and CDOB now concede that Plaintiffs had no involvement in the fraud committed by CBC's Chairman and CEO. The most serious charge that can be leveled against the CBC Outside Directors is that they unwittingly allowed CBC's Chairman and CEO to dupe them (along with FDIC and CDOB regulators and CBC auditors) into approving fraudulent loans. Directors and Officer's insurance policies, like the one Hartford sold to CBC, are supposed to afford protection for "corporate misgovernance" claims, like those asserted against the CBC Outside Directors. Accordingly, Hartford's motion for summary judgment (which in reality seeks an order sanctioning Hartford's conduct, conduct that is antithetical to a company which is supposed to providing "insurance") should be denied.

Finally, Plaintiffs' cross-motion to compel and for a continuance should be granted. Plaintiffs served discovery on Hartford prior to the expiration of the discovery cut-off and Hartford has yet to respond. Plaintiffs should be afforded an opportunity to review this discovery, not only to be afforded the opportunity to fully respond to

Hartford's motion and/or adequately prepare for trial, but also to determine whether

Plaintiffs are in a position to themselves move for summary judgment. Indeed, from

papers submitted by Hartford in its summary judgment papers, Plaintiffs have been able

to locate documents reflecting that statements made in Hartford's papers are erroneous.

## II. FACTS

### A. The Policy

The Directors, Officers and Company Liability Policy no. NDA 0200230-01 (the

"Policy") that Hartford sold to CBC provides coverage for the policy period July 1, 2001

to July 1, 2002. In bold print, on the first page of the Policy, Hartford describes its

coverage as follows:

> **NOTICE: THIS IS A CLAIMS-MADE AND REPORTED POLICY.
> EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THE
> COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR
> WRONGFUL ACTS FOR WHICH CLAIMS ARE FIRST MADE WHILE
> THE POLICY IS IN FORCE AND WHICH ARE REPORTED TO THE
> INSURER NO LATER THAN SIXTY (60) DAYS AFTER THE
> TERMINATION OF THE POLICY.**

Stewart Exh. "A," Complaint, at P 0039.

Section IV(A) of the Policy defines "Claim" as:

> **a written demand for civil damages or other civil relief commenced by the
> Insureds' receipt of such demand,**

> **a civil proceeding commenced by the service of a complaint or similar
> pleading, or**

> **a formal administrative or regulatory proceeding commenced by the filing of
> a notice of charges, formal investigative order or similar document,**

> **against Directors or Officers ... for a Wrongful Act, including any appeal
> therefrom.**

Section IV(O) of the Policy defines "Wrongful Act" as:

5

**any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, committed or attempted by the Directors and Officers, in their capacity as such, or in an Outside position ...**

Section IV (I) of the Policy defines "Interrelated Wrongful Acts" as:

**Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.**

The Policy provides that Hartford shall advance on behalf of the Officers and

Directors "Claims Expenses" that they incur in connection with Claims made against

them, "prior to the disposition of such Claims." *See* Section III.(C). Section IV(B) of the

Policy defines "Claims Expenses" as:

**that portion of Loss consisting of reasonable and necessary fees (including attorneys' fee and experts' fees) and expenses incurred in the defense or appeal of a Claim, but shall not include the wages, salaries, benefits or expenses of any Directors, Officers or employees of the Company.**

Section VI(D) of the Policy, states that **"[a]ll Claims arising out of the same**

**Wrongful Act or Interrelated Wrongful Acts of one or more of the Insureds shall be**

**considered a single Claim. Such Claims shall be deemed to be first made on the date**

**the first Claim is made or deemed to be made pursuant to Section VIII.(A) of this**

**Policy, regardless of whether such date is before or during the Policy Period."**

Section VIII. (A) of the Policy, entitled "Notice" and explicitly referred to in

Section VI(D) described immediately above, states as follows:

**If during the Policy Period the Insureds become aware of a specific Wrongful Act that may reasonably be expected to give rise to a Claim against any Director or Officer ... and if such Wrongful Act is reported to the Insurer during the Policy Period in writing with particulars as to the reasons for anticipating such Claim, the nature and dates of the alleged Wrongful Act, the alleged damages sustained, the names of potential claimants, any Director or Officer involved in the alleged Wrongful Act and the**

**manner in which the Insureds first became aware of the specific Wrongful Act, then any Claim subsequently arising from such duly reported Wrongful Act shall be deemed under this Policy to be a Claim made during the Policy Period in which the Wrongful Act is first reported to the Insurer.**

**B.    The Outside Directors' Meeting with Banking Regulators**

On June 25, 2002, approximately one week before the July 1, 2002 expiration of

the Policy, CBC's Board of Directors met with regulatory officials from the FDIC and

CDOB. These officials advised the Board of Directors that CBC's Chairman Randolph

Lenz and its President and CEO J. Donald Weand, Jr. were being dismissed from their

positions at CBC because of alleged misconduct. The Board of Directors was provided

with the following documents at this meeting:

1) A letter dated June 25, 2002 from the FDIC to the Board of Directors stating that, pursuant to Section 38 of the Federal Deposit Insurance Act, the FDIC had issued a Prompt Corrective Directive Ordering Dismissal (the "Dismissal Order") regarding Messrs. Lenz and Weand;

2) A copy of the Dismissal Order;

3) A letter dated June 25, 2002 from the FDIC to the Board of Directors advising them that a joint examination conducted by the FDIC and the State of Connecticut on April 1, 2002 revealed that CBC was "Critically Undercapitalized," as defined in Section 38 of the Federal Deposit Insurance Act, 12 U.S.C. § 1831o, thereby requiring the FDIC to take certain mandatory and discretionary actions, and warning that the FDIC would be required to place CBC in receivership if certain steps were not taken by CBC to ensure compliance;

4) A letter dated June 25, 2002 from the CDOB to the Board of Directors stating that the April 1, 2002 joint examination revealed that the "overall financial condition of [CBC] has deteriorated to the point where the bank is no longer viable." In this letter, the Commissioner of the CDOB ordered CBC's Board of Directors to arrange an immediate $35 million capital infusion into CBC in order to bring it into compliance with a prior Cease and Desist Order entered on November 30, 2001.

