UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARSHALL ASCHE, STEVEN B. LEVINE, TIMOTHY S. REED, MARCIAL CUEVAS and JACK WILLIAM DUNLAP,<br><br>Plaintiffs,<br><br>v.<br><br>HARTFORD INSURANCE COMPANY OF ILLINOIS,<br><br>Defendant. | Case No. 303CV0416 PCD |

## CERTIFICATION OF ALAN J. JOAQUIN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Alan J. Joaquin, declare:

1.  I am a member of the bar of New York, Massachusetts and the District of Columbia and have also been admitted *pro hac vice* in this case as counsel for Hartford Insurance Company of Illinois ("Hartford"), the defendant. I am executing this certification in support of Hartford's motion for summary judgment.

2.  I have in my custody a document relating to this action which is referenced in Hartford's response to plaintiffs' supplemental opposition to Hartford's motion for summary judgment filed herewith.

3.  Exhibit A is a true and correct copy of a letter dated March 13, 2003, sent from my office to Clay Parker, Esq. of Kirkland & Lockhard, LLP who, at the time, was counsel for plaintiff Timothy S. Reed.

Executed under penalty of perjury at Washington, D.C. on October 31, 2005.

_____
Alan J. Joaquin

# EXHIBIT A

# DrinkerBiddle&Reath
## L L P

Law Offices

1500 K Street, N.W.
Suite 1100
Washington, DC
20005-1209

202-842-8800
202-842-8465 fax
www.drinkerbiddle.com

PHILADELPHIA
NEW YORK
LOS ANGELES
SAN FRANCISCO
PRINCETON
FLORHAM PARK
BERWYN
WILMINGTON

Alan J. Joaquin
202-842-8832
alan.joaquin@dbr.com

March 13, 2003

Via Federal Express

Clay Parker, Esq.
Kirkpatrick & Lockhard LLP
201 South Biscayne Boulevard
Suite 2000
Miami, FL  33131

RE:  Insurer:    Hartford Insurance Company of Illinois
     Insured:    Connecticut Bank of Commerce
     Matter:     Timothy Reed
     Policy No.: NDA 0200230-01

Dear Mr. Parker:

This is to confirm correspondence received from Mr. Timothy Reed dated January 28, 2003 regarding the above referenced Directors and Officers Liability Policy (the "Policy") issued to Connecticut Bank of Commerce ("CBC") by the Hartford Insurance Company of Illinois ("Hartford"). We represent Hartford in connection with this matter.

According to Mr. Reed's letter, he contacted Hartford because he has:

> been notified by various parties as to [his] involvement as a
> director of the Connecticut Bank of Commerce, and on
> advice of counsel I am herewith informing you that
> conditions exist which would require me to call upon the
> Directors & Officers insurance coverage provided by
> Hartford under the above referece[d Policy].

Preliminarily, we note that because Mr. Reed does not refer to any "Claim" as defined by the Policy, it is not clear why it was sent at this time. However, we are aware that Mr. Reed has been named as a defendant in an action filed by depositor of CBC in the United States District Court for the District of New York captioned *Megaler, S.A. v. Randolph Lenz, Marshall Asche, Steven Levine, Brian Marks, Timothy S. Reed, Marcial Cuevas, Jack William Dunlap and Eduardo P. Martin*, Case No. 02cv7925 (the "Megaler Action"). Notice of this matter was given to Hartford by letter dated November 8, 2002

Established
1849

DC\373411\1

CBC 000804

DrinkerBiddle&Reath
LLP

Clay Parker, Esq.
March 13, 2003
Page 2

by Mr. Reed's counsel, Day, Berry & Howard. Hartford's response to Mr. Reed's counsel dated December 9, 2002 is attached for your review.

We also understand that Mr. Reed may have been implicated in a potential claim described in a letter by counsel representing certain unknown stockholders of CBC (the "Derivative Action"). Notice of this potential claim was given to Hartford by letter dated January 10, 2003, by Mr. Reed's counsel, Stewart, Occhipinti & Makow LLP. Hartford's response to Mr. Reed's counsel dated February 10, 2003 is attached for your review.

