UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARSHALL ASCHE, STEVEN B. LEVINE, TIMOTHY S. REED, MARCIAL CUEVAS and JACK WILLIAM DUNLAP, Plaintiffs, | : : : : |
| vs. | : Case No: 3:03cv416 (PCD) : : |
| HARTFORD INSURANCE COMPANY OF ILLINOIS, Defendant. | : : : |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, former directors and officers of the Connecticut Bank of Commerce ("CBC"), allege that Defendant, the Hartford Insurance Company of Illinois ("Hartford"), breached the terms of an insurance policy it issued to CBC and seek a declaratory judgment finding that the policy covers certain claims that have been, "or may be," asserted against Plaintiffs by third parties.  Defendant moves for summary judgment on Plaintiffs' Complaint.  For the reasons set forth herein, Defendant's Motion for Summary Judgment [Doc. No. 21] is **granted**.

**I.     BACKGROUND**

Plaintiffs are individual directors and officers of CBC, and are insured by Defendant's Directors, Officers and Company Liability Policy ("Policy").  The coverage period for the Policy extended from 12:01 a.m. on July 1, 2001 through 12:01 a.m. on July 1, 2002. (See Policy, Ex. A to Def.'s Mot. Summ. J.)

On June 25, 2002, the FDIC issued a seven-page order entitled "Prompt Corrective Action Directive Ordering Dismissal" (the "Dismissal Order") in an action entitled *In the Matter of Connecticut Bank of Commerce Stamford, Connecticut* (FDIC-02-101 PCAD).  The Dismissal

Order notes weaknesses in CBC loan management practices, specifically attributable to the leadership of Randolph Lenz, Chairman of CBC's Board, and J. Donald Weand, Jr., CBC's President and Chief Executive Officer, and orders the prompt dismissal of Lenz and Weand. Specifically cited in the Dismissal Order are a prior criticism of Lenz in 2001 for causing or permitting CBC to engage in lax, preferential and hazardous lending practices and administrative weaknesses resulting in a FDIC Cease-and-Desist order dated November 30, 2001, an ill-advised $3,795,000 credit line referred to CBC by Lenz extended to a gaming operation in Panama, an apparently fraudulent scheme of unlawful and unsound lending necessary to obtain the $20 million required to purchase another lending institution using CBC's own funds, and Weands' demonstrated failure and/or inability to exhibit the management necessary to stop the above practices. (See Dismissal Order, Ex. 6 to Palermini Aff.)

By letter dated June 26, 2002, CBC Chief Operating Officer Darren Schulman, notified Defendant of the Dismissal Order and attached a copy of the same. The letter indicates that CBC's "directors and officers, including but not limited to its Chairman Randolph W. Lenz and its President and CEO J. Donald Weand, Jr., may be subject to claims for wrongful acts." (Schulman Letter, Ex. 6 to Palermini Aff.)

Following receipt of this letter, a number of events transpired that potentially concerned Defendant's liability under the Policy. By letter dated July 1, 2002 and sent by facsimile at 8:21 a.m. that day, CBC's insurance broker, Swett & Crawford, forwarded Defendant a General Liability Notice of Occurrence/Claim form. (Brancaleoni Letter, Ex. 7 to Palermini Aff.) The occurrence described therein was a series of news articles indicating that CBC had been shut down and seized and that the FDIC was named as receiver. (See id.) The articles cite "large loan losses" and failure to maintain adequate capital as the reasons for the bank's decline. (Id.)

On October 3, 2002, Megaler, S.A., an Uruguay corporation maintaining a commercial deposit account with CBC, commenced an action in the U.S. District Court for the Southern District of New York against directors Lenz, Plaintiffs and Brian Marks and officer Eduardo P. Martin (the "Megaler Action"). (See Ex. 1 to Palermini Aff.; Ex. G to Compl.)  Megaler alleged that the Connecticut Department of Banking ("CDOB") and the FDIC found, after a joint examination conducted on April 1, 2002 (the "Joint Examination"), that CBC was insufficiently funded by $34,500,000 and that CBC's earnings were insufficient to fund this deficiency. Allegedly, Martin, an officer at CBC and defendant in the Megaler Action, met with Megaler one week after the Joint Examination and represented that "the financial condition of CBC Bank was sound, and without problems," after which Megaler deposited $2,693,103.18 in its CBC account.  The Megaler Action claims that director Lenz and Plaintiffs are liable for negligent supervision and breach of fiduciary duty for allowing Martin to make the alleged misrepresentations.