The Dismissal Order recited a range of allegedly improper conduct resulting in the FDIC's determination that CBC was "critically undercapitalized" as revealed by the FDIC and CDOB joint examination on April 1, 2002, and it referenced various prior proceedings in which CBC had been found to be in noncompliance, including the November 30, 2001 Cease and Desist Order. Among other things, the Dismissal Order concluded that Randolph Lenz, Chairman of the Board of Directors and the majority shareholder of CBC, had caused or permitted CBC to make $20 million in loans to nominee borrowers and others, including related interests of Lenz.

The Dismissal Order also discussed improper corporate governance at CBC, stating:

> Management of the Bank under the control of Chairman Lenz is poor. Weak risk management practices in many areas of Bank supervision are evident. Despite being warned of loan administration weaknesses, Respondent Lenz has continued to cause or permit the Bank to approve or allow renewal of loans despite the fact that prudent underwriting, effective administration, or adequate oversight appears absent. The findings of the 2002 examination of the Bank indicate that the Bank is in non-compliance with numerous provisions of the November 30, 2001 Cease and Desist Order. The amount of adversely classified loans as of the 2002 examination is $97,584,000.

See Stewart Exh. "A," Dismissal Order, at P 0065.

## C.    The FDIC'S Appointment as Receiver of CBC

On June 26, 2002, the day after the CDOB and the FDIC met with CBC's Board of Directors, the Commissioner of the CDOB commenced a legal proceeding in the Superior Court of Connecticut entitled *John P. Burke, Commissioner of Banking v. Connecticut Bank of Commerce*, pursuant to Sections 36a-220 and 26a-223 of the Connecticut General Statutes, for an *ex parte* order appointing the FDIC as Receiver of

8

CBC. *See* Stewart Exh. "A," Complaint, at P 0078-0091. In its submission to the Court,

the Commissioner concluded that CBC was "insolvent and in such condition that it is

unsafe and unsound for such institution to continue business in that its liabilities exceed

its assets and it is in an unsafe or unsound condition pursuant to section 8(b) of the

Federal Deposit Insurance Act, 12 U.S.C. § 1818(b)." *Id.*, at P 0080. Howard Pitkin,

Administrator of Depository Institutions for the CDOB, submitted an affidavit dated June

26, 2002 in connection with the Commissioner's application stating that, in the opinion of

the CDOB, CBC's Board of Directors had engaged in conduct contributing to CBC's

unsound loan practices. In his affidavit, Mr. Pitkin stated:

> On Sunday, June 23, 2002, the Board of Directors of CBC approved two
> loans totaling $11.5 million, which are exceptions to the Bank's credit
> policy. One loan for $6.5 million was disbursed without financial
> statements, which are critical to making a prudent credit decision. This
> is an unsafe and unsound loan practice and results in a dissipation of the
> Bank's assets.
>
> As a result of this transfer and as [sic] the resulting capital position the
> Bank is insolvent. There is a reasonable likelihood that an unsafe and
> unsound condition exists which is likely to have an adverse effect upon
> depositors or creditors of Connecticut Bank of Commerce.

Stewart Exh. "A," Complaint, at P 0090.

Mr. Pitkin further stated that a joint examination of CBC by the CDOB and FDIC

on April 1, 2002 revealed that CBC was not in compliance with several provisions of the

November 30, 2001 Cease and Desist Order. Stewart Exh. "A," Complaint, at P 0089.[1]

In the November 30, 2001 Cease and Desist Order, CBC had agreed to cease, among

other things: "operating with a board of directors ("Board") that fails to provide adequate

supervision and direction to the operating management of the Insured Institution." *Id.,* at

---

[1]    Mr. Pitkin stated that the Cease and Desist Order was dated November 28, 2001.
In fact, it is dated November 30, 2001. *See* Stewart Exh. "A," Complaint, at P 0111.

P 0095. Moreover, in the November 30, 2001 Cease and Desist Order, CBC's Board of Directors was ordered to take a number of steps to address the FDIC's and CDOB's concerns. *Id.,* at P 0023, ¶ 27.

Based on the papers filed by the Commissioner, the Connecticut Superior Court issued an Order appointing the FDIC as Temporary Receiver for CBC on the basis that "[t]here is reasonable likelihood that an unsafe or unsound condition exists which is likely to have an adverse effect upon the depositors and creditors of [CBC]." *See* Stewart Exh. "A," Complaint, at P 0013-0014.    Thereafter, the FDIC was in charge of all matters relating to CBC, including insurance matters.

### D.    CBC'S Notification to Hartford

On June 26, 2002, CBC's Chief Operating Officer Darren Schulman, acting with advice from CBC's outside counsel, the law firm of Day, Berry & Howard, LLP, notified Hartford in writing that CBC's officers and directors, including but not limited to CBC's Chairman Randolph Lenz and its President and CEO J. Donald Weand, Jr., "may be subject to claims for wrongful acts." Mr. Schulman informed Hartford that CBC had first learned that its officers and directors might be subject to liability for wrongful acts at the meeting with representatives of the CDOB and the FDIC on June 25, 2002. He provided Hartford with a copy of the Dismissal Order, and invited Hartford to contact him "if you have any questions or need additional information." Although Mr. Schulman remained at CBC working for the FDIC and Hudson United Bank, the entity that assumed the insured deposits of CBC, through November, 2002, he was never contacted by Hartford. Schulman Aff., ¶ 4.

CBC's insurance broker also notified Hartford about events at CBC. On July 1, 2002, Swett & Crawford, a wholesale insurance broker, notified Hartford that it had received a "First Report" from its "Producer" on the CBC account, Richard Allocca of First Union Insurance Services Agency ("First Union"). (Copies of the notice documents sent to Hartford by Swett & Crawford are attached to Hartford's summary judgment papers.) According to the facsimile legend on the "First Report" included in Hartford's summary judgment papers,[2] First Union issued its "First Report" on July 1, 2002 at 8:21 a.m. The First Report stated that the date of occurrence was June 27, 2002 and stated: "D&O – INSURED BANK SHUT DOWN & SEIZED BY DEPT OF BANKING. FDIC NAMED AS RECEIVER. SEE NEWS ARTICLES, ACTION DIRECTIVE FROM FDIC." One of the newspaper articles faxed to Hartford explicitly stated that the FDIC had alleged that CBC's board of directors had failed to properly supervise CBC's lending activities.