Finally, we note that Mr. Reed was named as a Respondent in a matter brought by the FDIC captioned *In the Matter of: Randolph W. Lenz, J. Donald Weand, Jr., Marcial Cuevas, Jack W. Dunlap, Steven B. Levine, Brian A. Marks, and Marshall C. Asche, individually and as former institution-affiliated parties of Connecticut Bank of Commerce, Stamford, Connecticut*, Case Nos. FDIC-02-174e; FDIC-02-158e; FDIC-02-160c&b; FDIC-02-161c&b; FDIC-02-175k; FDIC-02-176k; FDIC-02-177k; FDIC-02-178k; FDIC-02-179k; FDIC-02-180k; FDIC-02-181k; FDIC-02-182k (the "FDIC Filing").

To date, no one has provided us with notice of the FDIC Filing on behalf of Mr. Reed. Accordingly, this letter will provide you with Hartford's initial views of the allegations set forth in that Filing in light of the terms of the Policy. Please appreciate that these views are preliminary. No definitive coverage analysis can be completed until the issues raised in the litigation have been resolved. Hartford's views are necessarily based upon the unsubstantiated allegations of the complaint and do not reflect an independent assessment of the merits of the claim. We do not intend to suggest that there is any merit to such allegations.

We direct this letter to you as the authorized representative of the persons and entities covered under the Policy. If you are not acting on behalf of these individuals and entities with respect to insurance matters, please forward a copy of this letter to those individuals and entities or to their insurance representative.

## SUMMARY OF THE CLAIM

A. **The FDIC Filing**

   1. **The MTB Transaction and 3/22 Loans**

The FDIC Filing dated November 22, 2002, is captioned *In the Matter of: Randolph W. Lenz, J. Donald Weand, Jr., Marcial Cuevas, Jack W. Dunlap, Steven B. Levine, Brian A.*

DC\373411\1

CBC 000805

DrinkerBiddle&Reath

Clay Parker, Esq.
March 13, 2003
Page 3

*Marks, and Marshall C. Asche, individually and as former institution-affiliated parties of Connecticut Bank of Commerce, Stamford, Connecticut*, Case Nos. FDIC-02-174e; FDIC-02-158e; FDIC-02-160c&b; FDIC-02-161c&b; FDIC-02-175k; FDIC-02-176k; FDIC-02-177k; FDIC-02-178k; FDIC-02-179k; FDIC-02-180k; FDIC-02-181k; FDIC-02-182k.

According to the FDIC Filing, in August 1992, Respondent Lenz acquired more than 80% of the common stock of CBC. Throughout the time during which the transactions at issue occurred, CBC allegedly operated under either an FDIC Memorandum of Understanding dated March 23, 1999 or a Cease and Desist Order issued by the FDIC on November 30, 2001 ("C&D").

It is alleged that on August 4, 1999 – following discussions with the FDIC – CBC submitted an application to the FDIC for permission to purchase substantially all of the banking assets and to assume the deposits and certain liabilities of MTB Bank in New York. The FDIC indicated that it would approve the transaction but only if CBC increased its Tier 1 Capital by not less that $20 million (the "Capital Injection"). Ultimately, the FDIC approved the transaction because Lenz and others represented to the FDIC that the required Capital Injection would be satisfied by Lenz using his personal assets to fund his purchase of $10 million of CBC common stock and $10 million of CBC preferred stock.

The FDIC now alleges that Lenz did not use his own personal assets to satisfy the Capital Injection requirement as he had represented. Rather, it is alleged that Lenz engaged in an improper "straw" or nominee loan scheme. To facilitate that scheme, it is alleged that on March 22, 2000, CBC's Board of Directors and its Credit Committee held a joint meeting, during which Weand orally presented for approval certain loans to be issued to Lenz's social acquaintances and/or business associates (the "Straw Borrowers").