On November 22, 2002, the FDIC filed a Notice of Assessment of Civil Money Penalties (the "FDIC Proceeding") captioned *In the Matter of: Randolph W. Lenz, J. Donald Weand, Jr., Marcial Cuevas, Jack W. Dunlap, Steven B. Levine, Brian A. Marks, and Marshall C. Asche, individually and as former institution-affiliated parties of Connecticut Bank of Commerce, Stamford, Connecticut*, Case Nos. FDIC-02-174e; FDIC-02-158e; FDIC-02-160c&b; FDIC-02-161c&b; FDIC-02-175k; FDIC-02-176k; FDIC-02-177k; FDIC-02-178k; FDIC-02-179k; FDIC-02-180k; FDIC-02-181k; FDIC-02-182k. (See Ex. 2 to Palermini Aff.) As stated in the Notice, the FDIC found that CBC's directors wrongfully approved a number of large commercial loans between March 22, 2000 and June 23, 2002. (See id. at 11-27.)

On November 22, 2002, the CDOB served on director Brian Marks notice of an Intent to Impose Civil Penalties upon him (the "CDOB Proceeding"). (See Ex. 3 to Palermini Aff.) The CDOB sought penalties for the approval of sixteen loans in March 2000.

Plaintiff Levine received a letter dated January 3, 2003 from stockholders of CBC "who were stockholders prior to January 1, 2002 and remain stockholders as of June 26 and 27, 2002 and continue to won and hold stock certificates issued by said bank." (Stockholder Letter, Ex. 5 to Palermini Aff.) The letter alleges that Plaintiff Levine's conduct resulted in a loss to CBC stock of $2.57 per share and asserts that Plaintiff Levine is jointly and severally responsible for that loss. (Id.) By letter dated January 10, 2003, an attorney for Plaintiff Levine notified Defendant of "a claim or potential claim by or on behalf of certain unnamed stockholders of CBC and against CBC, its officers and directors . . .," and forwarded Defendant a copy of the stockholder letter. (Stewart Letter, Ex. 5 to Palermini Aff.)

Thereafter, on March 10, 2003, Plaintiffs filed the present complaint seeking a declaratory judgment that Defendant is obliged to pay loss and claim expenses for (1) regulatory proceedings initiated by the CDOB and the FDIC against Plaintiffs in connection with the FDIC's appointment as Receiver for CBC, (2) claims asserted against Plaintiffs in the Megaler Action and (3) potential future claims against Plaintiffs arising from the dismissal of CBC's Chairman, President and CEO and the FDIC's appointment as Receiver for CBC.  Defendant now moves for summary judgment on the complaint.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 69, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v.Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

   The moving party bears the burden of establishing that summary judgment is appropriate, Anderson, 477 U.S. at 225, however, when moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.") The non-moving party, in order to defeat summary judgment, must then come forward with "sufficient evidence favoring the nonmoving party for a

jury to return a verdict for that party." Anderson, 477 U.S. at 249. In making this determination, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

### III.   DISCUSSION

Defendant moves for summary judgment, arguing that (1) the claims for which coverage is sought were not first made during the policy period; (2) those claims and potential claims may not be deemed first made during the policy period; and (3) the policy's regulatory exclusion precludes coverage.  Plaintiffs respond that Defendant's arguments are without merit..

####   A.   Standard for Interpreting Insurance Policies

Courts shall construe provisions of an insurance agreement by the same general rules that govern the interpretation of any written contract and shall enforce the same in accord with the true intent of the parties as exhibited through the express language of the policy. O'Brien v. U.S. Fidelity and Guar. Co., 235 Conn. 837, 842, 669 A.2d 1221 (1996).[1]  Under generally applicable rules of contract construction, unambiguous words in a policy shall be accorded their natural and ordinary meaning; courts should not construe the language so as to give it a meaning other than that intended by the parties. Id.  The policy must be reviewed as a whole, considering all relevant portions together, and whenever possible operative effect should be given to all provisions in order to reach a reasonable overall result. Id. at 843.  Language shall be construed according to the understanding of laymen, not according to the understanding of sophisticated underwriters. Id.  Moreover, any ambiguities in the policy shall be resolved against the party responsible for drafting it. Id.

**B.     Claims-Made Policies**

The present policy is an example of a claims-made policy or, more accurately, a claims-made-and-reported policy.[2]  Such a policy provides coverage for a claim first asserted against the insured during the policy period, *if* the insured reports the claim during the policy period or within a specified time after learning of the claim, without regard to the date of the incident giving rise to the claim. See Textron, Inc. v. Liberty Mut. Ins. Co., 639 A.2d 1358, 1361 n.2 (R.I.

---

[1]     The parties rely on Connecticut law in their briefs and do not argue that the law of another jurisdiction should apply.