> In the most recent cease and desist order, the FDIC said that the bank's board failed to provide adequate supervision and direction to management and inadequately implemented a "memorandum of understanding" – a regulatory action one degree less severe – from March 1999.

Apparently, on July 26, 2002, Hartford responded by regular mail to the July 1, 2002 letter of Swett & Crawford, the wholesale insurance broker, acknowledging receipt of both its letter and Darren Schulman's June 26, 2002 letter. Hartford reserved its rights "as to whether the notification letters and attachments thereto constitute a Claim as

---

[2]    The first the CBC Outside Directors learned of the insurance broker's notice was when Hartford filed its summary judgment papers. The CBC Outside Directors have no knowledge of what other information that Hartford received relating to the FDIC's takeover of CBC.

defined by the Policy." In addition, Hartford stated that, "[i]t does not appear that the notification letters have detailed the nature of any wrongful acts, the alleged damages sustained and the names of potential claimants ..." Hartford also reserved its rights and defenses under Endorsement No. 4, the so-called regulatory exclusion. However, Hartford stated that it would defer determination as to whether the notification letters constituted a Claim and/or complied with the notice provisions of the policy "until such time as additional information is received or action by third parties develops."

Based on information contained in Hartford's summary judgment papers, the CBC Outside Directors (who have not been provided with the discovery requested from Hartford) learned that Hartford had received a copy of the November 30, 2001 Cease and Desist Order from First Union Insurance Services Agency on or about June 17, 2002. *See* Stewart Cert., ¶ 16; Stewart Exh. "G," (documents received from First Union). First Union had sent the November 30, 2001 Cease and Desist Order in response to an inquiry from Thomas Iorio, an Assistant Vice President at Hartford. Mr. Iorio was involved in Hartford's decision whether or not to renew the Policy. *Id.* On June 20, 2002, Mr. Iorio notified Wachovia Insurance Services, Inc., a company affiliated with First Union, that he wanted to set up a conference call with CBC to discuss the November 30, 2001 Cease and Desist Order, including "current compliance with C+D order and corrective actions to meet obligations of the C+D order." *Id.* On June 20, 2002, Mr. Iorio of Hartford stated: "[B]asically, I need the full story from the bank on what happened and why, and then what they are doing to correct it and what has happened so far this year to show a positive direction." *Id.* Subsequently, Hartford did not offer to renew CBC's D&O policy.

### E.    The Megaler Action

On or about October 3, 2002, Megaler, S.A., a foreign banking institution located

in Uruguay, commenced an action against, among others, the CBC Outside Directors in

the United States District Court for the Southern District of New York entitled *Megaler,*

*S.A. v. Lentz, et al.*, 02 Civ. 7925 (the "Megaler Action").  With respect to its claims

against the CBC Outside Directors, Megaler largely reiterated the FDIC's and CDOB's

allegations that the Board of Directors had failed to exercise proper corporate governance

and permitted the bank to become insolvent.  For example, Megaler alleged that CBC's

Board of Directors "were aware and had knowledge of CBC Bank's insolvency, at a

minimum, from June 23, 2002 [the date of the two loans totaling $11.5 million described

in Mr. Pitkin's June 26, 2002 affidavit discussed above], and had failed to take steps to

properly supervise CBC's employees."  Stewart Exh. "A," Complaint, at P 0118-0131.

The Outside Directors provided Hartford with written notice regarding the claims alleged

in the Megaler Action and requested defense and indemnification.

On December 9, 2002, Hartford (through its coverage counsel) responded to the

CBC Outside Directors.  Although Hartford claimed that its views were "preliminary"

and that "no definitive coverage analysis can be completed until the issues raised in the

litigation are resolved," Stewart Exh. "A," Complaint, at P 0133, Hartford denied

coverage for the Megaler Action.  *Id.*, at P 0133-0137.

### F.    The Federal and State Regulatory Actions

On November 22, 2002, the FDIC and CDOB each commenced actions against

the CBC Outside Directors arising from their alleged breaches of fiduciary duties and

13

negligence in fulfilling their corporate governance duties as members of the Board of Directors of CBC. As Hartford concedes, copies of the FDIC Notice of Assessment of Civil Money Penalties (the "FDIC Notice"), the CDOB Notice of Intent to Impose Civil Penalty (the "CDOB Notice"), and various related documents were provided to Hartford. The CBC Outside Directors settled with the CDOB in October, 2003, and with the FDIC in July, 2004. *See* Stewart Exhs. "C" (Settlement and Release agreement dated October 27, 2003 between Steven B. Levine, one of the CBC Outside Directors, and the CDOB) and "D" (Settlement and Release Agreement dated July 6, 2004 between the FDIC and the CBC Outside Directors ("FDIC Settlement Agreement")).

In the Settlement and Release Agreement executed between the CDOB and each of the CBC Outside Directors, the CBC Outside Directors denied the truth of the allegations contained in the CDOB Notice. *See, e.g.,* Stewart Exh. "C". Moreover, each Settlement and Release Agreement with the CDOB stated that "[e]xcept as otherwise set forth herein, this Agreement shall be a final adjudication establishing no liability on the part of the Respondent with respect to the allegations contained in the Notice." *Id.* The FDIC Settlement Agreement explicitly acknowledged that the FDIC claims against the CBC Outside Directors arose from "negligence in fulfilling their corporate governance duties as directors of CBC." Stewart Exh. "D." It further acknowledged that the "FDIC has not alleged and does not claim that the Outside Directors participated in or had contemporaneous knowledge of the fraud alleged by the FDIC against Randolph W, Lenz and J. Donald Weand, Jr." *Id.* And the FDIC Settlement Agreement stated that each of the CBC Outside Directors had filed an Answer, demanded a hearing, and that the parties had settled the matter "to avoid the uncertainty, trouble, and expense of further

14

litigation." *Id.* Hartford's refusal to acknowledge that the Policy afforded coverage for the Claims arising from the collapse of CBC dramatically influenced the CBC Outside Directors' decision to settle the federal and state regulatory actions.  Levine Aff., ¶ 26.