According to the FDIC Filing, all of the loans and credit facilities presented at the 3/22 Meeting, plus five loans and facilities that Weand caused to be made without board or credit committee approval (the 3/22 loans), were issued to the Straw Borrowers. The Straw Borrowers, in turn, allegedly "turned over" the loan proceeds to Lenz, either directly or through CBC Investment Partnership ("CBCIP"), an entity referred to in the FDIC Filing simply as "a related interest of Respondent Lenz." The proceeds were allegedly used to fund the purchase of $20 million in CBC common and preferred stock to purportedly satisfy the FDIC's Required Capital Injection.

It is further alleged that on March 5, 2001, during the joint FDIC/State of Connecticut Department of Banking examination, Lenz wrongfully denied that the 3/22 Loan

CBC 000806

DC\373411\1

DrinkerBiddle&Reath

Clay Parker, Esq.
March 13, 2003
Page 4

Proceeds were the source of funds used to satisfy the FDIC's Capital Injection requirement.

Based on the foregoing, it is alleged the Capital Injection, a written condition of the FDIC's approval of the MTB Transaction, was never satisfied. In addition, it is alleged that the transactions violated Generally Accepted Accounting Principles and the FFIEC's Instructions for the Preparation of Consolidated Reports of Condition and Income ("Call Report Instructions"). These principles and instructions required CBC to deduct from its capital account any capital contributions that were funded by CBC Loans. Because this was not done, the Call Reports (required to be filed by CBC with the FDIC) are alleged to have been materially inaccurate and falsified under the direction and/or with the consent of Lenz and/or Weand.

### 2. The 6/21 Loans

The FDIC Filing also alleges that in June 2000, CBC had loans or other credit facilities outstanding to National Pallet Leasing Systems, LLC ("NPLS"), who did not have the financial capacity to repay these loans. Because the loans and facilities were delinquent, CBC could not dispose of them. Accordingly, it is alleged that Lenz and Weand implemented another straw or nominee loan scheme to make them appear current so that they could be sold.

In furtherance of the scheme, it is alleged that the Peachtree Group, LLC ("Peachtree") was formed by F. Ross Walpole (the indirect owner of NPLS) and his wife as agents for Lenz. The Credit Committee then met on June 21, 2000 and approved seven loans totaling about $11.25 million (6/21 Loans) to entities alleged to be controlled by Lenz, his adult children or his business associates. In recommending the loans, it is alleged that Weand falsely represented to the Credit Committee that their proceeds would be used as working capital or as commercial mortgages. Ultimately, the loans were approved at the 6/21 meeting despite the fact they allegedly exhibited "more than the normal risk of repayment and/or other unsafe or unsound characteristics."

Once disbursed, it is alleged that $5 million of the 6/21 Loan Proceeds were transferred to Peachtree and used to purchase from CBC "a 100% participation in the majority of the NPLS Loans."[1] Then, on December 18, 2001, the Walpoles transferred to Lenz the

---

[1] At the time the 6/21 Loans were approved, Weand allegedly knew of their fraudulent nature, but did not disclose it to the Credit Committee Members.

DrinkerBiddle&Reath

Clay Parker, Esq.
March 13, 2003
Page 5

interest in Peachtree. It is alleged that because CBC was able to dispose of the previously delinquent NPLS Loan, CBC's condition appeared in the Bank's June 30, 2000 Call Reports to be materially better than it actually was and that CBC was meeting certain provisions of the Memorandum of Understanding, when it in fact was not.

### 3. Additional Loans

In and after March 2000, it is alleged that additional loans or loan modifications (the "Additional Loans") were made by CBC to one or more of the 3/22 Straw Borrowers and/or others. A portion of the proceeds from the Additional Loans were allegedly used by CBCIP to pay interest due on the 3/22 and 6/21 Loans. Other portions of the proceeds allegedly were used to provide operation funds to Lenz and his other entities.

According to the FDIC, Lenz referred the Additional Related Loans to CBC and caused them to be issued while knowing they would not be used for their stated purposes. Similarly, it is alleged that Weand orally presented many of the Additional Loans to CBC's Credit Committee and recommended that they be approved while being aware that they were poorly underwritten, violated the Bank's loan policy or exhibited other unsafe or unsound characteristics.