[2]     A prominent notice on the first page of the Policy provides: "THIS IS A CLAIMS-MADE AND REPORTED POLICY.  EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED TO LIABILITY FOR WRONGFUL ACTS FOR WHICH CLAIMS ARE FIRST MADE WHILE THE POLICY IS IN FORCE AND WHICH ARE REPORTED TO THE INSURERS NO LATER THAN SIXTY (60) DAYS AFTER THE TERMINATION OF THE POLICY."

1994) (citing, among others, Burns v. Int'l Ins. Co., 929 F.2d 1422 (9th Cir. 1991); Esmailzadeh v. Johnson & Speakman, 869 F.2d 422 (8th Cir. 1989)); Cabrera v. United Coastal Ins. Co., Nos. CV040833416S, CV040833417S, 2005 WL 1971216, at *4-5 (Conn. Super. Ct. July 18, 2005). In contrast, an occurrence-based policy provides coverage based whether the injury-causing event, or "occurrence," takes place during the policy period, without regard to whether the resulting claim is brought against the insured during or after the policy period. Textron, 639 A.2d at 1361 n.1; Cabrera, 2005 WL 1971216 at *5. Claims-made policies extinguish the "never-ending-tail liability" characteristic of occurrence policies.[3] Textron, 639 A.2d at 1361 n.2; American Home Assur. Co. v. Abrams, 69 F. Supp. 2d 339, 346-47 (D. Conn. 1999).

### C. Plaintiffs' Compliance with Policy Requirements

Defendant argues that the Schulman letter, dated June 26, 2002, sent days prior to the July 1, 2002 Policy expiration and enclosing the FDIC Dismissal Order of non-parties Lenz and Weand, is insufficient to invoke coverage. Plaintiffs respond that the facts articulated in that order sufficiently apprise Defendant of "wrongful acts" to implicate coverage.

Section I(A) of the Policy serves as the relevant starting points for resolving the present motion. It provides as follows:

> the Insurer will pay on behalf of the Directors and Officers Loss which the Directors and Officers shall become legally obligated to pay as a result of a Claim first made during the Policy Period . . . against the Directors and Officers for a Wrongful Act which takes place during or prior to the Policy Period . . . provided, however, as a condition precedent to any such coverage, the Insureds shall report such Claim . . . to the Insurer as soon as practicable but in no event later than sixty (60) days after the termination of the Policy Period or Discovery Period, if applicable.

---

[3] "Tail" coverage refers to the lapse of time between the occurrence and the claim.

(Policy § I(A), Ex. A to Def.'s Mot. Summ. J.)  By its terms, Section I(A) limits coverage to (1) claims for (2) wrongful acts (3) made while the policy is in force and (4) reported no later sixty days after the termination of the policy. (Id.)  The above statement cannot reasonably be read in the disjunctive, thus Plaintiffs must satisfy all four requirements in order to establish entitlement to liability coverage.

The first question then is whether a claim has been asserted against Plaintiffs within the Policy period.  Section IV(A) of the Policy defines "claim" as:

> (1) a written demand for civil damages or other civil relief commenced by the Insureds' receipt of such demand; (2) a civil proceeding commenced by the service of a complaint or similar pleading, or (3) a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, against Directors or Officers . . . for a Wrongful Act, including any appeal therefrom.

(Policy § IV(A).)  Plaintiffs do not contend that the administrative proceedings culminating in the FDIC's Dismissal Order constitutes a claim against them.  The only directors or officers who could characterize such an order as a claim are the non-parties—i.e., Lenz and Weand—named in the order.  Plaintiffs do not otherwise provide documents indicating they were personally involved in that proceeding through a notice of charges, formal investigative order or other document(s) that would serve to establish the existence of an administrative proceeding against them.  The letter itself belies the existence of a claim during the Policy period, indicating that CBC's "directors and officers, including but not limited to its Chairman Randolph W. Lenz and its President and CEO J. Donald Weand, Jr., *may be subject to claims* for wrongful acts." (Schulman Letter, Ex. 6 to Palermini Aff. (emphasis added).)

As there is no evidence as to the existence of a claim against Plaintiffs arising during the Policy period, Plaintiffs must find an alternative means of satisfying the requirements of the

Policy. Plaintiffs offer such an alternative, arguing that findings set out in the Dismissal Order constitute a "wrongful act"[4] and/or "interrelated wrongful act,"[5] as defined in the Policy, thereby rendering claims arising after the Policy period timely pursuant to the following notice provision:

> If during the Policy Period the Insureds become aware of a specific Wrongful Act that may reasonably be expected to give rise to a Claim against any Director or Officer . . . and if such Wrongful Act is reported to the Insurer during the Policy Period in writing with particulars as to the reasons for anticipating such a Claim, the nature and dates of the alleged Wrongful Act, the alleged damages sustained, the names of potential claimants, any Director or Officer involved in the alleged Wrongful Act and the manner in which the Insureds first became aware of the specific Wrongful Act, then *any Claim subsequently arising from such duly reported Wrongful Act shall be deemed under this Policy to be a Claim made during the Policy Period in which the Wrongful Act is first duly reported to the insurer*.