### G.    The Threatened Class Action

On January 3, 2003, two or more of the outside directors received a letter from a law firm purportedly representing stockholders of CBC, who were stockholders prior to January 1, 2002 and remained stockholders as of June 26 and 27, 2002.  This letter stated in part:

> As a result of your participation in unsafe and unsound practices in connection with [CBC], and by reason of your using your official position in a manner contrary to the interests of [CBC], said shareholders lost all value in their shares by reason of the conduct of [CBC] and the FDIC on or about June 26 and June 27, 2002.  The average value of said shares as traded in the three month period prior to June 26 and June 27 was $2.57 per share, which represents the loss per share of our clients resultant from your conduct as above described and as determined by the Banking Department of the State of Connecticut.

> We assume that [CBC] maintained directors and [sic] liability insurance for the bank and its officers and directors, and that your conduct as above described is covered by said policies …

> If we do not hear from you or the carrier within thirty (30) days from the date of this letter, we will have to take whatever actions are necessary to protect our client's[sic] rights and to recover for their losses.  We believe that you, individually, are both jointly and severally responsible for our client's [sic] loss.

*See* Stewart Exh. "A," Complaint, at P 0140

On January 10, 2003, Hartford was notified about the Threatened Shareholder Action.  On February 3, 2002, Hartford's counsel responded, and again denied coverage.

Stewart Exh. "A," Complaint, at P 0144.  To date, the Threatened Shareholder Action has
not been commenced.


**H.**    **The Bazinet Action**

On January 23, 2004, an attorney, Samuel Reiser, commenced a third-party action
against the CBC Outside Directors in the New York Supreme Court, County of New
York, entitled *Bazinet v. Kluge,* Index No. 110143/01 (the "Bazinet Action").   Reiser had
deposited $2,730,000 into his attorneys' escrow account prior to the FDIC's takeover of
CBC.  His third-party complaint against the CBC Outside Directors seeks contribution
and indemnification arising from precisely the same allegations included in the FDIC
Notice filed fourteen months earlier.  *Compare* Stewart Exh. "B," Bazinet Third-Party
Complaint, with the FDIC Notice attached as Exhibit 3 to the Palermini Affidavit
accompanying Hartford's motion.  Hartford has been provided with a copy of the Bazinet
Complaint.

## III.    ARGUMENT

As discussed below, Hartford's motion for summary judgment should be denied and Plaintiffs' cross-motion to compel and for a continuance should be granted.

### A.    Summary Judgment Standard

The party seeking summary judgment carries the burden of demonstrating that there is no genuine material dispute of fact. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). Summary judgment is only appropriate when there is no dispute as to a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In assessing the record, to determine if such issues exist, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721 (2d Cir.1994). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000). "If as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995); *see also Brady v. Colchester*, 863 F.2d 205, 210-11 (2d Cir. 1988).

Applying these established rules of law to the facts of this case demonstrates that Hartford's motion for summary judgment must be denied in its entirety.

**B.    Interpretation Of Insurance Policies**

The rules for construing insurance policies under Connecticut law are well settled. As the court recently stated in *Ohio Casualty Insurance Co. v. Dentek, Inc.*, 283 F. Supp. 2d 655, 659 (D. Conn., 2003):

> An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy. The policy words must be accorded their natural and ordinary meaning. Under well established rules of construction, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy.

*See also Costabile v. Metro. Prop. & Cas. Ins. Co.*, 193 F. Supp. 2d 465, 475 (D. Conn. 2002). Indeed, if the terms of the policy are of doubtful meaning, the construction most favorable to the policy holder must be adopted. *Id.*

It is firmly established under Connecticut law that the obligation to pay defense costs is independent of, and broader than, the duty to indemnify. *Keithan v. Massachusetts Bonding & Ins. Co.*, 159 Conn. 128, 267 A.2d 660, 665-66 (Conn. 1970). Even if the allegations only "appear" to state a covered claim, the insurance company must defend its policyholder. *See West Haven v. Commercial Union Ins. Co.*, 894 F.2d 540, 544 (2d Cir. 1990) (Connecticut law); *LaBonte v. Federal Mut. Ins. Co.*, 159 Conn. 252, 268 A.2d 663 (1970). This is true despite the fact that "the insurer will eventually be able to establish that it has no duty to indemnify the insured." *Firestine v. Poverman*, 388 F. Supp. 948, 950 (D. Conn. 1975); *accord Krevolin v. Dimmick*, 39 Conn. Supp. 44,

18

467 A.2d 948, 951 (Conn. Super. 1983) ("duty to defend must be exercised regardless of whether the original suit is totally groundless or regardless of whether, after full investigation, the insurer got information which categorically demonstrates that the alleged injury is not in fact covered").

Although Hartford's Policy does not impose an express duty to defend upon Hartford, it does provide that Hartford will pay on behalf of CBC's Directors and Officers "Loss which the Directors and Officers shall become legally obligated to pay," and "Loss" is explicitly defined to include "Claims Expenses." Moreover, Hartford has an obligation to advance defense costs to Plaintiffs. Courts have established that an insurance company's obligation to reimburse directors and officers attaches, at the latest, when attorneys' fees are incurred. *See PepsiCo., v. Continental Casualty Co.,* 640 F. Supp. 656, 659-60 (S.D.N.Y. 1986); *McGinniss v. Employers Reinsurance Corp.,* 648 F. Supp. 1263, 1271 (S.D.N.Y. 1986); *Okada v. MGIC Indem. Corp.,* 823 F.2d 276, 280 (9th Cir. 1987); *Little v. MGIC Indem. Corp.,* 836 F.2d 789, 793-96 (3d Cir. 1987). Here, Hartford's obligation occurs even earlier because it agreed to "advance" defense costs to CBC's Directors and Officers. *See* Stewart Exh. "A," Complaint, at P. P0043. Courts have held that a breach of an insurance company's duty to pay the costs of defense under a D&O insurance policy will be treated the same way as a breach of the duty to defend. *See Xebec Dev. Partners, Ltd. v. National Union Fire Ins. Co.,* 12 Cal. App. 4th 501, 15 Cal. Rptr. 2d 726, 737 (Cal. App. 1993). *Cf. Milford Hosp. v. Fed. Ins. Co.,* 2002 Conn. Super. LEXIS 3353 (Conn. Super Ct. Oct. 15, 2002) (discussing duty to defend obligation under D&O insurance policy).