### 4. The 6/23 Meeting

Finally, it is alleged that in June 2002, the FDIC and State examiners (the "Regulators") informed CBC that they planned to hold meetings with CBC's management and its Board of Directors on June 24 and 25, 2002. Accordingly, the FDIC alleges that prior to June 23, 2002, Lenz and Weand were aware that the results of the 2002 Examination were likely to show a severe deterioration in CBC's condition and that there was a possibility that the Regulators might restrict CBC's ability to extend credit.

Therefore, on June 23, 2002, a Sunday evening, CBC's Board of Directors allegedly held a meeting by telephone. Respondents Lenz, Weand, Cuevas, Dunlap, Levine, Reed and Asche are alleged to have participated. During that meeting a number of one-year extensions of maturity on loans to individuals and entities closely associated with Lenz were presented to and approved by the Board (the "6/23 Extensions"). The 6/23 Extensions were allegedly approved upon oral presentations only. In addition, it is alleged that two new large structured finance proposals totaling $11.5 million (the "6/23 New Loans") were presented to and approved by the CBC Board of Directors at the meeting. According to the FDIC, all the 6/23 Extensions and Loans violated the C&D and exhibited numerous unsafe and unsound characteristics.

CBC 000808

DC\373411\1

DrinkerBiddle&Reath

Clay Parker, Esq.
March 13, 2003
Page 6

Based on the above-described conduct, Lenz and Weand, and the fact that each of the other Respondent Directors are alleged to have taken part in approving the loans and extensions at issue despite the fact "that circumstances existed in connection with each of these loans [and extensions] that should have caused the Respondent Directors to question their propriety," the FDIC Filing provides notice of the following:

1) Notice To Prohibit From Further Participation in the conduct of the affairs of any insured depository institution against Lenz and Weand. This charge is based on allegations that Lenz and Weand: violated laws, rules, regulations, cease and desist orders and conditions imposed by Regulators; and engaged in unsafe or unsound practices and breaches of fiduciary duty. The Notice also alleges that "by reason of the violations, unsafe or unsound practices and breaches of fiduciary duty": (a) CBC has suffered or will suffer loss or damage; (b) "Respondent Lenz and Respondent Weand have received financial gain or benefit;" and (c) such transactions "involve [their] personal dishonesty."

2) Notice of Charges for Orders of Restitution against Lenz and Weand. This Notice alleges that Lenz was unjustly enriched in the amount of at least $20 million in this matter and that he and Weand caused or were primarily responsible for causing CBC to issue loans having a present aggregate unpaid balance of at least $34 million.

3) Notice of Assessment Of Civil Money Penalties, Findings of Fact and Conclusions of Law against all Respondents alleging that each of them knowingly violated law and/or regulations and "knowingly and/or recklessly caused a substantial pecuniary gain or other benefit by reason of such acts."

4) Order To Pay Civil Money Penalties for the conduct described in the FDIC Filing. The FDIC asserts that these penalties should be in the amounts of $2 million and $1 million respectively for Lenz and Weand and that the other Respondent Directors be assessed fines of either $500,000 (Cuevas, Dunlap and Levine) or $250,000 (Reed, Marks and Asche).

5) Notice Of Hearing scheduled no less than 60 days from the date of service of the FDIC Filing.[2] The purpose of the hearing is to take evidence on the charges asserted in the filing and to determine whether a permanent order should be issued to prohibit Lenz and Weand from further participating in the conduct of the affairs of any insured depository institution without the prior consent of the FDIC. The Notice of Hearing also states that if the Respondents fail to request a hearing regarding the Penalties imposed, the penalty assessed in the FDIC Filing will be final.

---

[2] At this time, we do not know whether this hearing has yet occurred.

**DrinkerBiddle&Reath**

Clay Parker, Esq.
March 13, 2003
Page 7

### COVERAGE ISSUES[3]

Hartford issued the Policy to CBC with a Policy Period of July 1, 2001 to July 1, 2002. The Policy has a Limit of Liability of $5,000,000, subject to a $200,000 Retention under Insuring Agreements B and C. The Policy does not provide for any duty or obligation on the part of Hartford to defend the Directors and Officers.