(Policy § VIII(A) (emphasis added).)

A plain reading of this provision indicates that proper notice requires (1) a report to the Insurer (2) during the Policy period (3) including certain details, specifically (a) the reasons for anticipating the claim, (b) the nature and dates of the alleged wrongful act, (c) the alleged

---

[4] Section IV(O) of the Policy defines "Wrongful Act" as: "(1) any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, committed or attempted by the Directors or Officers, in their capacity as such, or in an Outside Position, or with respect to Insuring Agreement (C), by the Company, or (2) any manner claimed against the Directors and Officers solely by reason of their serving in such capacity or in an Outside Position."

[5] Section IV(I) of the Policy defines "Interrelated Wrongful Act" as: "Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." While Plaintiffs make much of this term in reference to Defendant's obligation to provide insurance, the reference to 'Interrelated Wrongful Acts' appears not in the Insuring Agreements section of the Policy, Section I, but rather in Section VI, "Limits of Liability, Retention and Coinsurance." The term appears in Section VI(D), which addresses multiple claims, and provides that "[a]ll claims arising out of the same Wrongful Act or Interrelated Wrongful Acts of one or more of the Insureds shall be considered a single Claim." The provision is plainly designed to limit Defendant's potential liability by utilizing monetary limits on coverage, not to expand potential liability to include unidentified, associated acts as Plaintiffs' use of the term would have this Court conclude. The decision relied on by Plaintiffs for expanded scope of coverage using the term "Interrelated Wrongful Act," Seneca Ins. Co. v. Kemper Ins. Co., No. 02 Civ. 10088 (PKL), 2004 WL 1145830, at *4 (S.D.N.Y. May 21, 2004), in fact uses that term to exclude coverage of a particular claim. In any event, the term is not ambiguous, nor is its usage in the present policy.

damages sustained, (d) the names of potential claimants, (e) any Director or Officer involved in the wrongful act and (f) the manner in which the insureds first became aware of the specific wrongful act.  Defendant received a letter from its insureds during the Policy period.  As such, Plaintiffs satisfy the first and second requirements of a report to the Insurer during the Policy period.  The relevant question here is whether the letter itself, or any documents incorporated therein, provide the requisite level of detail necessary to satisfy the notice requirement.

>   The letter sent to Defendant provided, in relevant part:
>
>   I write to provide you with notice in connection with the above-referenced policy. It has come to the attention of the Connecticut Bank of Commerce (the "Insured") that its directors and officers, including but not limited to its Chairman Randolph W. Lenz and its President and CEO J. Donald Weand, Jr., may be subject to claims for wrongful acts. The Insured learned about this matter on Tuesday, June 25, 2002, when it[sic] directors and senior management met with representatives of the Federal Deposit Insurance Corporation ("FDIC") and the State of Connecticut Banking Department. Attached to this letter is the Prompt Corrective Action Directive Ordering Dismissal issued by the FDIC on June 25, 2002, which describes the information that the Insured has obtained at this point in time.

(Schulman Letter, Ex. 6 to Palermini Aff.)  The letter further provided a point of contact at CBC should Defendant "have any questions or need additional information." (Id.)

A cursory review of the letter indicates that it falls well short of satisfying the five requirements unambiguously set forth in the Policy.  There is no indication as to why the substance of the Dismissal Order would be expected to involve claims against Plaintiffs, and the letter does not identify specific wrongful acts that would be anticipated as the basis for claims, damages expected or the identity of potential claimants.  The language in the letter itself attests to the uncertainty provided therein, stating in effect that some or all directors or officers "may be subject to claims for wrongful acts."  In effect, the letter forgoes specific notice requirements, attaching an order that invites Defendant to peruse its contents, contemplate all possible insurance