**C.    All Claims Against the Outside Directors Stem From the FDIC'S and CDOB'S Initial Allegations of Wrongdoing**

Hartford's argument that the CBC Outside Directors failed to give adequate

detailed notice of the Megaler Action, the Bazinet Action, the State and Federal

Regulatory Actions and all other actions arising or threatened as a result of the collapse

of CBC is misplaced. The Dismissal Order sent to Hartford constitutes a "Claim," as that

term is defined in the Policy, and concerned Wrongful Acts (as that term is defined in the

Policy).[3]    Because all the subsequent actions against the CBC Outside Directors

constitute "Interrelated Wrongful Acts," i.e., acts that arise from a Wrongful Act that has

been reported to Hartford in accordance with Section VIII.(A), Hartford's Policy plainly

affords coverage to the CBC Outside Directors for such actions.

*Seneca Ins. Co. v. Kemper Ins. Co.*, 2004 U.S. Dist. LEXIS 9159 (S.D.N.Y. May

20, 2004), where the court discussed at length the definition of "Interrelated Wrongful

Acts" in an insurance policy and discussed several relevant authorities, is particularly

instructive. In *Seneca*, Seneca Insurance Company provided insurance to USA

Equestrian for the period July 18, 2000 through July 18, 2001. Kemper Insurance

Company provided insurance to USA Equestrian for the period August 31, 2001 through

August 31, 2002. On July 6, 2001, during the Seneca policy, a lawyer for Michael

---

[3]    In a footnote, Hartford erroneously argues that the Dismissal Order did not
constitute a "Claim" because "the Policy provides coverage for direct liability of CBC
only for 'Securities Claims' and 'Employment Practices Claims.'" Hartford Br. at p. 13,
n.8. Section IV(A) of the Policy defines "Claim" as, among other things, a formal
administrative or regulatory proceeding commenced by the filing of a notice of charges,
formal investigative order or similar document" against the "Directors and Officers."
Stewart Exh., "A," Complaint, at P 0043. The Dismissal Order does not identify a party
and the focus of the document is on the activities of CBC's Chairman and CEO which the
FDIC and CDOB alleged were part of a "fraudulent scheme of unlawful and unsound
lending." *See* Stewart Exh. "A," Complaint, at P 0066.

Gallagher wrote a letter to USA Equestrian accusing it of antitrust violations. On August 29, 2002, Gallagher and JES, an unrelated entity engaged in the same business as Gallagher, jointly commenced an antitrust action against USA Equestrian. USA Equestrian submitted the claim to Kemper, which rejected it on the basis that it was "first made" during the period of Seneca's policy. Seneca, which had provided a defense to USA Equestrian, sued Kemper to recover costs of defense. The *Seneca* court held that the July 6, 2001 letter from Gallagher constituted a "Claim" under the Policy, and that Gallagher's and JES's August 29, 2002 jointly filed complaint arose from "Interrelated Wrongful Acts."

The *Seneca* court held that there was "a sufficient factual nexus between the Wrongful Acts from which the Gallagher Claim and the JES Claim arose to justify their classification as Interrelated Wrongful Acts." 2004 U.S. Dist. LEXIS 9159, at *26. In relevant part, the *Seneca* court stated:

> The Wrongful Acts underlying the Gallagher Claim and the JES Claim are neither factually nor legally distinct, but instead arise from common facts. The JES Complaint itself details numerous logically connected facts and circumstances between them." The complaint alleges that both plaintiffs intended to promote "'A' rated hunter and jumper Recognized Horse Shows on certain dates and in certain locations" (Plaintiff's Opposition, JES Compl. P 39), both attempted to secure such dates (id. at P 40), both applied for such dates between 2000 and 2003 (id. at P 41, 42), USA Equestrian denied certain of these dates (id. at P 43), USA Equestrian denied these dates on the basis of the mileage rule (id. at P 44), the mileage rule gives USA Equestrian "a virtual monopoly over the ability to hold 'A' rated hunter and jumper and Recognized Horse Shows" (id. at P 46), the mileage rule prohibits "new promoters" like both plaintiffs from entering the marketplace (id. at P 51), both plaintiffs are "within the sector of the economy endangered by the breakdown of competition as a result of the enforcement of the Mileage Rule" (id. at P 52), both plaintiffs are "the target against which the antitrust activity is directed" (id. at P 53), and USA [*27] Equestrian's conduct has damaged both plaintiffs' businesses (id. at P 54). Moreover, the attorney who drafted the July 6,

> 2001 Gallagher Claim on behalf of Gallagher is the same attorney who
> drafted the July 26, 2002, letter on behalf of JES and Gallagher and
> who filed the JES Complaint.

*Id.*

Likewise, here all the claims against the CBC Outside Directors arise from

common facts first reported to Hartford in June, 2002. These common facts discussed in

the Dismissal Order include:

1)    The criticisms of the Bank's practices in the November 30, 2001 Cease

and Desist Order (referenced in the Dismissal Order), including loan weaknesses and

weak risk management practices;

2)    The joint examination of CBC by CDOB and the FDIC which indicated

that the Bank was in noncompliance with numerous provisions of the November 30, 2001

Cease and Desist Order; and

3)    The fraudulent scheme of unlawful and unsound lending by CBC's

Chairman, including $20 million in loans to nominee borrowers and others.

These very same facts lie at the core of each of the allegations against the CBC

Outside Directors, who are accused of corporate misgovernance for allowing these

matters to take place on their watch.

Moreover, by July 1, 2001, Hartford (which had previously received, at a

minimum, the November 30, 2001 Cease and Desist Order on June 17, 2002 in

connection with its review of whether to renew the Policy), had newspaper articles

further describing events at CBC, including the FDIC's takeover and the reasons therefor,

that form the basis of each of the actions against the CBC Outside Directors. Hartford's

tacit argument that it can disregard materials it received on July 1, 2002 at 8:32 a.m.

because the policy's period ended a few hours earlier is belied by the language of the

Policy stating that the policyholder had sixty (60) days to file Claims after the expiration of the Policy.

None of Hartford's notice cases address the significance of the "Interrelated Wrongful Act" clause contained in the Policy.[4]  Accordingly, each of these cases is inapposite.  Hartford's policy-based argument that it establishes reserves based on the information that it has received at the expiration of the Policy (Hartford Br. at pp. 14-15) merely underscores that Hartford should be required to turn over the information responsive to Plaintiffs' document request, including reserve, underwriting and claims information, before Plaintiffs are required to respond to Hartford's motion.  Indeed, after taking over CBC, the FDIC may have been in contact with Hartford regarding the Policy and its allegations of wrongdoing against CBC's directors and officers.  Without Hartford's documents, there is simply no expedient way to discover this information.