Insuring Clause A of the Policy provides coverage for Loss that the Directors and Officers become legally obligated to pay as a result of a Claim first made during the Policy Period for a Wrongful Act that took place during or prior to the Policy Period. Insuring Clause B provides coverage to CBC for loss to the extent it has indemnified the Directors and Officers for an otherwise covered Loss. Because the FDIC Filing names individuals only, and because CBC appears to be Financially Insolvent,[4] coverage, if any, would fall under Insuring Clause A.

As stated above, Endorsement No. 4 to the Policy excludes from coverage any Claim made against the Directors and Officers . . . brought by or on behalf of the Resolution Trust Corporation, Office of Thrift Supervision, Federal Deposit Insurance Corporation ("FDIC") the Comptroller of the Currency, or similar federal or state supervisory or regulatory authority." Section IV(A) of the Policy defines "Claim" as including "a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document. Directors and Officers, in turn, are defined pursuant to Section IV(D) to include one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors or officers of [CBC]."

Based on the foregoing Policy provisions, it appears that the FDIC Filing constitutes a Claim made against Directors and Officers which have been brought by the FDIC. Accordingly, the Policy would provide no coverage for any liability the Insureds may have incurred by reason of that matter.

We do note, however, that Endorsement No. 4 also provides that in the event of a judgment or other final adjudication establishing no liability on the part of any Insured

---

[3] As the Sections and Endorsements of the Policy referred to in this letter are merely summarized, and because other Sections and Endorsements may apply, we recommend that you read the Policy in its entirety.

[4] Section IV.G defines Financial Insolvency as including the status of CBC resulting from the appointment of a receiver (in this case, the FDIC).

CBC 000810

DC\373411\1

DrinkerBiddle&Reath
L L P

Clay Parker, Esq.
March 13, 2003
Page 8

for any Claim which would otherwise be excluded by the terms of Endorsement No. 4, the Claims Expenses incurred in connection with that Claim – up to a $2.5 million Limit of Liability – will not be excluded from coverage by reason of that Endorsement. All other terms, conditions and exclusions of the Policy, however, including the applicable Retention, continue to apply. In that regard, we wish to bring to your attention the following Policy provisions:

Section III(A) provides that No Claims Expenses shall be incurred without Hartford's prior written consent. Section IV(B) of the Policy defines Claims Expenses as that portion of Loss consisting of reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense or appeal of a Claim, but shall not include the wages, salaries, benefits or expenses of any Directors, Officers or employees of the Company. Please advise whether or not Mr. Reed is seeking Hartford's consent to incur defense costs in this matter

Section V of the Policy, as amended by Endorsement No. 1 to the Policy, excludes coverage of Loss, including Claims Expenses, incurred in connection with any Claim made against the Directors and Officers for based upon, arising from, or in any way related to the following:

(I) the Insured(s) gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled;

(J) any deliberate dishonest, malicious or fraudulent act or omission or any willful violation of law by such Insured if a judgment or other final adjudication adverse to the insured establishes such an act, omission or willful violation;

(M) the rendering or failure to render professional services in connection with the Company's business.

## CONCLUSION

Based on the forgoing, it would appear that there would be no coverage for any liability resulting from the FDIC Filing. Of course, if you have any other questions or comments, or if you disagree with the analysis set forth above or in the attached letters, please promptly advise us of your views in writing together with any information that you believe Hartford should consider.

Please appreciate that Hartford's continuing attention to these matters is not intended as an admission of coverage. Accordingly, Hartford respectfully reserves all of its rights

DC\373411\1                                                                                                CBC 000811

DrinkerBiddle&Reath
L L P

Clay Parker, Esq.
March 13, 2003
Page 9

and defenses under the Policy, in equity and at law. Hartford also reserves its right to raise additional Policy terms and conditions, if and when it may be appropriate to do so.

Sincerely yours,

*Alan Joy*

Alan J. Joaquin

Enclosures

cc: Mr. Timothy Reed
Swett & Crawford

CBC 000812

DC373411\1