scenarios and conduct independent inquiry to preserve possible claim coverage for all Plaintiffs—although none were specifically named in the letter—against potential, unidentified claimants. This Court can identify no precedent that would impose such an obligation on Defendant under a claims-made-and-reported policy. See, e.g., Hoyt v. St. Paul Fire & Marine Ins. Co., 607 F.2d 864, 866-67 (9th Cir. 1979) (letter indicating that claims "might be expected to follow" not consistent with "if claim is made" clause in policy); Bodewes v. Ulico Cas. Co., 336 F. Supp. 2d 263, 278-79 (W.D.N.Y. 2004) (describing contents of proper notice in light of policy's notice provision); Sigma Financial Corp. v. American Intern. Specialty Lines Ins. Co., 200 F. Supp. 2d 710, 715 n.5 (E.D. Mich. 2002) ("[c]laims made policies can provide coverage for 'potential claims' if . . . the policy indicates that coverage is provided for claims arising out of an 'occurrence' *sufficiently noticed* during the policy period") (emphasis added)); Federal Sav. & Loan Ins. Corp. v. Burdette, 718 F. Supp. 649, 654 (E.D. Tenn. June 22, 1989) (finding a notice letter to be sufficiently specific where it contained details including the name of the claimant, nature of claims, possible subjects of claim, and the date of their occurrence). Ultimately, the limited savings clause for claims not made during the Policy period is not intended to be a license to preserve coverage for unspecified future claims through a letter best characterized as a "reservation of rights" letter.

     Plaintiffs' remaining arguments are without merit. They argue that Defendant should have made inquiries once it received the letter in an effort to cure any potential defects in this letter, that Defendant had constructive notice of potential claims attributable to its decision not to renew the Policy, and that a failure to hold Defendant would run contrary to its reasonable expectations under the policy. An insurer has no obligation to investigate generally adverse information under a claims-made policy. In re Enron Corp. Securities, Derivative & "Erisa"

Litigation, 391 F. Supp. 2d 541, 552 n.18 (S.D. Tex. 2005) (applying Texas law and noting that "in 'claims-made' policies . . . coverage often extends to future claims . . . but not for merely generalized allegations of wrongdoing or adverse information"). Furthermore, information available in material provided to an insurer by an insured during a policy renewal inquiry will not establish constructive notice of a claim, the factual basis of which may be apparent through review of such material. See, e.g., Am. Casualty Co. v. FDIC, 944 F.2d 455, 460 (8th Cir. 1991) (holding that facts presented during renewal and not in compliance with the policy's requirements did not constitute constructive notice of a claim). Finally, assuming arguendo standard rules of construction apply to a claims-made policy, an interpretation of a policy comports with reasonable expectations if objectively reasonable from a layman's point of view. R.T. Vanderbilt Co., Inc. v. Continental Cas. Co., 273 Conn. 448, 463 (2005). Imposing a lesser notice standard is not objectively reasonable given the express notice requirements of the Policy.

     Plaintiffs bargained for a claims-made-and-reported policy, not an occurrence policy. The prominent notice on the first page of the Policy leaves no doubt as to this conclusion. Claims-made policies place special reliance on notice. Abrams, 69 F. Supp. 2d at 347. Through the notice requirement inherent in claims-made policies, insurers are left with the knowledge that if no claims have been made when the policy period expires, it retains no liability under the policy. Id. This makes the insurer better able to compute reserves and premiums, and the insured benefits from this certainty through lower premiums. Id. As such, if the insured fails to provide adequate notice under the terms of the policy within the policy period, no coverage is provided.

     As is evident by the result suggested by Plaintiffs in this case, an interpretation that reads continued coverage into this Policy would impose an ongoing obligation on Defendant for an indefinite number of claims well after the expiration of the policy. The result would be a claims-

made policy that turns on the uncertainties of acts or omissions during the policy period, thus transforming the claims-made policy into an occurrence-based policy. In another case involving a claims-made policy, the Fifth Circuit noted:

> The purpose of claims-made policies, unlike occurrence policies, is to provide exact notice periods that limit liability to a fixed period of time after which an insurer knows it is no longer liable under the policy, and for this reason such reporting requirements are strictly construed. . . . Allowing coverage beyond that period would be to grant the insured more coverage than that which was bargained for, and to require insurers to provide coverage for risks not assumed.

Nat'l Union Fire Ins. Co. v. Willis, 296 F.3d 336, 343 (5th Cir. 2002) (internal citation and quotation marks omitted). Such a result would not be in accord with the express terms of a claims-made-and-reported policy or the reasonable expectations of the parties in entering into such a policy.

Plaintiffs' failure to establish an entitlement to coverage for claims arising after the Policy period obviates the need to address the remaining issues for which declaratory judgment is sought, specifically which actions and what fees and losses are compensable.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 21] is **granted**. The Clerk shall close the file.

SO ORDERED.

Dated at New Haven, Connecticut, September __, 2006

/s/
Peter C. Dorsey, U.S. District Judge
United States District Court