At the very least, the provisions of Hartford's Policy as to what notice must be given with regard to claims and potential claims stemming from the initial "Claim" reported during the relevant time (here, within sixty (60) days from the termination of the

---

[4]    *See, e.g., FDIC v. Mijalis*, 15 F.3d 1314, 1330 (5th Cir. 1994) (no discussion of Interrelated Wrongful Acts); *Home Ins. Co. v. Adco Oil Co.*, 154 F.3d 739, 742 (7th Cir. 1998); *FDIC v. Caplan*, 838 F. Supp. 1125, 1130 (W.D. La. 1993) (same); *Sapp v. Greif*, 1998 U.S. App. LEXIS 6668, at *14-15 (10th Cir. Apr. 3, 1998) (same); *American Home Assur. Co. v. Abrams*, 69 F. Supp. 2d 339, 348-49 (D. Conn. 1999) (same).  Indeed, the *American Home Assurance* case supports Plaintiffs because it notes that the question under a claims-made policy is whether the insurance company was put on notice of an act, error or omission that could reasonably be expected to give rise to a claim under the Policy and, if so, whether the claims that were actually filed can be considered as arising out of such act, error or omission.  Given all of the information provided to Hartford during the policy period and within the sixty (60) day period following the termination of the policy, including the November 30, 2001 Cease and Desist Order, the Dismissal Order, the First Report provided by First Union, and the two newspaper articles that accompanied the First Report, the actions later filed against the CBC Outside Directors certainly can be considered as arising out of the acts, errors and omissions described in the various documents sent to Hartford.

Policy) are ambiguous and must be construed against the insurance company and in favor of coverage. *See McCuen v. American Casualty Co.*, 946 F.2d 1401, 1406 (8th Cir. 1991) (holding that policy provisions regarding notice were ambiguous). The CBC Outside Directors' construction of the Policy – that all actions arising from the collapse of CBC are deemed to fall within Hartford's Policy – is more reasonable than Hartford's view that the post-July 1, 2002 lawsuits against the CBC Outside Directors stemming from CBC's collapse should be borne by a subsequent insurance company. A subsequent insurance company would undoubtedly argue that the claims against the CBC Outside Directors arose prior to the July 1, 2002. In *ITC Investments, Inc. v. Employers Reinsurance Corp.*, 2000 Conn. Super. LEXIS 3544 (Conn. Super. Ct. 2000), for example, a case upon which Hartford relies, the insurance company providing a professional malpractice policy successfully argued that a lawyer's letter constituted a "Claim" prior to the inception of its policy.

In sum, Hartford's reliance on the notice provisions of Section VIII.(A) to avoid coverage for claims asserted against the CBC Outside Directors arising from the collapse of CBC is thoroughly misplaced. As in *Seneca*, the sufficiency of the notices and information provided to Hartford within sixty (60) days of the expiration of the Policy obligate Hartford to provide coverage to the CBC Outside Directors for claims that were asserted against them after the termination of the policy.

**D.    The Regulatory Exclusion Did Not Permit Hartford to Disregard its Obligation to Advance Claims Expenses for the Regulatory Actions**

Hartford argues that the so-called Regulatory Exclusion (Stewart Exh. "A," Complaint, P. 0056) precludes coverage for all costs associated with the investigations

24

and actions initiated by the FDIC and CDOB. However, under Connecticut law, where an insurance company sets up a special exclusion for the purpose of withdrawing a specific liability from coverage, the insurance company bears the burden to demonstrate that coverage is excluded. *American Ins. Co. v. Saulnier*, 242 F. Supp. 257, 259 (D. Conn. 1965). Furthermore, insurance policies are to be interpreted in a manner that gives "operative effect" to "each sentence, clause and word ... if that can be done by any reasonable construction." *Buell Indus. v. Greater N.Y. Mut. Ins. Co.*, 259 Conn. 527, 539, 791 A.2d 489 (2002). In addition, the interpretation of insurance policies is based on the intent of the parties, that is, "the coverage that the insured expected to receive coupled with the coverage that the insurer expected to provide, as expressed by the language of the entire policy." *Wentland v. Am. Equity Ins. Co.*, 267 Conn. 592, 600-01 (2004) (emphasis supplied). Applying this settled law to the language of the Policy demonstrates that Plaintiffs' construction of the Regulatory Exclusion is more reasonable than Hartford's.

Section III.(C). of the Policy states that Hartford is obligated to advance defense fees to the CBC Outside Directors despite the fact that such fees are potentially not covered under the Policy. It states: "Subject to Section VII. of this Policy [the allocation provisions] the Insurer shall advance on behalf of the Insureds Claims Expenses which Directors and Officers ... have incurred in connection with Claims made against them, prior to the disposition of such Claims, provided always that to the extent it is finally established that any such Claims Expenses are not covered under this Policy, the Insureds, as appropriate, agree to repay the insurer such non-covered Claims Expenses." The Regulatory Exclusion, on the other hand, states that Hartford is not liable to pay

"Loss" in connection with actions brought by regulatory authorities against CBC's Directors and Officers, but will pay up to $2.5 million in Claims Expenses "in the event ... of a judgment or other final adjudication establishing no liability on the part of any Insureds for any Claim(s) which would otherwise be excluded by the terms of [the Regulatory Exclusion]. The most reasonable construction of the Policy is that Hartford is obligated to advance up to $2.5 million in defense costs to the CBC Outside Directors in connection with regulatory investigations and proceedings; however the CBC Outside Directors potentially are obligated to repay advancements of defense fees if they are not exonerated of specific charges.

Under Hartford's construction of the Policy, the only way the CBC Outside Directors can recover their defense costs is to personally stake the massive cost of proceeding to trial against the Government. For example, as Dr. Levine explains in his affidavit, despite the fact that the CBC Outside Directors believed, and continue to believe, that they engaged in no improper or unlawful conduct, Dr. Levine was told that his defense costs alone could be $1.5 million. Levine Aff., ¶ 21. Few individuals, and certainly none of the CBC Outside Directors, are able to muster together such a defense fund without a tremendous strain on their personal resources and manner of living – if they can do it at all. The more reasonable construction of the Policy is that Hartford is supposed to advance the funds necessary for the CBC Outside Directors to conduct a complete defense. This way a director or officer of a company can litigate against the Government without hocking his or her family's future – unless and until there is an adverse decision, at which time the insurance company is entitled to reimbursement of

the defense costs it has advanced regarding the specific charge for which the director has been found liable.

Hartford's construction of the Policy also is unreasonable because it lumps together all charges brought by regulatory authorities and fails to credit the instances when the policyholder demonstrates that he or she is innocent of charged conduct. For example, both the FDIC and CDOB proceedings alleged numerous charges of improper conduct on the part of the CBC Outside Directors.[5] Yet, the Settlement Agreements reflect that the CDOB and FDIC concluded that the CBC Outside Directors were innocent of the vast majority of the charges against them.[6] For example, the CDOB Settlement explicitly states that "[e]xcept as otherwise set forth herein, this Agreement shall be a final adjudication establishing no liability on the part of the Respondent with respect to the allegations contained in the Notice." Similarly, the FDIC Settlement expressly states that the FDIC had not found that the CBC Outside Directors engaged in fraudulent activities. Indeed, even the modest settlement payments made by the CBC Outside Directors reflect that the CDOB and FDIC generally absolved the CBC Outside Directors of wrongful conduct in connection with the collapse of a bank having

---

[5]    As Hartford writes in its brief: "The [November 22, 2002] FDIC Proceeding alleges that the respondents, who include Plaintiffs in this action, participated in various straw loan schemes and made and/or authorized improper loans and loan extensions that were poorly written, violated CBC's loan policy or exhibited other unsafe or unsound characteristics." Hartford Br. at p. 8.

[6]    These Settlement Agreements constituted a "final adjudication" of the Claims asserted by the state and federal regulatory authorities. *See Janus Films, Inc. v. Miller*, 801 F.2d 578, 581-82 (2d Cir. 1986); *Nance v. N.Y. Police Dep't*, Civ. No. 01-7345, 2002 U.S. App. LEXIS 4129, * at 7 (2d Cir. March 13, 2002 ) ("In this case, because the stipulation agreement dismissed [plaintiff's] action 'with prejudice,' it has the effect of a final adjudication on the merits.").

approximately $97 millions in assets.[7]   Under the Plaintiffs' construction of the Policy,

to the extent that the CBC Outside Directors have been found innocent of charged

conduct, they would have no obligation to reimburse Hartford for defense costs

associated with such charges.   Where, as here, Hartford never paid such defense costs,

the CBC Outside Directors are entitled to recover them with respect to charges for which

they were determined not to be liable.

The CBC Outside Directors' construction of the Policy also is more reasonable

because it advances a public policy concern of encouraging settlement of actions. *See*

*Associated Elec. & Gas Ins. Servs., Ltd. v. Rigas,* 2004 U.S. Dist. LEXIS 4498 (E.D. Pa.

Mar. 17, 2004) (discussing public policy factors supporting court's decision that

insurance company had to advance defense costs to directors under D&O policy).   If

Hartford had not breached its obligation to advance defense costs to the CBC Outside

Directors, it surely would have encouraged the CBC Outside Directors to settle with the

CDOB and FDIC for modest amounts rather than incur enormous attorneys' fees

litigating through trial.   As explained in Dr. Levine's affidavit, for economic reasons, the

CBC Outside Directors resolved all regulatory actions and their total costs associated

with such actions (defense fees and settlement payments) were a fraction of the amount

they anticipated for just defense costs.

Finally, the CBC Outside Directors' construction is more reasonable because it

reduces future insurance coverage disputes.   Hartford's position is that regulatory actions

are the concern of directors and officers unless and until they are exonerated of charges at

trial.   However, had Dr. Levine and the other CBC Outside Directors had the resources to

---

[7]      As stated in Dr. Levine's affidavit, the total amount of the settlements for both
regulatory actions was $560,000.  Levine Aff., ¶¶ 21, 23.

litigate against the Government (while shouldering the expense of defending themselves

in the civil litigations), exonerated themselves in the regulatory proceedings and the

presented millions of dollars in defense costs for reimbursement, Hartford undoubtedly

would challenge the bills for reasonableness, multiplicity or some or similar excuse.  If

Hartford is advancing the defense funds, as it would under the CBC Outside Directors'

construction of the Policy, Hartford will be forced to monitor the defense bills as they are

incurred, thus reducing the possibility of future disputes about such bills.

> **E.    Hartford's Wrongful Denial of its Obligation to Advance Defense Costs Obligates it to Reimburse the CBC Outside Directors for Defense Costs in All Actions and Settlement Costs in the Regulatory Actions**

Courts across the country have held that insurance companies that forsake the

defense obligations they owe to their policyholders do so at their own risk.  For example,

Connecticut law "imposes upon an insurer as a penalty for breaching its duty to defend an

insured, the obligation to <u>indemnify</u> its insured against a judgment which, under the

contract of insurance most strictly construed against the insurer, it would otherwise not be

compelled to shoulder."  Pollack, The Supreme Court of Connecticut 1967-68, 43 Conn.

B.J. 117, 130 (1969).  *See also Keithan v. Massachusetts Bonding and Ins. Co.,* 159

Conn. 128, 139, 267 A.2d 660 (1970); *Firestine v. Poverman,* 388 F. Supp. 948, 950 (D.

Conn. 1975).

In *Lexington Ins. Co. v. Devaney,* 1995 U.S. App. LEXIS 4976 (9th Cir. Mar. 9,

1995), the Ninth Circuit held that an insurance company which had breached its

obligation under a D&O insurance policy to reimburse a director for his defense costs

was liable for the full $5 million judgment against the director despite the D&O policy

limit of $1 million.  The *Devaney* court stated that "when an insurer fails to accept a

reasonable settlement offer within policy limits because 'it believes the policy does not

provide coverage [it] assumes the risk that it will be held liable for all damages resulting

from such refusal, including damages in excess of applicable policy limits.'"  1995 U.S.

App. LEXIS 4976 at *4, *citing Consolidated American Ins.Co.  v. Mike Soper Marine

Services,* 951 F.2d 186, 190 (9th Cir. 1991).

        Here, as stated in Dr. Levine's affidavit, Hartford's refusal to afford a defense to

the CBC Outside Directors for any of the CBC-related actions – the Megaler Action, the

State and Federal Regulatory Actions, the Bazinet Action – effectively left the CBC

Directors no choice but to settle with the FDIC and CDOB because of mounting

economic pressures.  As the *Devaney* court stated in discussing the steps that a director,

Barg, took after his D&O insurance company declined coverage:

> Lexington's refusal of coverage caused Barg to take steps to protect
> himself.  "When the insurer exposes its policyholder to the sharp thrust
> of personal liability by breaching its obligations, the insured need not
> indulge in financial masochism."

1995 U.S. App. LEXIS 4976 at *7.

        Here, Hartford assumed the risk that it would be liable for settlements with

regulatory officials that would otherwise be outside the coverage of the Policy when it

wrongfully refused to provide a defense to the CBC Outside Directors.  However, it is

worth noting that Hartford will be obligated to pay substantially less than it would have

had it provided a defense to the CBC Outside Directors through trial.  *See* Levine Aff.,

¶¶ 23-24.

        Moreover, where Hartford abandoned its policyholders in the hope of avoiding

coverage, this Court should excuse the non-occurrence of the condition that Plaintiffs be

exonerated in the regulatory proceedings in order to recover their defense costs.    At

minimum, if the CBC Outside Directors can establish that Hartford suffered no material

prejudice from their settlements with the regulatory authorities, this Court should excuse

their failure to proceed to trial in such proceedings. *See Aetna Casualty & Surety. Co. v.*

*Murphy,* 206 Conn. 409, 412-14, 538 A.2d 219 (1988) (holding that condition precedent

that policyholder provide timely notice or forfeit coverage can be excused in order to

avoid a disproportionate forfeiture of coverage).

**F.    Plaintiffs' Cross-Motion to Compel and for a Continuance Should be
       Granted**

Plaintiffs' cross-motion to compel and for a continuance should be granted.    A

party requesting further discovery pursuant to Rule 56(f) must demonstrate (1) particular

facts sought and the manner in which they are to be obtained, (2) how those facts would

establish a genuine issue of material fact, (3) efforts made to obtain those facts, and (4)

why the efforts were unsuccessful. *Ruotolo v. DOJ,* 53 F.3d 4, 11 (2d Cir. 1995);

*Parsons v. UPS, Inc.,* 2002 U.S. Dist. LEXIS 27345 (D. Conn. Jan. 2, 2002).    The

movant must establish that the material sought is germane to the defense and is neither

cumulative nor speculative. *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d

Cir. 1994).

Plaintiffs seek to compel Hartford to produce the documents responsive to

Plaintiffs' Document Request.    Hartford's summary judgment motion is based on the

alleged lack of notice that it received during the relevant period concerning CBC.

However, as demonstrated by documents that Plaintiffs received from First Union after

reviewing Hartford's summary judgment papers, Hartford apparently received notice of

31

regulatory proceedings at CBC prior to the termination of its policy, despite contrary statements in its papers. Plaintiffs served their document requests prior to the expiration of discovery (albeit as a precautionary measure, since the parties were engaged in settlement discussions), and has demanded that Hartford produce responsive documents. To date, although Hartford has agreed to produce documents, it has not done so. A number of Plaintiffs' document requests seek documents that would reflect what Hartford knew about CBC, and when it knew it.

The documents requested from Hartford may also shed light on the relationship between Hartford and other insurance professionals that had involvement in CBC's insurance program, and reflect what these other professionals knew about the FDIC's takeover of CBC and when they knew it. As discussed above, First Union sent newspaper articles to Swett & Crawford along with the July 1, 2002 notice regarding the FDIC's takeover of CBC. Under certain circumstances, notice to Hartford's agent can constitute notice to Hartford. *See Green Door Realty Corp. v. TIG Ins. Co.,* 329 F.3d 282, 289-90 (2d Cir. 2003) (holding that there were material issues of fact concerning existence of principal-agency relationship between insurance agent who received timely notice and insurance company).

Plaintiffs seek a brief continuance to review the documents it requested from Hartford, conduct a short investigation, and re-file its opposition papers in this action together with a cross-motion, if deemed appropriate, for summary judgment against Hartford.

IV.    **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully request that Hartford's

motion for summary judgment be denied and that their cross-motion to compel and for a

continuance be granted.

Dated: January 10, 2005

Respectfully submitted,

By:_____
Charles A. Stewart, III (CT 17452)
cstewart@somlaw.com
STEWART OCCHIPINTI, LLP
1350 Broadway, Suite 2200
New York, New York  10018
(212) 239-5500

and

WEINSTEIN & WISSER, P.C.
Richard P. Weinstein (CT 06215)
29 South Main Street, Suite 207
West Hartford, CT 06107
(860) 561-2628

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------------X

MARSHALL ASCHE, STEVEN B. LEVINE,
TIMOTHY S. REED, MARCIAL CUEVAS and
JACK WILLIAM DUNLAP,

Plaintiffs.

-against-                                             Dkt. No. 3:03cv416 (PCD)

HARTFORD INSURANCE COMPANY
OF ILLINOIS,                                          **CERTIFICATE OF
SERVICE**

Defendant.

----------------------------------------------------------------X

      Charles A. Stewart, III, an attorney admitted to practice in the United States
District Court for the Southern District of New York and admitted pro hac in the
United States District Court for the District of Connecticut in the above action,
certifies, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that on January 10,
2005, in addition to service by email, I served the attached ***Plaintiffs' Cross-Motion
to Compel and for a Continuance, accompanying Memorandum of Law and Local
Rule 56(a)(2) Statement*** upon all counsel of record in this action by depositing true
copies of the same, each enclosed in a pre-paid envelope, in a depository maintained
by the Federal Express, addressed to the following at the address provided by each for
that purpose, to wit:

                    Alan J. Joaquin, Esq.
                    Drinker Biddle & Reath, LLP
                    1500 K Street N.W.
                    Suite 1100
                    Washington, D.C. 20005-1208

                    W. Joe Wilson
                    Tyler Cooper & Alcorn, LLP
                    185 Asylum Street
                    Hartford, CT  06103-3488

Dated: January 10, 2005

                         _____
                              Charles A. Stewart, III